NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| ISABEL PEREZ, | Hon. Dennis M. Cavanaugh |
| Plaintiff, | **OPINION** |
| v. | Civil Action No. 2:13-cv-00327 (DMC)(JBC) |
| FACTORY DIRECT OF SECAUCUS, LLC d/b/a ASHLEY FURNITURE HOMESTORE, EUGENE CHRINIAN and KATHY MARTIN, | |
| Defendants/Third-Party Plaintiffs, | |
| v. | |
| THE OTTINGER FIRM, P.C., | |
| Third-Party Defendant. | |

DENNIS M. CAVANAUGH, U.S.D.J.:

This matter comes before the Court upon the Motion of The Ottinger Firm, P.C. ("Third-Party Defendant" or "Ottinger") to Dismiss the Third-Party Complaint of Factory Direct of Secaucus, LLC d/b/a/ Ashley Furniture HomeStore ("Ashley"), Eugene Chrinian ("Chrinian"), and Kathy Martin ("Martin") (collectively "Third-Party Plaintiffs") pursuant to FED. R. CIV. P. 12(b)(6). Pursuant to FED. R. CIV. P. 78, no oral argument was heard. Based on the following and for the reasons expressed herein, Third-Party Defendant's Motion to Dismiss is **granted**.

1

## I. BACKGROUND[1]

### A. The Underlying Action

The Plaintiff in the underlying action, Isabel Perez ("Perez"), was employed at Ashley from September 25, 2012 to October 8, 2012 as a Human Resources Director. During her time at Ashley, Perez reported to Martin, Direct of People Services and Development, and Chrinian, Chief Executive Officer. Perez claims that Martin and Chrinian made a number of derogatory racial comments during her interview. For example, she states that Martin referred to African-Americans as "Brownies" and Caucasians as "creamies." She also alleges that Martin asked her about her religious views and that Chrinian asked her about her marital status. After Perez informed Martin and Chrinian that she is a Christian, Chrinian purportedly asked her if she is a "real Christian."

According to Perez, on September 21, 2012, she met with Martin at her request for a meeting at one of Ashley's offices. Perez claims that during this meeting, Martin took hold of her hands began to pray to God, made a number of derogatory remarks about homosexuals, and disclosed that she is often possessed by Jesus. Martin also allegedly made a number of discriminatory comments on September 25, 2012, Perez's first day at Ashley, such as referring to an employee as a "nigga." Perez claims that she asked Martin to stop using such comments in the workplace and that Martin told her that she needed to be more understanding of the company's culture. Perez also states that two other human resources employees informed her that Martin referred to them as "nigga," "lesbo," and "fag," among others names. Perez claims that she continued to raise concerns with Martin about these comments during her two weeks at Ashley and that Martin continued her practice of praying before meetings. Perez also claims that

---

[1] The facts from this section are taken from the parties' pleadings.

2

although she attempted to keep her sexual orientation private, it was well known among her co-workers that she is a lesbian and is married to a woman.

On October 5, 2012, Perez alleges that Martin approached her in the company parking lot and asked about a decal for the Human Rights Campaign that Perez has on her car. Perez states that she explained to Martin that the decal is the "equality symbol." Perez claims that Martin then asked her if the decal was for "the gays," and told Perez that she was not sure if she made the right decision when she hired her because she did not fit in with the culture of the company. Martin then allegedly told Perez that she would "speak to God" about Perez's continued employment with Ashley. Perez was fired the next day. Martin purportedly told Perez that God had spoken to her and told her that she needed to let Perez go. Martin also allegedly told Perez that her beliefs "just don't fit" with Ashley.

On January 17, 2013, Ottinger filed the underlying Complaint in this action on behalf of Perez, alleging that Third-Party Plaintiffs subjected her to discriminatory treatment and harassment due to her sexual orientation, and that she was unlawfully retaliated against after complaining about the discrimination in violation of Section 1981 of the Civil Rights Act of 1866 and the New Jersey Law Against Discrimination.

### B. The Articles

The present action is based on the following five internet articles that were published after the underlying Complaint was filed.

#### 1) The Ottinger Blog Post

Ottinger maintains a website at www.ottingerlaw.com. This website contains a blog with self-authored reports on developments in employment law, and in particular, cases handled by Ottinger. On or about January 22, 2013, Ottinger posted an article on the blog titled "Fired for

Being Gay" (the "Ottinger Blog Post"). The relevant content of the Ottinger Blog Post is as follows:

> On Friday, our employment firm filed an employment discrimination case against Ashley Furniture for firing our client over her sexual orientation. The case has generated media interest (Huffington Post, Courthouse News Service) due to the outrageous nature of the alleged conduct and also because gay rights is becoming a national issue.

### 2) The Spaulding Post

Non-party Pam Spaulding ("Spaulding") maintains a blog at pamshouseblend.firedoglake.com. Third-Party Plaintiffs allege that Spaulding is the author of the Huffington Post article that is referenced to in the Ottinger Blog Post. Spaulding also maintains a social networking presence through the use of a Google+ webpage (the "Spaulding Google+ page"). On January 21, 2013, the Spaulding Google+ Page printed a post (the "Spaulding Post") that included a link to an article about the lawsuit filed by Perez, along with the following excerpt from the article:

> Isabel Perez is suing the Ashley Furniture HomeStore of Secaucus, N.J., Ashley CEO Eugene Chrinian and Ashley's director of people services and development Kathy Martin, in Federal Court because she was fired for being a lesbian. On October 5, 2012, Martin and Isabella [sic] were walking in the parking lot and approached Isabella's [sic] car when Martin asked her about an HRC decal that she had on her car. Isabella [sic] explained to Martin that the decal was an 'equality symbol.' Martin then asked Isabella [sic] if it was for 'the gays' and then told her that she was not sure that she made the right decision about hiring her because she did not fit the 'culture' at the company. Martin then explained that she was going to 'speak to God' about it and wheather [sic] Isabella [sic] should continue her employment with Ashley Furniture.

The same day, Third-Party Plaintiffs alleges that Robert Ottinger, as agent for Ottinger, posted two comments on the Spaulding Post. The first comment states: "As the firm representing Ms. Perez in this case, we appreciate you spreading the news on Google plus!" The second comment states: "As one of the lawyers working on this case, I could

not agree more. This is an important issue. Obama even mentioned gay rights in his speech yesterday – good sign." On January 23, 2013, Perez commented the following on the Post: "thank you for the positive feedback and support!"

### 3) The Winona Daily News Article

Third-Party Plaintiffs allege that Perez was interviewed by the Lacrosse Tribune and that the interview was reprinted in an article titled "Ashley affiliate sued for anti-gay practice" at www.winonadailynews.com. Third-Party Plaintiffs do not identify the relevant portions of this article.

### 4) The AOL Article

On January 30, 2013, AOL printed an article titled "Furniture Chain Exec Allegedly Fired Lesbian Because 'God' Spoke to Her" (the "AOL Article"). The AOL Article contains the following six quotes attributable to Perez (the "AOL Quotes"):

1. "It was uncomfortable," admits Perez. "But as a human resources person, you think you'll be able to change the culture they're putting forward, this is a point I could bring up later and discuss."

2. "She asked me not to be so rigid. "I'm not sure you fit our culture," Perez says she was told. "… She alluded to the fact that I may not be the best Christian."

3. "Is that for the gays, for the lesbos."

4. "The last few weeks, it's been a culmination. I have to think about this. I have to speak to God."

5. "I had just given up everything to join an organization, thinking I could change the culture."

6. "I have to make a difference in the human resources community" she says, "in order to bring awareness to that fact that gay, bisexual, transgender Americans – there are no federal laws that consistently protect us. I want people to understand that this is a real issue."

Third-Party Plaintiffs allege that the source of the AOL Quotes is an email from Gregory

5

Filosa ("Filosa"), an individual who, at the time, was an attorney at Ottinger. The AOL Article also includes the following statement, which is not attributed to any individual: "The owner [of Ashley], Eugene Chrinian, purportedly questioned [Perez] about the ring on her finger, and asked what she felt about hiring gay people and African Americans." Finally, the AOL Article includes the following statement made by Filosa: "'A company's managers are entitled to exercise their own beliefs in their personal lives,' explains Perez's attorney Gregory Filosa, of The Ottinger Firm, P.C., in an email, 'but it is illegal under NJ law for a private employer to terminate an employee because of their sexual orientation, regardless of the employer's religious beliefs.'"

### 5) The Proactive Article

Third-Party Plaintiffs allege that on February 1, 2013, an online blog called "The Proactive Employer" published an article containing the following three quotes from Perez:

1. "It was uncomfortable," she says, "As a human resources person, you think, I'll be able to change the culture... this is a point I could bring up later and discuss."

2. "I had just given up everything to join an organization, thinking I could change the culture."

3. "I have to make a difference within the human resources community."

Third-Party Plaintiffs again allege that an email sent by Filosa is the source of these quotes.

### C. The Instant Action

On February 14, 2013, Third-Party Plaintiffs filed an Answer to Perez's Complaint along with a Third-Party Complaint against Ottinger, alleging i) Defamation, ii) False Light/Defamation by Implication and Conspiracy, and iii) Tortious Interference with Prospective Economic Advantage ("Compl.," ECF No. 5). Ottinger filed the instant Motion to Dismiss on April 1, 2013 ("Def.'s Mot.," ECF No. 15). Third-Party Plaintiffs filed an Opposition on May 6,

2013 (Pl.'s Opp'n," ECF No. 20). Ottinger filed a Reply on May 14, 2013 (ECF No. 23).

## II. STANDARD OF REVIEW

In deciding a motion under FED. R. CIV. P. 12(b)(6), the District Court is "required to accept as true all factual allegations in the complaint and draw all inferences in the facts alleged in the light most favorable to the [plaintiff]." Phillips v. Cnty. of Allegheny, 515 F.3d 224, 228 (3d Cir. 2008). "[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). However, the plaintiff's "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions and a formulaic recitation of the elements of a cause of action will not do." Id. On a motion to dismiss, courts are "not bound to accept as true a legal conclusion couched as a factual allegation." Papasan v. Allain, 478 U.S. 265, 286 (1986). A plaintiff's complaint is subject to the heightened pleading standard set forth in Ashcroft v. Iqbal:

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged . . . Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged - but it has not "show[n]" - "that the pleader is entitled to relief."

556 U.S. 662, 678-79 (2009) (quoting Twombly, 550 U.S. at 557, 750).

## III. DISCUSSION

### A. Defamation

To state a claim for defamation under New Jersey law, a plaintiff must show "(1) that [the] defendant[] made a false and defamatory statement concerning [the plaintiff]; (2) that the statement was communicated to another person (and not privileged); and (3) that [the]

defendant[] acted negligently or with actual malice." G.D. v. Kenny, 15 A.3d 300, 310 (N.J. 2011). A statement is defamatory if it is false and injurious to a person's reputation. Paul v. United Parcel Serv., No. 05-CV-1918, 2005 WL 3307268, at *2 (D.N.J. Dec. 6, 2005). To determine whether a statement is defamatory, courts look at its "content, verifiability, and context." Lynch v. New Jersey Educ. Ass'n, 735 A.2d 1129, 1136 (N.J. 1999). In analyzing the content of a statement, courts must "consider the fair and natural meaning that will be given [to the statement] by reasonable persons of ordinary intelligence." DeAngelis v. Hill, 847 A.2d 1261, 1268 (N.J. 2004) (internal quotations and citation omitted). In analyzing the verifiability of a statement, courts must determine whether the statement is one of fact or opinion. Id. at 1269. Because mere opinions cannot be proven as true or false, they do not give rise to liability unless "they imply false underlying objective facts." Lynch, 735 A.3d at 1137. Finally, with respect to the context of a statement, courts must consider "[t]he listener's reasonable interpretation, which will be based in part on the context in which the statement appears." Ward v. Zelikovsky, 643 A.2d 972, 980 (N.J. 1994).

This Court will address each internet article in turn.

### 1) The Ottinger Blog Post

Third-Party Plaintiffs allege that the Ottinger Blog Post is defamatory because "[t]he headline of the [Ottinger Blog Post], 'Fired for Being Gay,' when read in conjunction with the [f]irst [s]entence, unquestionably indicates and expresses that an individual was, in fact, terminated from their employment with Ashley 'for Being Gay'" (Compl. ¶ 14). The first sentence of the Ottinger Blog Post states the following: "On Friday, our employment law firm filed an employment discrimination case against Ashley Furniture for firing our client over her sexual orientation" (Id. ¶ 13).

8

Third-Party Plaintiffs' argument is unavailing, as the context of the Ottinger Blog Post shows that it is not defamatory. The Ottinger Blog Post simply describes the lawsuit filed by Ottinger on behalf of Perez. The statement that Ottinger "filed an employment discrimination case against Ashley Furniture for firing [Perez] over her sexual orientation" is a true assertion, as this lawsuit was clearly filed. See G.D., 984 A.2d at 187 ("A truthful statement will not support a cause of action based on defamation, and the truth of the statement is an absolute defense to a claim of defamation."). With respect to the title of the Post and the second part of the first sentence, which indicates that Ashley fired Perez over her sexual orientation, Third-Party Plaintiffs unpersuasively argue that "the fact that the . . . statements appeared on a law firm website, authored by a lawyer, actually heightens the defamatory harm of those statements because the readers are more inclined to perceive the contents of the statements as true" (Pl's Opp'n at 17). This Court finds that the opposite is true - the context of the Ottinger Blog Post makes it clear to a reasonable reader that the statements within the Post describe disputed facts in a lawsuit. In fact, the second sentence of the Post explicitly refers to the "*alleged* conduct" of Third-Party Plaintiffs. Accordingly, the Ottinger Blog Post is not defamatory.

### 2) The Spaulding Post

Third-Party Plaintiffs claim that by commenting on the Spaulding Post, Robert Ottinger and Ottinger "endorsed the statements in the Post and adopted the statements contained therein as their own" (Compl. ¶ 27). First, it cannot reasonably be argued that the fact that Robert Ottinger posted two short comments on the Spaulding Post resulted in Ottinger adopting the entire Post.[2] Second, the comments themselves are not defamatory. The first comment states:

---

[2] The only rational explanation for this assertion is that Third-Party Plaintiffs believe that Robert Ottinger's comment that he "could not agree more" is an adoption of the Spaulding Post. However, although Third-Party Defendant does not make this argument, it seems that this comment was actually written in response to another comment made by a reader of the Spaulding Post, rather than to the Spaulding Post itself. The Spaulding Post simply

9

"As the firm representing Ms. Perez in this case, we appreciate you spreading the news on Google plus!" This simple expression of appreciation does not make any reference to Third-Party Plaintiffs and could not be construed by a reasonable reader as defamatory to Third-Party Plaintiffs. The second comment states: "As one of the lawyers working on this case, I could not agree more. This is an important issue. Obama even mentioned gay rights in his speech yesterday – good sign." This comment is an opinion, and Third-Party Plaintiffs' argument that it is a "mixed opinion" is unavailing. A "pure" opinion exists when "the maker of the comment states the facts on which he bases his opinion of the plaintiff and then states a view as to the plaintiff's conduct." Kotlikoff v. The Cmty. News, 444 A.2d 1086, 1089 (N.J. 1982). On the other hand, a "mixed" opinion exists when "an opinion . . . is apparently based on facts about the plaintiff or his conduct that have neither been stated by the defendant nor assumed to exist by the parties to the communication." Id. Pure opinions are not actionable, because when "the facts supporting [an] author's opinion [are] disclosed, readers [are] reasonably able to draw their own conclusions as to whether those facts justif[y] that opinion." Id. at 1090. Robert Ottinger's comments that he "could not agree more" and that "[t]his is an important issue" are pure opinions because Third-Party Plaintiffs allege that the basis for the opinions is the Spaulding Post itself, which is clearly visible to readers of the comments. Accordingly, the Spaulding Post is not defamatory.

### 3) The Winona Daily News Article

Third-Party Plaintiffs allege that Perez was interviewed by the Lacrosse Tribune and that the interview was reprinted in the Winona Article. However, as Third-Party Defendant points out

---

states the alleged facts of the underlying suit. It does not contain any opinions, and therefore it is not logical to suggest that Robert Ottinger wrote that he "could not agree more" in response to the Post. However, the person who commented directly before Robert Ottinger wrote "we think is [sic] not fair what they did to her." Thus, it is rational to conclude that Ottinger intended to express that he "could not agree more" with that reader's comment, not with the Spaulding Post. Regardless, even if Robert Ottinger was expressing agreement with the Spaulding Post, it does not follow that he and Ottinger have adopted the words of the Post as their own.

in its Motion to Dismiss, Third-Party Plaintiffs do not make any allegation that Ottinger provided defamatory statements for the Winona Article. Third-Party Plaintiffs do not attempt to explain this deficiency in their Opposition. Thus, Third-Party Plaintiffs have not adequately pleaded the first element of defamation, which requires them to show that Third-Party Defendant "made a false and defamatory statement concerning [Third-Party Plaintiffs]." G.D., 15 A.3d at 300.

### 4) The AOL Article

Third-Party Plaintiffs allege that numerous statements within the AOL Article are defamatory. First, Third-Party Plaintiffs complain of the AOL Quotes, the six allegedly defamatory quotes made by Perez. As discussed above, a plaintiff alleging defamation must show that the *defendant* made a false and defamatory statement. Third-Party Plaintiffs claim that the source of the AOL Quotes is an email sent by Filosa. However, nothing in the AOL Article indicates that Filosa is the source of the AOL Quotes, and Third-Party Plaintiffs do not provide any facts to support this idea other than the allegation itself. Further, even if Filosa did provide the quotes, this does not change the fact that the statements were made by Perez and not Ottinger.

The sole statement in the AOL Article that is directly attributable to Ottinger is the following:

> "A company's managers are entitled to exercise their own beliefs in their personal lives," explains Perez's attorney Gregory Filosa, of The Ottinger Firm, P.C., in an email, "but it is illegal under NJ law for a private employer to terminate an employee because of their sexual orientation, regardless of the employer's religious beliefs."

This statement is not defamatory, as it is a description of a legal standard, and is therefore true.

Finally, Third-Party Plaintiffs complain of the assertion in the AOL Article that Chrinian questioned Perez about the ring on her finger and asked her how she felt about "hiring gay

11

people and African Americans." This statement does not appear in quotations in the AOL Article. Further, the AOL Article does not indicate the source of this information, and Third-Party Plaintiffs have not shown that Ottinger is the source. Accordingly, the AOL Article is not defamatory.

### 5) The Proactive Article

Similar to the AOL Quotes, although the Proactive Article includes statements made by Perez, it does not include any statements made by Ottinger. Therefore, for the same reasons as the AOL Quotes, the Proactive Article is not defamatory.

### B. False Light/Defamation by Implication and Conspiracy

In New Jersey, a defendant is subject to liability for false light invasion of privacy if "(a) the false light in which the [plaintiff] was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the [plaintiff] would be placed." Cibenko v. Worth Publishers, Inc., 510 F. Supp. 761, 766 (D.N.J. 1981). Claims for defamation and false light invasion of privacy "are closely allied, and the same considerations apply to each." Id.

For many of the same reasons as discussed above, Third-Party Plaintiffs' false light invasion of privacy claim must fail. With respect to the Ottinger Blog Post, describing a law suit that has been filed is not akin to making a false statement when the law suit was in fact filed. With respect to the comments on the Spaulding Post, neither comment places Third-Party Plaintiffs in a false light, as the first comment is merely an expression of appreciation and the second comment is an agreement with another person's opinion. With respect to the Winona Article, the AOL Article, and the Proactive Article, the only statement in these Articles that is

attributable to Ottinger is Filosa's description of the legal standard for employment discrimination, which does not place Third-Party Plaintiffs in a false light.

In addition to the above deficiencies, Third-Party Plaintiffs have not adequately pleaded the knowledge requirement of a false light claim. The only support provided in the Third-Party Complaint for this element is the allegation that "Ottinger acted with malice, had knowledge of the falsity of its statements, or, at minimum, acted with reckless disregard as to the falsity of the statements" (Compl. ¶ 65). This District has found that such a conclusory allegation, without more, is insufficient to state a claim for false light. See Artista Records, Inc. v. Flea World, Inc., 356 F. Supp. 2d 411, 427 & n.4 (D.N.J. 2005) (finding that the statement that a party acted with "knowledge and reckless disregard" for the falsity of statements was a conclusory allegation that was "simply insufficient to survive a motion to dismiss"). Accordingly, Third-Party Plaintiffs' false light invasion of privacy claim must be dismissed.

### C. Tortious Interference with Prospective Economic Advantage

To state a claim for tortious interference with prospective economic advantage, a complaint must allege that 1) the plaintiff was in "pursuit" of business; 2) the interference was intentional and malicious; 3) the interference caused the loss of a prospective gain; and 4) the plaintiff suffered damages. Printing Mart-Morristown v. Sharp Electronics Corp., 563 A.2d 31, 37 (N.J. 1989). However, when a tortious interference claim "is based on allegedly defamatory statements and the defamation cause of action fails for lack of evidentiary support, the tortious interference claim necessarily fails as well." Prof'l Recovery Servs., Inc. v. Gen. Elec. Capital Corp., 642 F. Supp. 2d 391, 408 (D.N.J. 2009). As discussed above, Third-Party Plaintiffs' defamation claim must be dismissed. Therefore, because Third-Party Plaintiffs' tortious interference claim is based on the allegedly defamatory statements, it must also be dismissed.

## IV. CONCLUSION

For the foregoing reasons Third-Party Defendant's Motion to Dismiss is **granted**. An appropriate order follows this Opinion.

_____
Dennis M. Cavanaugh, U.S.D.J.

Date: October 23, 2013
Original: Clerk's Office
cc: Hon. James B. Clark U.S.M.J.
All Counsel of Record
File