**ARCHER & GREINER**
**A Professional Corporation**
Court Plaza South, West Wing
21 Main Street, Suite 353
Hackensack, New Jersey 07601-7095
(201) 342-6000
Attorneys for Defendants Factory Direct of Secaucus, LLC
d/b/a Ashley Furniture HomeStore, Eugene Chrinian and Kathy Martin

BY:  DANIEL C. RITSON, ESQUIRE (027802004)

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| ISABEL PEREZ,<br><br>           Plaintiff,<br><br>v.<br><br>FACTORY DIRECT OF SECAUCUS, LLC<br>d/b/a ASHLEY FURNITURE HOMESTORE,<br>EUGENE CHRINIAN, in his official and<br>individual capacities, and KATHY MARTIN,<br>in her official and individual capacities,<br><br>           Defendants. | CIVIL ACTION<br><br>NO.:  2:13-cv-00327 (SDW-MCA)<br><br><br>**CERTIFICATION OF COUNSEL**<br>**IN SUPPORT OF DEFENDANTS'**<br>**MOTION FOR**<br>**SUMMARY JUDGMENT** |

Daniel C. Ritson, of full age, hereby certifies as follows:

1.      I am an attorney in the law firm of Archer & Greiner, P.C., attorneys for

Defendants Factory Direct of Secaucus, LLC d/b/a Ashley Furniture HomeStore, Eugene

Chrinian, and Kathy Martin (collectively, "Defendants").

2.      I make this certification in support of Defendants' Motion for Summary

Judgment.

3.      Attached as Exhibit "A" is a true copy of the Amended Complaint filed in this

action by Plaintiff Isabel Perez.

4.      Attached as Exhibit "B" is a true copy of those portions of the transcript of the July 17, 2013 deposition of Kathy Martin, which portions are cited in the Statement of Material Facts Not in Dispute Pursuant to Local Civ. Rule 56.1(a) (the "Statement of Facts") and the Brief in Support of Defendants' Motion for Summary Judgment, submitted herewith (the "Brief").

5.      Attached as Exhibit "C" is a true copy of those portions of the transcript of the July 19, 2014 deposition of Eugene Chrinian, which portions are cited in the Statement of Facts and the Brief.

6.      Attached as Exhibit "D" is a true copy of those portions of the transcript of the January 24, 2014 deposition of Theresa Ricciardi, which portions are cited in the Statement of Facts and the Brief.

7.      Attached as Exhibit "E" is a true copy of those portions of the transcript of the February 18, 2014 deposition of Lisa Thorpe, which portions are cited in the Statement of Facts and the Brief.

8.      Attached as Exhibit "F" is a true copy of those portions of the transcript of the February 24, 2014 deposition of Amber Dominguez, which portions are cited in the Statement of Facts and the Brief.

9.      Attached as Exhibit "G" is a true copy of those portions of the transcript of the June 18, 2014 deposition of Mark Scott, which portions are cited in the Statement of Facts and the Brief.

10.     Attached as Exhibit "H" is a true copy of those portions of the transcript of the July 11, 2013 deposition of Isabel Perez, which portions are cited in the Statement of Facts and the Brief.

11.    I hereby certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

_____
DANIEL C. RITSON

Dated:  August 4, 2014

11357751v1

# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| ISABEL PEREZ,<br><br>            Plaintiff,<br><br>   v.<br><br>FACTORY DIRECT OF SECAUCUS, LLC d/b/a<br>ASHLEY FURNITURE HOMESTORE, EUGENE<br>CHRINIAN, in his official and individual capacities<br>and KATHY MARTIN, in her official and<br>individual capacities,<br><br>            Defendants. | CASE NO. 13-CV-327 (DMC)(MF)<br><br>**AMENDED COMPLAINT**<br>**JURY TRIAL DEMAND** |

Plaintiff Isabel Perez ("Plaintiff" or "Ms. Perez"), by and through her undersigned

counsel, as and for her Amended Complaint in this action against Defendants Factory Direct of

Secaucus, LLC d/b/a Ashley Furniture HomeStore, Eugene Chrinian and Kathy Martin

(collectively, "Defendants"), hereby alleges as follows:

## NATURE OF THE CLAIMS

1.     This is an action for declaratory, injunctive and equitable relief, as well as

monetary damages, to redress Defendants' unlawful employment practices against Plaintiff,

including its discriminatory treatment and harassment of Plaintiff due to her sexual orientation

and its unlawful retaliation against her after she complained about unlawful discrimination in the

workplace in violation of the Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981

("Section 1981"), Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. ("Title

VII"), and the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 et seq. ("NJLAD").

## JURISDICTION AND VENUE

2.     The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 as this action involves federal questions regarding the deprivation of Plaintiff's rights under Section 1981 and Title VII.  The Court has supplemental jurisdiction over Plaintiff's related claims arising under state and local law pursuant to 28 U.S.C. § 1367(a).

3.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## ADMINISTRATIVE PROCEDURES

4.     Prior to the filing of the Complaint, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging violations of Title VII. Plaintiff's EEOC charge arose out of many of the same facts alleged herein.

5.     On or about July 6, 2013, Plaintiff received a notice of right to sue issued by the EEOC in connection with the previously filed charge of discrimination.  This Amended Complaint has been filed within 90 days of Plaintiff's receipt of her notice of right to sue from the EEOC.

6.     Any and all other prerequisites to the filing of this suit have been met.

## PARTIES

7.     Plaintiff Isabel Perez is a resident of Bergen County, New Jersey.  At all relevant times, Plaintiff is and has been a resident of the State of New Jersey and met the definition of an "employee" under all applicable statutes.

8.     Upon information and belief, Defendant Factory Direct of Secaucus, LLC d/b/a as Ashley Furniture HomeStore ("Ashley" or the "Company") is engaged in the sale of home

2

furniture in the metropolitan New York and New Jersey area. At all relevant times, Ashley has met the definition of an "employer" under all applicable statutes.

9.      Defendant Eugene Chrinian is the Chief Executive Officer of Ashley and resides in the State of New Jersey. At all relevant times, Defendant Chrinian directly participated in the discriminatory and otherwise unlawful employment decisions and actions taken against Plaintiff, and was a "covered employer" and/or an "aider" or "abettor" under all relevant statutes. Defendant Chrinian, through a number of different legal entities, owns and operates 7 Ashley Furniture HomeStore locations in the metropolitan New York and New Jersey area.

10.     Defendant Kathy Martin is Ashley's Director of People Services and Development and resides in the State of New Jersey. At all relevant times, Defendant Martin directly participated in the discriminatory and otherwise unlawful employment decisions and actions taken against Plaintiff, and was a "covered employer" and/or an "aider" or "abettor" under all relevant statutes.

## FACTUAL ALLEGATIONS

11.     Plaintiff is a homosexual female and former employee of Ashley.

12.     Plaintiff was employed by Ashley from September 25, 2012 to October 8, 2012 as a Human Resources Director.

13.     As Human Resources Director, Plaintiff reported to Defendant Martin and Defendant Chrinian.

14.     During the course of her employment with the Company, Plaintiff's position had responsibility for providing human resources support and services to each of the Ashley Furniture HomeStore locations owned and operated by Defendant Chrinian.

15.     From the outset of Plaintiff's employment with the Company, Plaintiff was subjected to a pattern of inappropriate questions concerning her religion and her sexual orientation as well as derogatory comments regarding the race and ethnicity of other Company employees.

<u>Plaintiff's Employment Interviews with Chrinian and Martin</u>

16.     Prior to accepting employment with Ashley, Plaintiff interviewed with both Martin and Chrinian.  During these interviews, both Martin and Chrinian questioned Plaintiff about her religious views and marital status.

17.     During Plaintiff's interview with Martin, Martin made a number of derogatory racial comments.  For example, Martin referred to African-Americans as "Brownies" and Caucasians as "Creamies."  Martin explained that she could make these comments because she was of mixed descent.

18.     During her interview with Martin, Martin also advised Plaintiff that Chrinian was a Christian and asked Plaintiff whether she was.  Plaintiff responded that she was and Martin then asked Plaintiff she asked a number of questions about being a minister because Plaintiff had listed on her resume that she was a member of the National Association of Christian Ministers.

19.     During the interview, Martin also advised Plaintiff that Chrinian adhered to the teachings of the C12 Group – a group of Christian business owners that advocates the application of biblical principals to business management.

20.     During Plaintiff's interview with Chrinian, Chrinian questioned Plaintiff about her marital status – which Plaintiff attempted to deflect because she did not believe it was an appropriate question for an employment interview and because she did not want to disclose her sexual orientation at this point.

4

21.     Chrinian also question Plaintiff about being a minister and asked if Plaintiff was a Christian.  When she responded that she was, Chrinian asked if she was a "real Christian," to which Plaintiff responded that she was.

22.     After her interviews with both Martin and Chrinian, Plaintiff was offered the position with Ashley and she accepted the following day.  Plaintiff and Defendants then agreed that Plaintiff's official start date would be Tuesday, September 25, 2012.

23.     After accepting their job offer, Plaintiff began to take steps to wind down the private consulting business that she had been operating prior to her employment with Ashley so that she could focus her efforts on her employment with Ashley.

**Plaintiff's Pre-Employment Work and Martin's Continued Derogatory Comments**

24.     On September 19, 2012, at Martin's request, Plaintiff attended a training session at ADP with two other Ashley Human Resources employees.

25.     On September 21, 2012, at Martin's request, Plaintiff met with Martin at the Company's offices.  At the start of this meeting, Martin took hold of Plaintiff's hands and began to pray to God to ask for guidance in addressing the particular work situation that they were set to discuss.

26.     During this same meeting, Martin disclosed the fact that she was frequently possessed by Jesus and would sometimes speak in tongues without warning.  At this meeting, Martin said that she "spoke to God" and that she was "sure [they] would make a balanced team."

27.     During this meeting, Martin made a number of derogatory remarks about homosexuals, stating that "lesbos and gays would be judged" and that she follows the "word of Leviticus" – which purportedly condemns homosexuality – and that "there are many who call themselves true Christians, but they don't know what that means."

<u>Plaintiff Officially Begins Her Employment With Ashley</u>

28. On September 25, 2012, Plaintiff's "official" start date, Plaintiff witnessed Martin make a number of derogatory and discriminatory comments about Company employees.

29. For example, Plaintiff witnessed Martin refer to a Company employee as a "nigga" – which she tried to explain was different from the n-word. When Plaintiff expressed concern and asked Martin to stop using these derogatory comments in the workplace, Martin responded, "Girl, please. They're different. It was nigga, not [the n-word]." Martin then advised Plaintiff that she needed to be more understanding of the Company's "culture."

30. Similarly, two other Human Resources employees recounted to Plaintiff that Martin often directed derogatory and discriminatory comments to them, including referring to them as "nigga" (as well as the n-word), "bitch," "heifer," "ghetto," "lesbo" and "fag," among others.

31. Over the course of the following two weeks, Plaintiff continued to raise concerns with Martin regarding Martin's and other co-workers' discriminatory comments and conduct including, but not limited to, the use of various racial and ethnic slurs in the workplace as well as Martin's constant application of her religious beliefs to relatively trivial workplace matters that far exceeded what would be reasonable under similar circumstances.

32. During this same time period, Martin continued her practice of praying before most of her work meetings with Plaintiff and her unsolicited "laying of the hands" on Plaintiff which she explained was so that God could speak to Plaintiff through Martin.

33. While Plaintiff attempted to keep her sexual orientation private, it was well known among Plaintiff's co-workers that she was a lesbian and was married to a woman. In fact, Plaintiff disclosed her sexual orientation to two of her co-workers when they questioned her

about her marital status. Upon information and belief, both Chrinian and Martin were aware of Plaintiff's sexual orientation.

<u>Defendants' Termination of Plaintiff's Employment</u>

34. On October 5, 2012, Martin and Plaintiff were walking in the parking lot and approached Plaintiff's car. Martin then questioned Plaintiff about a decal that she had on her car. The decal was for the Human Rights Campaign -- the nation's largest civil rights organization dedicated to achieving equality for lesbian, gay, bisexual and transgender Americans.

35. Plaintiff explained to Martin that the decal on her car was the "equality symbol." Martin then asked Plaintiff whether it was for "the gays" and then proceeded to tell Plaintiff that she was not sure that she made the right decision about hiring Plaintiff because she did not fit the "culture" at the Company. She then explained that she was going to "speak to God" about Plaintiff's continued employment with Ashley.

36. The next business day, Monday, October 8, 2012, Plaintiff was called into a meeting with Martin and Alfred Nunez (Sales Manager) where Martin told Plaintiff that she had prayed about it and that God had spoken to her and told her that she needed to let Plaintiff go. Martin continued: "You just don't fit our culture. . . . I need someone in your position that can embody our mission statement. Your beliefs just don't fit." Martin stressed to Plaintiff that the decision was not related to her work performance, telling Plaintiff: "We all know you are very capable and can easily manage the entire department."

37. In light of the foregoing, it is clear that Plaintiff was terminated because or her sexual orientation and/or objection to Martin's discriminatory comments.

38. While Martin did not explain what she meant when she said that Plaintiff did not fit the Company's "culture" or "embody [the Company's] mission statement," Martin's

comments were a clear reference to the Company's efforts to incorporate management's view of Christian teachings into the workplace.

39.     Indeed, the Company's website indicates that it proudly supports FamilyLife, an organization whose mission is to "effectively develop godly marriages and families who change the world one home at a time." While this mission is laudable on its face, in practice it promotes discrimination against homosexuals as the founder of FamilyLife has warned against the "radical homosexual element in our culture."

## FIRST CAUSE OF ACTION

### (Retaliation in Violation of Section 1981 – Against All Defendants)

40.     Plaintiff hereby repeats and realleges the allegations in each of the preceding paragraphs as if fully set forth herein.

41.     Defendants have violated Section 1981 by subjecting Plaintiff to retaliation for her protected complaints and opposition to Martin's discriminatory comments on the basis of race and ethnicity, by, *inter alia,* terminating Plaintiff's employment with the Company.

42.     As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of Section 1981, Plaintiff has suffered and continues to suffer monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation and benefits for which she is entitled to an award of monetary damages and other relief.

43.     As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of Section 1981, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

44.     Defendants' unlawful retaliatory conduct constitutes a willful and wanton violation of Section 1981, was outrageous and malicious, was intended to injure Plaintiff, and was done with conscious disregard of Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

<u>SECOND CAUSE OF ACTION</u>

**(Retaliation in Violation of Title VII – Against Defendant Factory Direct of Secaucus, LLC)**

45.     Plaintiff hereby repeats and realleges the allegations in each of the preceding paragraphs as if fully set forth herein.

46.     Defendant Factory Direct of Secaucus, LLC has violated Title VII by subjecting Plaintiff to retaliation for her protected complaints and opposition to Martin's discriminatory comments on the basis of race, ethnicity, sex, and religion by, *inter alia*, terminating Plaintiff's employment with the Company.

47.     As a direct and proximate result of Defendant Factory Direct of Secaucus, LLC's unlawful retaliatory conduct in violation of Title VII, Plaintiff has suffered and continues to suffer monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation and benefits for which she is entitled to an award of monetary damages and other relief.

48.     As a direct and proximate result of Defendant Factory Direct of Secaucus, LLC's unlawful retaliatory conduct in violation of Title VII, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

9

49.     Defendant Factory Direct of Secaucus, LLC's unlawful retaliatory conduct constitutes a willful and wanton violation of Title VII, was outrageous and malicious, was intended to injure Plaintiff, and was done with conscious disregard of Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

## THIRD CAUSE OF ACTION

### (Violation of the New Jersey Law Against Discrimination – Against All Defendants)

50.     Plaintiff hereby repeats and realleges the allegations in each of the preceding paragraphs as if fully set forth herein.

51.     Defendants have discriminated against Plaintiff in violation of the New Jersey Law Against Discrimination by subjecting her to disparate treatment because of her sexual orientation, by, *inter alia*, terminating Plaintiff's employment with the Company.

52.     As a direct and proximate result of the Defendants' unlawful discriminatory conduct in violation of the New Jersey Law Against Discrimination, Plaintiff has suffered and continues to suffer financial and economic damages as well as severe mental anguish and emotional distress, including but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

53.     Defendant's unlawful discriminatory conduct constitutes a willful and wanton violation of the New Jersey Law Against Discrimination, was outrageous and malicious, was intended to injure Plaintiff, and was done with reckless indifference to Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

10

## FOURTH CAUSE OF ACTION

### (Retaliation in Violation of the New Jersey Law Against Discrimination – Against All Defendants)

54.     Plaintiff hereby repeats and realleges the allegations in each of the preceding paragraphs as if fully set forth herein.

55.     Defendants have violated the New Jersey Law Against Discrimination by subjecting Plaintiff to retaliation for her protected complaints and opposition to Martin's discriminatory comments on the basis of race and ethnicity by, *inter alia*, terminating Plaintiff's employment with the Company.

56.     As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of the New Jersey Law Against Discrimination, Plaintiff has suffered and continues to suffer monetary and/or economic damages as well as suffer severe mental anguish and emotional distress, including but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

57.     Defendant's unlawful retaliatory conduct constitutes a willful and wanton violation of the New Jersey Law Against Discrimination, was outrageous and malicious, was intended to injure Plaintiff, and was done with reckless indifference to Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against Defendant, containing the following relief:

A.     A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States and the State of New Jersey;

11

Case 2:13-cv-00327-DMC-JBC Document 26 Filed 07/18/13 Page 12 of 13 PageID: 274

B.      An injunction and order permanently restraining Defendants from engaging in such unlawful conduct;

C.      An order directing Defendants to place Plaintiff in the position she would have occupied but for Defendants' discriminatory, retaliatory and/or otherwise unlawful treatment of her, as well as to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices and other unlawful conduct are eliminated and do not continue to affect Plaintiff;

D.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages, including, but not limited to, the loss of past and future income, wages, compensation, job security and other benefits of employment;

E.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for her severe mental anguish and emotional distress, humiliation, depression, embarrassment, stress and anxiety, loss of self-esteem, self-confidence and personal dignity, and emotional pain and suffering and any other physical or mental injuries;

F.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for harm to her professional and personal reputation and loss of career fulfillment;

G.      An award of damages for any and all other monetary and/or non-monetary losses suffered by Plaintiff in an amount to be determined at trial, plus prejudgment interest;

H.      An award of punitive damages;

I.     An award of costs that Plaintiff has incurred in this action, as well as Plaintiff's reasonable attorneys' fees to the fullest extent permitted by law; and

J.     Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: July 18, 2013

THE OTTINGER FIRM, P.C.

By:    s/Denise Rubin Glatter
       Denise Rubin Glatter
       Ariel Y. Graff (*pro hac vice*)

       20 West 55th Street, 6th Floor
       New York, NY 10019
       Telephone: (212) 571-2000
       Facsimile: (212) 571-0505

       COUNSEL FOR PLAINTIFF

# EXHIBIT B

[Page 1]

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY



------------------------------X

ISABEL PEREZ,

        Plaintiff,       Case No.

                     13 Civ.327(DMC)(MF)

      v.

FACTORY DIRECT OF SECAUCUS,

LLC d/b/a ASHLEY FURNITURE

HOMESTORE, EUGENE CHRINIAN,

in his official and

individual capacities, and

KATHY MARTIN, in her

official and individual

capacities,

         Defendants/Third-

         Party Plaintiffs,

      v.

THE OTTINGER FIRM, P.C

------------------------------X


    VIDEOTAPED DEPOSITION of KATHY MARTIN,

held at the offices of STOTZ COURT REPORTING,

One Gateway Center, Suite 2600, Newark,

New Jersey, Pursuant to Notice, before

Beth Radabaugh, a Certified Shorthand Reporter

and Notary Public of the State of New Jersey,

on Wednesday, July 17, 2013, commencing at

10:07 a.m.

[Page 21]

1    at the time she was Ms. Thorpe's supervisor?

2         A.    Manager of HR.

3         Q.    During what period of time was

4    Ms. Bautista an HR manager?

5         A.    I don't know.

6         Q.    When did you begin your employment at

7    Ashley?

8         A.    May 7th.

9         Q.    Of what year?

10        A.    2012.

11        Q.    Are you currently employed --

12        A.    No.

13        Q.    -- at Ashley?

14              When did you end your employment at

15   the company?

16        A.    The end of February.

17        Q.    February 2013?

18        A.    Yes.

19        Q.    What position did you hold when you

20   first began working at Ashley?

21        A.    Director of people services and

22   development.

23        Q.    Did you hold any other positions or

24   job titles during your tenure?

25        A.    No.

[Page 162]

1    about them.  So that doesn't offend.

2         Q.    So was it your perspective -- or

3    strike that.

4              From your perspective was there

5    anything offensive or inappropriate about the

6    statement that you said Ms. Perez made?

7         A.    Not to me.

8         Q.    Was anything else about anyone's

9    family discussed during your interview with

10   Ms. Perez?

11        A.    No.

12        Q.    Did you interview Ms. Perez in a

13   private office?

14        A.    Yes.

15        Q.    Was the door closed?

16        A.    It was partly open.

17        Q.    Did the subject of religion come up

18   in any way during that meeting?

19        A.    Describe religion.

20        Q.    Religious affiliation, religious

21   faith.

22        A.    Yeah.

23        Q.    How did that subject come up?

24        A.    She told me she was an Episcopalian

25   minister.

1    about Ms. Perez?

2       A.    I told him that her skills looked

3    good.  I told him about the other candidate that

4    I liked, but I told him that because she had

5    told me about her education and the juris

6    doctorate, that that might be the way we want to

7    go.  I wanted him to make sure and to think

8    about what he saw.

9       Q.    What, if anything, did Mr. Chrinian

10   say to you about Ms. Perez?

11      A.    He liked her skills.  He liked part

12   of her presentation and would consider that she

13   might be a real viable candidate.

14      Q.    Did either of you say anything else

15   about Ms. Perez during that discussion?

16      A.   Yes.

17      Q.    What else was said?

18      A.    He liked her skills, but he

19   questioned or asked me if I could speak with her

20   about the employee relations piece because she

21   seemed a little assertive, if she actually could

22   handle pulling back some of that personality

23   when she dealt with the employee relation piece

24   of it.

25      Q.    What did you say in response to that?

[Page 172]

1          A.      That I would speak with her and ask

2    her if she had a softer side for the employee

3    relations piece.

4          Q.      Did you have an opinion either way on

5    that issue when you heard Mr. Chrinian raise it?

6          A.      When I heard him raise it?

7          Q.      That is in your own mind did you

8    agree with that sentiment?

9          A.      I don't remember because I don't -- I

10   don't -- I don't remember if I had that same

11   sentiment or not, but I knew that I needed to

12   address it.

13         Q.      Did Mr. Chrinian explain what it was

14   about Ms. Perez's presentation that caused him

15   concern about her being assertive, as you had

16   described it?

17         A.      I don't -- I don't remember.

18         Q.      Beyond what you've already testified

19   to, was anything else concerning Ms. Perez

20   discussed between you and Mr. Chrinian on that

21   occasion?

22         A.      No, just that he -- he thought he

23   might want to render an offer.

24         Q.      Did you discuss anything about the

25   offer?

[Page 178]

1          Q.     Was that meeting -- strike that.

2                 Do you recall the first date of

3     Ms. Perez's employment at Ashley?

4          A.     Yes.   Her official first date?

5          Q.     Sure.

6          A.     The 25th of September.

7          Q.     Was your discussion with Ms. Perez

8     that you referenced a moment ago that touched on

9     her consulting business, did that happen prior

10    to the 25th?

11         A.     Prior to it, yes.

12         Q.     Why did you have a meeting with

13    Ms. Perez prior to her official start date?

14         A.     I had concerns about her employment.

15         Q.     Concerns about her, I'm sorry?

16         A.     Her employment and her fit within the

17    organization.

18         Q.     At what point did you develop those

19    concerns?

20         A.     After a meeting with ADP and I

21    observed her interaction with Lisa Thorpe and

22    Amber Dominguez.

23         Q.     What did you observe that caused you

24    concern with respect to Ms. Perez's interaction

25    with Ms. Thorpe?

[Page 179]

1       A.      There was -- looking at their -- they

2   just -- I don't know what it was, but there was

3   a bumping and a confrontational atmosphere

4   between them.

5       Q.      Is that something that you observed

6   during the course of the ADP meeting?

7       A.      Yes.

8       Q.      Was there any other aspect of

9   Ms. Perez's interaction with Ms. Thorpe that

10  caused you concern?

11          MR. HARZ:  Well, objection because

12          you're mischaracterizing.  She said between

13          Ms. Thorpe and Ms. Dominguez.

14          MR. GRAFF:  I had asked now

15          specifically what she had observed with

16          respect to Ms. Perez's interactions with

17          Ms. Thorpe that caused her concern.

18          MR. HARZ:  And you said Ms. Dominguez

19          as well, or her response was Ms. Thorpe and

20          Dominguez.

21          MR. GRAFF:  I think there was another

22          question in between, but I'll clarify it.

23          MR. HARZ:  Please.

24      Q.      Specifically with respect to

25  Ms. Thorpe, what did you observe that caused you

1    concern as to Ms. Perez's interactions with

2    Ms. Thorpe?

3        A.    So you don't care about Ms. Dominguez

4    right now?

5        Q.    I'll ask about Ms. Dominguez

6    separately.

7        A.    Okay.  When I first came -- got to

8    the meeting, I was there -- I got there a little

9    late, I had text messages and phone calls from

10   Isabel stating that she felt like there was a --

11   there was a conflict and she met me when I --

12   when I got to the meeting, she met me and showed

13   me where they were and when I walked in, the

14   tension was just thick, just thick.  You just

15   could cut it it was so thick, and when the

16   instructor was teaching, Lisa would ask a

17   question and Isabel would make a huffing, hhhh.

18   You know, how do you -- what's a word for that?

19       Q.    I don't want to put words into your

20   mouth.

21       A.    Hhhh.  You know what I mean?

22            MR. GRAFF:  If this is accurate, I'll

23        note for the transcript the witness made

24        what sounded perhaps like an exasperated --

25       A.    Okay.

[Page 181]

1          MR. GRAFF:  -- exclamation.

2      A.    And that's what Isabel did, and then

3  I watched Lisa and Amber start to talk between

4  themselves and then Isabel look at me and say,

5  see what I mean, they won't listen to me, and I

6  was thinking, okay, we're going to have issues,

7  this is not good.

8          And then specifically with Lisa and

9  Isabel, when I went to the restroom, Lisa

10  followed me out and said, she won't let us ask

11  questions.  She keeps saying that you're not --

12  this isn't Kathy's concern, she's going to take

13  over the ADP project.  We're just trying to find

14  out information and we can't get information.

15  She was very, very frustrated.

16          And then we went back into the

17  meeting and it excalated to the point where I

18  thought, okay, I got to separate these people.

19  So I moved -- Isabel and I went to another

20  meeting while I left Amber and Lisa there with

21  the ADP trainer.

22          And you didn't ask me about Amber,

23  but, by the way, Amber pulled me -- when I

24  went -- we went to get something to eat, she

25  said can I talk to you, and she told me the same

[Page 182]

1    thing.

2         Q.    Apart from what you just said, was

3    there anything else that you observed as to

4    Ms. Perez's interaction with Ms. Dominguez that

5    caused you concern?

6         A.    Yeah, I did see that very -- a little

7    past assertive, but on the tipping point between

8    assertive and aggressive confrontation.

9         Q.    Anything else?

10        A.    No.

11        Q.    Why -- as far as you know why was

12   Ms. Perez at the ADP meeting prior to the

13   official start date of September 25th?

14        A.    We had discussed that there was going

15   to be a meeting and she told me, well, if I

16   don't have plans for the day, I'd like to come,

17   and I thought that would be a great idea since

18   you'll be helping us with this project.  So...

19        Q.    Was it Ms. Perez who suggested that

20   she perhaps would attend the meeting?

21        A.    I don't remember -- I don't remember

22   which way that went, but I know we were

23   discussing it and it came up.  So I don't know

24   if she said it or I said it.  I don't remember

25   that.

[Page 186]

1      that with Ms. Perez?  Was it prior to

2      September 25th?

3           A.    I don't remember.

4           Q.    Do you remember anything else that

5      you said to Ms. Perez at any point in terms of

6      describing her duties and role with the company?

7                 MR. HARZ:  In addition to what she's

8           already testified to?

9                 MR. GRAFF:  Yes.

10          A.    I don't remember.

11          Q.    As far as you know -- strike that.

12                Did anybody else at the company ever

13     tell you that they themselves had informed

14     Ms. Perez of what her duties would be and the

15     nature of her role would be?

16          A.    No.

17          Q.    As far as you know did anyone

18     other -- strike that.

19                From the time that Ms. Perez was

20     offered the job on the day of her interview, as

21     far as you know did anyone other than yourself

22     explain to her what her duties would be?

23          A.    I don't think so.  I don't know.

24          Q.    Other than that ADP meeting, did you

25     have any subsequent meetings with Ms. Perez

1    before her official start date of work?

2        A.    Yes.

3        Q.    When was the next meeting after the

4    ADP meeting?

5        A.    It was after the ADP meeting.   I

6    don't remember the exact date.   I don't remember

7    the date.

8        Q.    Was it an in-person meeting?

9        A.    Yes.

10       Q.    Where did you meet with Ms. Perez?

11       A.    In Secaucus.

12       Q.    Why did you have a meeting with

13   Ms. Perez on that occasion before her official

14   start date?

15       A.    I had concerns about her fitting into

16   the organization, especially after witnessing

17   what had happened with ADP, at the ADP meeting.

18       Q.    Did you schedule that meeting that

19   you're referring to for the purpose of sharing

20   concerns with Ms. Perez?

21       A.    Yes.

22       Q.    Other than yourself did anyone else

23   participate in the meeting?

24       A.    No.

25       Q.    How long was the meeting?

[Page 193]

1    have been that or do you partially remember?

2                MR. HARZ:  Don't guess.

3                THE WITNESS:  Okay.

4       A.    I don't remember.

5                MR. HARZ:  Don't guess, please.

6       A.    I don't remember.

7                THE WITNESS:  I'm sorry.

8       Q.    Did Ms. Perez ever say anything to

9    you about whether she was currently married?

10      A.    No.

11      Q.    Did Ms. Perez ever say anything to

12   you about who, if anyone, she lived with?

13      A.    Her son.

14      Q.    Did she ever communicate to you that

15   she lived with anyone other than her son in her

16   residence?

17      A.    No.

18      Q.    Did Ms. Perez ever refer to her

19   partner?

20      A.    No.

21      Q.    Did you ever ask Ms. Perez -- I think

22   it's implicit from the last question, but I'll

23   ask it anyway.  Did you ever ask Ms. Perez

24   anything about her partner?

25      A.    No.

1          whether she thought that anyone was of any

2          gender or sexual orientation?

3               MR. GRAFF:  I can discuss it with you

4          off the record, but I --

5               MR. HARZ:  Let's go off the record.

6               MR. GRAFF:  Sure.

7               THE VIDEOGRAPHER:  We're off the

8          record now.  It's 2:42.  Off record.

9               (Discussion held off the record.)

10          THE VIDEOGRAPHER:  We're back on at

11        2:43.

12    BY MR. GRAFF:

13        Q.   Ms. Martin, at any point during

14    Ms. Perez's employment did you form a belief one

15    way or another as to Ms. Perez's sexual

16    orientation?

17        A.   No.

18        Q.   Would you have cared either way if

19    Ms. Perez would have told you that she was a

20    lesbian?

21        A.   No.

22        Q.   Did you at some point in time become

23    aware that Ms. Perez was a lesbian?

24        A.   Yes.

25        Q.   Was that before -- strike that.

[Page 198]

1           At what point in time did you first

2    become aware of that?

3           A.    When she was terminated.

4           Q.    In what way -- strike that.

5                 How did you become aware at that

6    time?

7           A.    Amber and Lisa told me they thought

8    she was.

9           Q.    Did Amber and Lisa say that before or

10   after Ms. Perez's termination?

11          A.    After.

12          Q.    Was that the very first time that you

13   became aware at all that Ms. Perez was a

14   lesbian?

15          A.    Yes.

16          Q.    And what did Amber say about

17   Ms. Perez being a lesbian at that time?

18          A.    She said they had had a closed-door

19   meeting and she told her she was a --

20                MR. HARZ:  Who told who?

21                THE WITNESS:  Amber.

22          A.    Amber -- well, Lisa and Amber and I

23   were sitting there talking after her termination

24   and Amber said, well, I have something to tell

25   you, and I said, okay, what is it, and, among

[Page 209]

1          As best you can -- I can break it

2     down into a lot of questions, but it might be

3     easier, let me know if it is, can you explain

4     the circumstances that led to Ms. Ricciardi's

5     termination?

6          A.     Yes.

7          Q.     Would you, please.

8          A.     There were several instances.

9     Probably the first was --

10               THE WITNESS:  Can you hear me okay?

11               THE COURT REPORTER:  Um-hmm.

12          A.     -- was at the Paramus store where

13     there -- Isabel and Theresa were over there to

14     watch, to meet the store managers, to observe

15     how the store runs and the business, and they

16     attended a huddle, actually they attended two

17     huddles, and were very rude, combative.  One of

18     the words I heard was crude and insinuated that

19     Neel, who was the store manager, was not

20     qualified to run his store.  Theresa had

21     interrupted the meeting a couple of times and

22     they both had questionable behavior in which I

23     got phone calls from the sales manager, the

24     director of sales and the COO.

25               And then after that meeting, another

[Page 210]

1    day we came back and we had meetings to discuss

2    recruiting strategy at the Secaucus office and

3    Theresa and Isabel got into a confrontation in

4    front of Lisa and Amber and myself and they were

5    screaming, Isabel and Theresa were screaming at

6    each other.  First Theresa stomped out, slammed

7    a door.  We got that under control and then

8    Isabel stomped out, slammed a door and quit and

9    walked out, and we all came back in and more

10   words were said.  Voices were escalated.  Store

11   managers were coming down the hall to find out

12   what was going on, and that's when the decision

13   was made.

14        Q.    Who proposed at that point in time

15   terminating her?

16        A.    I don't remember.

17        Q.    Did you consider terminating

18   Ms. Perez at that time?

19        A.    Actually she kind of resigned and

20   when I went to talk to her and calmed her down

21   and said, let's just go back into the conference

22   room and finish this strategy.  I don't think I

23   really was planning on terminating her, no.

24        Q.    Did you encourage her to go back in

25   because you wanted her to continue her

[Page 211]

1    employment at that time?

2          A.    I wanted everybody to get back in

3    there so we could get a strategy on recruiting.

4          Q.    At what -- let me ask it a different

5    way.

6                You indicated that you then all went

7    back into the room.  Had the decision at that

8    point already been made to terminate

9    Ms. Ricciardi?

10         A.    No.

11         Q.    When was the decision actually made?

12         A.    When I -- when I realized we weren't

13   going to finish that meeting.  Everybody went

14   back into the HR office, we shut the door and

15   there were discussions.

16         Q.    Discussions between who?

17         A.    Isabel, myself, and I believe I had

18   some input from Lisa because Lisa at that point

19   was discussing recruiting strategy.

20         Q.    Did Lisa have any input as to

21   terminating --

22         A.    No.

23         Q.    Okay.  Was it in the course of

24   discussions back in the HR office between you

25   and Ms. Perez that the decision was made to

[Page 212]

1    terminate Ms. Ricciardi?

2        A.    Yes.

3        Q.    Did you and Ms. Perez discuss how to

4    effectuate the termination, how you would

5    actually bring about the end of Ms. Ricciardi's

6    employment?

7        A.    I don't remember the specific

8    strategy.

9        Q.    Did Ms. Perez at the time, as best

10   you understood it, have the authority to decide

11   to terminate Ms. Ricciardi without your

12   approval?

13       A.    I gave it to her.

14       MR. HARZ:    Listen to the question.

15       A.    Tell me what you're saying.

16       MR. HARZ:    Answer the question,

17   please.

18       Q.    Did she require your approval to

19   terminate Ms. Ricciardi?

20       A.    Sorry.    Did she require my approval.

21   Yes.

22       Q.    Did Ms. Perez have the authority at

23   any point during her employment to terminate any

24   employees without anybody else's permission?

25       A.    No.

[Page 213]

1       Q.    Did you need to get anybody's

2    permission or consent to terminate

3    Ms. Ricciardi?

4       A.    Did I?

5       Q.    Yes.

6       A.    Ms. Ricciardi?

7       Q.    (Nodding).

8       A.    No.

9             MR. HARZ:  Do we want to go off the

10      record for you to do what you have to do?

11            THE WITNESS:  I'm sorry.

12            MR. HARZ:  Let's go off the record

13      for a second.

14            THE WITNESS:  Yeah, thank you.

15            THE VIDEOGRAPHER:  We're going to go

16      off the record.  It's 3:04.

17            (Discussion held off the record.)

18            THE VIDEOGRAPHER:  We're back on.

19      It's 3:05.  You may proceed.

20   BY MR. GRAFF:

21      Q.    Were you present when Ms. Ricciardi

22   was informed of her termination?

23      A.    Yes.

24      Q.    Did you inform her of the

25   termination?

[Page 214]

1        A.    No.

2        Q.    Who informed her?

3        A.    Isabel.

4        Q.    Where were the three of you located

5    when --

6        A.    In the HR department.

7        Q.    Was anybody else present for that

8    meeting?

9        A.    Lisa.

10       Q.    Anybody else?

11       A.    Amber was in there.

12       Q.    At the time of the termination they

13   were both there?

14       A.    No.

15       Q.    Was anybody else a part of the

16   discussion --

17       A.    No.

18       Q.    Just for the record, if I could

19   finish the question.  Was anybody else part of

20   the discussion that included Ms. Ricciardi's

21   termination?

22       A.    No.

23       Q.    Did you have any further discussions

24   with Ms. Perez concerning Ms. Ricciardi after

25   Ms. Perez told her she was terminated?

[Page 221]

1    discussion?

2        A.   He asked me to give it some great

3    thought to determine if her fit within the

4    organization was really a good one.

5        Q.   Did Mr. Scott say anything else to

6    you during that discussion with respect to

7    Ms. Perez that you can recall?

8        A.   No.

9        Q.   When is the next time, if ever, that

10   you received any further information from

11   anybody about Ms. Perez and Ms. Ricciardi's

12   visit to the Paramus store?

13       A.   I received an e-mail.

14       Q.   From whom?

15       A.   Mr. Scott.

16       Q.   How many days or hours had passed

17   from the time of your spoken communication with

18   Mr. Scott and your receipt of that e-mail?

19       A.   I don't know the exact days.

20       Q.   Was it more than one day?

21       A.   Yes.

22       Q.   Did Mr. Scott in that e-mail

23   communicate any new information to you?

24       A.   Yes.

25       Q.   What was the new information?

[Page 222]

1          A.     Terminate Isabel Perez.

2          Q.     Did Mr. Scott indicate in that e-mail

3    why it was that he had moved from suggesting

4    that you give it some thought to actually

5    directing you to conduct the termination?

6          A.     He also heard about the big arguments

7    in the conference room from the Secaucus store

8    managers.

9          Q.     Was that something that you had

10   communicated with Mr. Scott about at all prior

11   to receiving that e-mail?

12         A.     No.

13         Q.     Did Mr. Scott in his e-mail indicate

14   any other reasons apart from the Paramus store

15   visit and the Secaucus conference room argument?

16   Is there anything else that he indicated as a

17   basis for thinking Ms. Perez should be

18   terminated?

19         A.     No.

20         Q.     Did you respond to the e-mail?

21         A.     Yes.

22         Q.     Did you respond by e-mail?

23         A.     No.

24         Q.     In what way did you respond?

25         A.     I terminated Ms. Perez.

[Page 223]

1       Q.    Did you respond to Mr. Scott in

2   connection with his e-mail?

3       A.    No.

4       Q.    How much time passed between when you

5   received the e-mail and when you terminated

6   Ms. Perez?

7       A.    I don't remember.

8       Q.    Did you have any communication with

9   anyone -- apart from Mr. Scott's e-mail, did you

10  have any communications with anyone about the

11  anticipated termination of Ms. Perez prior to

12  conducting it?

13      A.    No.

14      Q.    Apart from the discussion with

15  Mr. Scott and the e-mail from Mr. Scott, did you

16  have any other communications with him

17  concerning Ms. Perez's potential or actual

18  termination prior to terminating her?  I'll

19  reask that.

20          Other than the discussion that you

21  already referenced with Mr. Scott and

22  Mr. Scott's e-mail, did you have any other

23  communications with him --

24          MR. HARZ:  Listen to his question.

25      Q.    -- about terminating Ms. Perez before

[Page 226]

1          Q.     Okay.  Let's focus on the day of

2    Ms. Perez's termination.  Had you indicated to

3    Ms. Perez in any way prior to your actual

4    termination meeting that you had given any

5    consideration to the possibility of terminating

6    her?

7          A.     No.

8          Q.     As far as you know did anybody

9    indicate in any way to Ms. Perez prior to her

10   termination --

11         A.     No.

12         Q.     Did you ask Ms. Perez to come to your

13   office at some point on the day of her

14   termination?

15         A.     Yes.

16         Q.     And what was the date, if you recall?

17         A.     October 8th.

18         Q.     Did you meet with Ms. Perez on the

19   morning of October 8th?

20         A.     Yes.

21         Q.     Was that in a scheduled meeting or

22   something else?

23         A.     No.

24         Q.     Did you ask her to come to your

25   office for that meeting?

[Page 227]

1         A.      Yes.

2         Q.      Other than you and Ms. Perez, was

3    anyone else present?

4         A.      Yes.

5         Q.      Who else?

6         A.      Alfred.

7         Q.      Who is Alfred?

8         A.      He's the store manager at Secaucus.

9         Q.      Is his last name Nunez?

10        A.      Nunez, yes.

11        Q.      Was there any particular reason why

12   Mr. Nunez was present for that meeting?

13        A.      Yes.

14        Q.      Why?

15        A.      As a witness.

16        Q.      Did you ask him to be present for

17   that purpose?

18        A.      Yes.

19        Q.      Was there any official policy or

20   practice that you were aware of at Ashley

21   Furniture concerning the presence of a witness

22   in termination meetings?

23        A.      Say it again.

24        Q.      Why did you want there to be a

25   witness for Ms. Perez's termination meeting?

[Page 228]

1      A.     It's usually wise that you have

2  someone with you when you terminate.

3      Q.     Does Ashley have any policies or

4  practices that you're familiar with that would

5  require or direct the presence of a witness?

6      A.     Practices.

7      Q.     Was there any particular reason you

8  selected Mr. Nunez as a witness rather than any

9  other person?

10     A.     Yes.

11     Q.     Why?

12     A.     He's a store manager.

13     Q.     If you can walk me through what

14 happened during that meeting.   Who spoke first?

15         MR. HARZ:  You mean the termination

16     meeting?

17         MR. GRAFF:  Yes.

18     A.     I did.

19     Q.     And what did you say to start off?

20     A.     I had written a statement that I

21  read.

22     Q.     When did you write that statement?

23     A.     That morning.

24     Q.     Was that -- strike that.

25         Had you ever prepared a written

[Page 229]

1    statement for purposes of a person's termination

2    prior to that occasion?  Had you ever read from

3    a written statement in a termination meeting

4    before?

5         A.    Before?

6         Q.    Before Ms. Perez's case.

7         A.    Yes.

8         Q.    When you drafted the written

9    statement that you read to Ms. Perez, were you

10   working off of a template or a draft that you --

11        A.    No.

12        Q.    Was it a handwritten statement?

13        A.    No.

14        Q.    Typewritten?

15        A.    Yes.

16        Q.    How long did it take you to read the

17   written statement?

18        A.    I don't know.

19        Q.    Was it less than one page long?

20        A.    Yes.

21        Q.    Did anybody review the written

22   statement before you read it to Ms. Perez?

23        A.    No.

24        Q.    Was there any particular reason why

25   you read from a written statement rather than

[Page 230]

1    speaking extemporaneously?

2         A.    Yes.

3         Q.    Why?

4         A.    Not to be carried off in any

5    discussion.

6         Q.    Was there any particular reason why

7    in the case of Ms. Perez's termination but not

8    all terminations you wanted to use a written

9    statement?

10        A.    Yes.

11        Q.    Why?

12        A.    Because I knew she was a combative,

13   aggressive person.

14        Q.    Had you ever at any point during

15   Ms. Perez's employment spoken to her about your

16   perception that she was combative or aggressive?

17        A.    Yes.

18        Q.    When did you first speak with her

19   about that?

20        A.    I don't remember.

21             MR. HARZ:   In addition to what she's

22        already testified to?  Because there's been

23        a great deal of testimony by Ms. Martin in

24        that regard.

25        Q.    Other than what's already come out,

1   were there any other occasions prior to her

2   termination on which you discussed with

3   Ms. Perez your perception that she was

4   combative?

5       A.   No.

6       Q.   What happened after you read the

7   written statement?

8       A.   She wanted to discuss it.

9       Q.   Did she speak?

10      A.   Yes.

11      Q.   Did you say anything other than what

12   was in the written statement before Ms. Perez

13   began to speak?

14      A.   No.

15      Q.   What did Ms. Perez say?

16      A.   I don't remember.

17      Q.   Do you remember anything she said?

18      A.   She cried.

19      Q.   Do you remember anything she said at

20   all during the course of that meeting?

21      A.   She kept asking why.

22      Q.   Did you provide her with any further

23   explanation as to why she was being terminated?

24      A.   No.

25      Q.   Is there any particular reason why

[Page 232]

1      you did not explain more information on that?

2            A.      I did not want to get into a

3      discussion.

4            Q.      How long was the meeting in total?

5            A.      I don't know.

6            Q.      Was it more or less than 30 minutes,

7      if you can say?

8            A.      Less.

9            Q.      Was it more or less than 15 minutes,

10     if you can say?

11           A.      I don't know.

12           Q.      Did Mr. Nunez say anything during the

13     meeting?

14           A.      No.

15           Q.      Did Mr. Nunez know before the meeting

16     started what the purpose of it would be?

17           A.      No.

18           Q.      Did Mr. Nunez ever say anything to

19     you about that termination meeting?

20           A.      No.

21           Q.      Did Mr. Nunez ever after the meeting

22     say anything to you about Ms. Perez?

23           A.      No.

24           Q.      Other than crying and asking why, do

25     you recall anything else that Ms. Perez

[Page 233]

1    communicated during that meeting?

2        A.    She felt like it wasn't fair.

3        Q.    Anything else?

4              MR. HARZ:  If you remember.

5        A.    She tried to speak to Mr. Nunez and

6    crying.  That was it.

7        Q.    Apart from reading the written

8    statement, did you say anything else to

9    Ms. Perez during the meeting?

10       A.    Yes.

11       Q.    What else did you say to her?

12       A.    We need the keys, we need our laptop

13   and I need her to exit the building.

14       Q.    Did you say anything else?

15       A.    I don't remember.

16       Q.    And did -- how did Ms. Perez respond

17   when you indicated that you needed the keys and

18   the laptop?

19       A.    She cried.

20       Q.    Did she provide those items to you?

21       A.    Yes.

22       Q.    Did she ultimately exit the building?

23       A.    Oh, yes.

24       Q.    Was she escorted out by security?

25       A.    No.

[Page 234]

1        Q.      Did she scream or make any sort of

2    scene on her way out?

3        A.      She spoke to Lisa and Amber and left.

4        Q.      Were you present when she spoke to

5    Lisa and Amber?  That is did you hear her

6    speaking to them?

7        A.      No.

8        Q.      Do you know how much time she spent

9    speaking to them before she left the building?

10       A.      Sixty seconds.  I don't know.

11       Q.      Did Lisa and Amber tell you what it

12   was that they -- did Lisa or Amber ever tell you

13   what they had discussed?

14       A.      Yes.

15       Q.      Who told you?

16       A.      Lisa and Amber.

17       Q.      What did they say?

18       A.      She said she was going to, number

19   one, go to the police and, number two, file a

20   lawsuit.

21       Q.      Just so I'm clear, Lisa and Amber

22   said that Ms. Perez said that she --

23       A.      That Ms. Perez said.

24       Q.      Did Lisa and Amber indicate to you,

25   tell you that Ms. Perez had said anything to

# EXHIBIT C

[Page 1]

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

--------------------------------X

ISABEL PEREZ,

         Plaintiff,       Case No.

                        13 Civ.327(DMC)(MF)

        v.

FACTORY DIRECT OF SECAUCUS,

LLC d/b/a ASHLEY FURNITURE

HOMESTORE, EUGENE CHRINIAN,

in his official and

individual capacities, and

KATHY MARTIN, in her

official and individual

capacities,

           Defendants/Third-

           Party Plaintiffs,

        v.

THE OTTINGER FIRM, P.C.

--------------------------------X

     VIDEOTAPED DEPOSITION of EUGENE CHRINIAN,

held at the offices of ARCHER & GREINER, P.C.,

Court Plaza South, West Wing, 21 Main Street,

Suite 353, Hackensack, New Jersey, Pursuant to

Notice, before Beth Radabaugh, a Certified

Shorthand Reporter and Notary Public of the

State of New Jersey, on Friday, July 19, 2013,

commencing at 9:58 a.m.

[Page 12]

1          So that would have been just --

2   whatever is in the complaint would have been a

3   general conversation.

4        Q.    Prior to receiving the complaint, did

5   you know one way or another if Ms. Perez was a

6   lesbian?

7        A.    No.

8        Q.    Had you ever had any communication

9   with anybody about whether or not Ms. Perez was

10  or was not a lesbian?

11       A.    No, I didn't know she was a lesbian.

12       Q.    Did you ever have any communications

13  with anybody about her marital status?

14       A.    No.

15       Q.    Did you know one way or another if

16  Ms. Perez was married prior to receiving the

17  complaint?

18       A.    It's irrelevant.

19       Q.    Did you know?

20       A.    No.

21       Q.    Did Ms. Martin indicate that there

22  was any factual basis for Ms. Perez's

23  allegations of discrimination?

24       A.    Repeat that question.

25       Q.    Did Ms. Martin indicate that there

[Page 31]

1    was more interested in the title than she was

2    her responsibility to be embodied in the things

3    that we stand for.

4         Q.    Was Ms. Perez hired to fill the same

5    position that Ms. Bautista had held?

6         A.    Yes.

7         Q.    Same scope of duties?

8         A.    Yes.  But she wanted to be called

9    director of human resource as opposed to human

10   resource manager.

11            MR. HARZ:  Could you refer to who the

12       she is.

13       A.    Isabel.  And we obliged that and it

14   was the first indication that she may not be a

15   good fit.

16       Q.    And when did that request come up?

17       A.    Sometime during the initial offer.

18   Probably before she accepted employment or

19   thereabouts.

20       Q.    How did you first come to hear the

21   name Isabel Perez?

22       A.    Through the interview process.

23       Q.    Did you select Ms. Perez as a

24   candidate to be interviewed?

25       A.    I didn't select her as a candidate to

[Page 36]

1          A.     I ask similar questions with every

2     candidate.  So...

3          Q.     How did the interview start?  That is

4     did you begin by talking about the company and

5     the nature of the job or did you begin by asking

6     her questions about herself or something else?

7          A.     Typically we just start an interview

8     on a little bit of an ice breaker.  So we would

9     talk a little bit about ourselves and so tell me

10    a little bit about Isabel.  That's all.

11         Q.     As best you could remember -- strike

12    that.

13               As you sit here today do you remember

14    anything in particular that Ms. Perez said

15    during the interview that stuck in your mind?

16         A.     She made reference to a Bible verse

17    that I have on the wall.

18         Q.     What Bible verse do you have on the

19    wall?

20         A.     A Bible verse that references seeking

21    God's kingdom first.  Right behind my desk it's

22    on the wall and she questioned me about that

23    plaque on my wall.

24         Q.     Okay.  So when you're referring to

25    the Bible verse on the wall, is it in the nature

[Page 37]

1    of like artwork?

2         A.    It's a plaque, yes.  It's a wood

3    engraved plaque that goes right over my desk.

4         Q.    What did Ms. Perez ask about it?

5         A.    She made reference to it and she

6    said, are you a Christian.

7         Q.    How did you respond to that question?

8         A.    I said, yes, I am, and then she

9    responded, I'm an Episcopal minister, and I

10   responded, that's great, so you're also a

11   Christian.  She said yes, and then we continued

12   the interview process.

13        Q.    Was anything else on the subject of

14   religion said by either of you during that

15   interview?

16        A.    She questioned the plaque, as I just

17   said, and exactly what I just said is what took

18   place and then we just continued the interview

19   process.

20        Q.    Apart from what you've already

21   described, did religion --

22        A.    No.

23        Q.    -- come up at all at any other point

24   in the interview?

25        A.    No.

[Page 42]

1    through Kathy that Isabel wasn't content with

2    the position, the title of the position, which

3    was the first indication to me that she was not

4    going to -- potentially not going to be a good

5    fit.

6        Q.    Between Ms. Perez leaving at the end

7    of your interview and the discussion that you

8    just referenced with Ms. Martin about the job

9    title, so between those two points in time, did

10    you have any communications with anyone about

11    Ms. Perez?

12        A.    Can you please restate that question.

13        Q.    Sure.

14        A.    Between what periods of time?

15        Q.    I'll ask it in a different way.

16    After Ms. Perez left at the end of her

17    interview, when is the next time that you had

18    any communication with anyone about Ms. Perez?

19        A.    I would have spoken to Kathy at that

20    point, as I stated, Kathy, I agree, let's move

21    forward.  The next time I would have had any

22    conversation was likely over this matter because

23    as we made the offer, again, as I said, it was

24    the first indication that she was not going to

25    be a good fit.  She was more concerned about her

[Page 43]

1    title than the responsibility but we obliged it.

2        Q.    And did Ms. Martin tell you

3    specifically what title Ms. Perez wanted to

4    have?

5        A.    She wanted director of human

6    resources as opposed to human resource manager.

7        Q.    Did Ms. Martin explain to you why it

8    was that Ms. Perez was requesting that

9    particular title or just --

10       A.    I don't recall if she explained why.

11   She just said it was a request made by Perez.

12       Q.    What did you say to Ms. Martin in

13   response to her bringing that up with you?

14            MR. HARZ:   Objection.   If you

15       understand the question.   I don't

16       understand the question.

17       Q.    When Ms. Martin told you that

18   Ms. Perez wanted that title --

19       A.    That would have raised the concern.

20   If someone -- I've said it three times now.   If

21   someone to me is more important about their

22   title, it's potentially not a good fit.   So I

23   would have said if we can -- if this is

24   something we can accommodate that makes her, you

25   know, feel more comfortable, we'll discuss

[Page 44]

1    accommodating it, but, again, it's just that

2    it's an indication that it may not be a good

3    fit.

4         Q.    So you told Ms. Martin that you saw

5    it as an indication that it wouldn't be a good

6    fit?

7         A.    Whether I specifically had it on

8    that -- had that conversation with Mrs. Martin,

9    I know with any candidate that comes up, if that

10   type of situation comes up, that's the way I

11   would respond to it.

12        Q.    Prior to Ms. Perez starting work at

13   your company, did you express any other concerns

14   about possible red flags or potential --

15        A.    That was the only -- that was the

16   only engagement prior to her starting was the

17   offer process and the fact of the title.  So

18   there was nothing else to talk about.  There was

19   no other feedback.

20        Q.    Other than that communication with

21   Ms. Martin about title, did you have any other

22   communication with anyone prior to Ms. Perez

23   starting the job?

24        A.    Again, I've answered that three

25   times.  I said no.

[Page 45]

1      Q.      Okay.   Who did Ms. Perez report to as

2    director of HR?   That is who were her

3    supervisors?

4      A.      She reported to Kathy.

5      Q.      Anyone else?

6      A.      Kathy reports to me.   But Kathy had

7    no discretion on hiring or firing anybody in a

8    leadership position like that.

9      Q.      Were there any positions over which

10   Ms. Kathy Martin did have discretion to fire

11   employees without anyone else's approval?

12     A.      She would partner with Mark Scott if

13   it was anybody store related through a

14   corrective action process.   So she would partner

15   with Mark, but anybody in a leadership role, at

16   that level she had no authority.

17     Q.      Did Ms. Martin have authority to

18   terminate any employees without partnering with

19   Mr. Scott?

20     A.      By the nature of the reporting

21   process any -- any corrective action would have

22   naturally gone through Mark to get to Kathy.   So

23   they would have collaborated on it.

24     Q.      Apart from your interview with

25   Ms. Perez, did you during her employment have

[Page 46]

1    any communications with her directly?

2        A.    With Perez?

3        Q.    Yes.

4        A.    I believe I only actually saw her one

5    time in the eight to ten days she was with us.

6    Physically once.

7        Q.    And in what context did you see her

8    on that occasion?

9        A.    I was in Secaucus.  She was in

10    Secaucus.  She had been out the previous day and

11    in passing I said, how you doing, and prior to

12    that, the day before she was -- she had to go to

13    the hospital for something.  So I was concerned

14    about her and I asked her how she was doing.

15        Q.    Was that the extent of your

16    communication with her?

17        A.    Yes.  It was approximately five

18    minutes.

19        Q.    That was the only face-to-face

20    communication you had with her during her

21    employment?

22        A.    Over the course of the ten days

23    that's the only one I recall.  She may have been

24    in the building, in another building, but I

25    don't recall any other conversation directly.

[Page 102]

1 focuses on marriage and family life.

2   Q. Does Family Life have anything to do

3 with business?

4   A. No.

5   Q. Okay.  Are you a member of

6 Family Life?

7   A. No.

8   Q. Do you have any involvement with the

9 Family Life organization?

10   A. Be more specific, please.

11   Q. Other than being familiar with it as

12 a Christian ministry that focuses on marriage,

13 do you do anything, receive any information from

14 Family Life?

15   A. No.  Receive any information from --

16   Q. For example, do you attend events

17 that they hold or lectures or seminars?

18   A. I have not.

19   Q. Do you know one way or another

20 whether any employees of your company are

21 homosexual?

22   A. Do I know one way -- please restate

23 the question.

24   Q. To your knowledge are there any

25 homosexual employees of your company?

[Page 103]

1          A.    Current or past?

2          Q.    Current.

3          A.    Yes.

4          Q.    How is it that you are aware of the

5    fact that there are homosexual employees at the

6    company?

7          A.    Because the employee makes it known.

8          Q.    Do you care or is it of any interest

9    to you either way whether an employee is

10   homosexual or not?

11         A.    We've had many over the years and we

12   look for quality people, employees and it makes

13   absolutely no difference what -- homosexual or

14   gay has no bearing on their employment status.

15         Q.    Did you ever pray with Ms. Perez?

16         A.    No.

17         Q.    Do you have a prayer group or a

18   regular practice of praying with any employees

19   at your company?

20         A.    No.

21         Q.    I'm going to pass to you a document

22   that was marked as Exhibit Chrinian 2, two pages

23   Bates stamped ASH-PER-93 and 94.  If you could

24   please take a moment to review the document and

25   let me know when you've had a chance to do that.

[Page 114]

1          MR. GRAFF:  Mr. Chrinian, thank you

2     for your time today.  Subject to any

3     follow-up on any questions that your

4     counsel might have, I have nothing further.

5          MR. HARZ:  Yeah, I have questions.

6  EXAMINATION BY

7  MR. HARZ:

8     Q.     Mr. Chrinian, I'm going to call your

9  attention to Chrinian 1.  It's the Ashley

10  Furniture HomeStore Employee Resource Guide

11  about which Mr. Graff asked certain questions

12  and I call your attention to page seven.  He

13  asked you questions relating to the section

14  entitled Reporting Harassment and Investigation.

15  Do you see that section?

16     A.    Yes.

17     Q.    Reporting Harassment and

18  Investigation.  He asked -- well, I forget who

19  read it into the record, but either you or he

20  read into the record the first sentence and then

21  the second sentence.  The second sentence reads

22  again "If you believe you are being harassed or

23  have observed harassment, you should promptly

24  inform human resources or any senior member of

25  management within the organization."  Do you see

[Page 115]

1    that sentence?

2         A.    Yes.

3         Q.    For a position such as that held by

4    Isabel Perez, you referred to it as an HR

5    generalist, we called it another title as well,

6    other than Kathy Martin, who would have been

7    considered a member of senior management for a

8    position like that held by Isabel Perez?

9         A.    Mark Scott, myself.

10        Q.    Anyone else?

11        A.    Frank Passanate, who's our CFO, would

12   certainly have been considered senior.

13        Q.    Anyone else?

14        A.    There's other managers, but if you're

15   really senior, it would be them.

16        Q.    Those three --

17        A.    Yes.

18        Q.    -- would be considered senior?

19              Did -- or do you know whether or not

20   Ms. Perez ever complained to Mark Scott about

21   harassment?

22        A.    She never complained to Mark Scott

23   about harassment.

24        Q.    Do you know whether or not Ms. Perez

25   ever complained to Mark Scott about any

[Page 116]

1     employment discrimination?

2          A.     She did not.

3          Q.     Did Ms. Perez ever complain to you

4     about harassment?

5          A.     Never.

6          Q.     Did Ms. Perez ever complain to you

7     about employment discrimination?

8          A.     No.

9          Q.     Do you know whether or not Ms. Perez

10    ever complained to Frank Passanate about

11    harassment?

12         A.     She did not.

13         Q.     Do you know whether or not Ms. Perez

14    ever complained to Frank Passanate about

15    employment discrimination?

16         A.     She did not.

17              MR. HARZ:   I have no further

18         questions.

19              MR. GRAFF:   I have nothing further.

20    We can go off the record and adjourn.

21              THE VIDEOGRAPHER:   We're off the

22    record at 12:24.

23              (The deposition is adjourned at

24         12:24 p.m.)

25

# EXHIBIT D

FEB 0 7 2014

CONDENSED COPY

1        UNITED STATES OF DISTRICT COURT
         FOR THE DISTRICT OF NEW JERSEY
2        CIVIL ACTION NO.: 2:13-cv-00327 (DMC-MF)
      --------------------------------x
3
      ISABEL PEREZ,
4
              Plaintiff,
5     -vs-

6     FACTORY DIRECT OF SECAUCUS,
      LLC d/b/a ASHLEY FURNITURE
7     HOMESTORE, EUGENE CHRINIAN,
      in his official and indivi-
8     dual capacities, and KATHY
      MARTIN, in her official and
9     individual capacities,

10            Defendants/Third-
              party Plaintiffs,
11
      -vs-
12
      THE OTTINGER FIRM, P.C.,
13
              Third-party Defendant.
14    _____/ January 24, 2014
                                     Hackensack, N.J.
15

16                    DEPOSITION OF:

17                 THERESA RICCIARDI

18

19

20           ROSENBERG & ASSOCIATES, INC.

21       Certified Court Reporters & Videographers

22    425 Eagle Rock Ave., Ste. 201  250 Park Ave., 7th Fl.

23    Roseland, NJ 07068              New York, NY 10177

24     (973) 228-9100    1-800-662-6878     (212) 868-1936

25             www.rosenbergandassociates.com

34

1   Q.   Okay.  Who is your attorney?
2   A.   Leonardo Puig.
3   Q.   Can you spell the last name?
4   A.   P-u-i-g.
5   Q.   P-u --
6   A.   P-u-i-g.
7   Q.   Oh, P-u-i-g as in George?
8   A.   Yes.
9   Q.   On October 5th, 2012 you attended a
10  meeting at the Ashley Secaucus store with regard
11  to recruiting at which Kathy, Isabel, Amber
12  Dominguez, and Lisa Thorpe were present.  Isn't
13  that correct?
14  A.   Yes.
15       MR. GRAFF:  Objection.
16  Q.   Okay.  Now, earlier you testified,
17  quote, you said about Isabel Perez, quote, she
18  never gave me any kind of problem.  That was your
19  testimony.
20  A.   She never did with those times that
21  you've mentioned.
22  Q.   Okay.  I'm going to call your
23  attention to the October 5th --
24  A.   Yes.
25  Q.   -- 2012 meeting at the Secaucus

35

1   store regarding recruiting.  You had a
2   disagreement with Isabel during that meeting.
3   Correct?
4   A.   I believe there was some kind of a
5   friction going on between -- yes.
6   Q.   Thank you.  What specifically was
7   said by her, by you?  Could you explain to us
8   what happened?
9   A.   I don't remember exactly what she
10  said to me, but I know that once I sat next to --
11  it wasn't Amber.  What was the other?  Lisa?
12  When I sat next to Lisa, who was the other
13  recruiter, she started to get very upset --
14  Q.   Who starts to get very upset?
15  A.   I'm sorry.  Isabel seemed upset and
16  bothered some.  I didn't know what was going on.
17  She became very agitated at me.  I didn't
18  understand what was wrong, and I briefly
19  mentioned it to Kathy too.
20       Kathy was back and forth from in the
21  meeting, leaving the room and taking a phone call
22  a couple of times.  I don't remember how many
23  times it was.  It made me feel so uncomfortable
24  that I didn't even want to sit next to Lisa that
25  I got up and I went and I sat -- because we were

36

1   in the back, and I sat further up to the left of
2   the room, and there was a laptop there, and then
3   I got up again, because every time I kept turning
4   around she was just there and she was staring at
5   me like with such angry eyes.
6   Q.   Who is the "she"?
7   A.   I'm sorry.  Isabel Perez.  And she
8   made me feel so uncomfortable and it was getting
9   me very upset emotionally because I didn't
10  understand what was going on and I don't like any
11  confrontation when I'm at work.  I like to come
12  in and do my job and then be on my way, and, you
13  know, I went outside and I was trying to talk to
14  Kathy again but she was on the phone again, and
15  then I came back in and I ended up sitting
16  somewhere else.  I didn't even go back to sit
17  where the laptop was, and then I guess from what
18  I remember, when Kathy finally spoke with me --
19  or was it Lisa?  I think it might have been Lisa.
20  Lisa asking me if I broke the laptop.  I
21  said, "Excuse me"?  Because I didn't break
22  anything, and I do remember after like I went
23  outside and came back in, Isabel was already in
24  my seat.  That's why I didn't sit in that seat
25  where the laptop was, because she actually went

37

1   and decided to sit there where I was.  So I ended
2   up going, moving back to the back of the room,
3   and I didn't want to be anywhere around her at
4   that moment because she was making me feel
5   uncomfortable because you can just tell by her
6   body language and her facial expressions that she
7   was, you know, angry and agitated almost like as
8   if she was being territorial of me.  You know, I
9   didn't understand where this behavior was coming
10  from.
11  Q.   Her voice was raised to you during
12  that time.  Is that correct?
13  A.   I believe she did raise her voice
14  at me.  She did.  I don't remember exactly what
15  she said.  Trying to go back and in thinking
16  about everything, I really can't remember.  I
17  mean if you have something to help me jog my
18  memory, I'm more than welcome to listen to it,
19  but she did raise her voice.  I don't know what
20  exactly she said to me though.  I can't really
21  remember.  I honestly can't remember.
22  Q.   Isabel left the room, didn't she?
23  A.   I know that I was going out because
24  I was trying to talk to Kathy, and I think she
25  went and she left the room as well too.  I don't

38

1  know how many times it was done.
2      Q.    You mean she later came back?
3      A.    I believe she did.
4      Q.    And at that point she and you began
5  to argue again. Correct?
6          MR. GRAFF: Objection.
7      A.    I don't remember if we argued
8  again. I honestly don't.
9      Q.    Didn't she yell at you, quote, you
10 have to listen to me, I'm the H.R. director, I'm
11 the H.R. director? Do you recall?
12         MR. GRAFF: Objection.
13     A.    She did. Now that I remember, she
14 did.
15     Q.    And you also, you mentioned that
16 you left the room. What specifically caused you
17 to leave the room?
18     A.    The fact that she was making me
19 feel so uncomfortable because of her behavior and
20 her tone of voice, and I didn't understand where
21 this was coming from.
22         Like I said, I saw a complete change in her
23 once I decided to sit next to Lisa, the other
24 recruiter. You know, we're supposed to be
25 working together. We're supposed to be helping

39

1  to recruit, you know, for the company, and she's
2  basically my work partner, you know, where we
3  can, you know, just jog, or, you know, bring up
4  ideas with each other as far as recruiting, but
5  it did, it made me feel very uncomfortable.
6      Q.    You were discharged by Ashley later
7  that day. Correct?
8      A.    Yeah, I was. And I was in -- I'm
9  sorry. No, I was just in shock. I didn't
10 understand where this was all coming from and why
11 this happened. It really wasn't explained to me.
12     Q.    Do you know why you were
13 discharged?
14     A.    I don't remember exactly why. I
15 know I was trying to talk to Kathy about it, and
16 Kathy kept telling me not to worry about it, that
17 she would be in touch with me, she needed to look
18 into it some more. I said okay.
19         So I was thinking that I was going to get
20 rehired back by them, but I never did.
21     Q.    Other than the incident on October
22 5th that we just discussed, the recruiting
23 meeting, did you have any other disagreements
24 with Isabel?
25     A.    I.... After October 5th? I'm

40

1  sorry. Is that what you asked me?
2      Q.    Other than on October 5th or
3  anything else you testified to, did you have any
4  other disagreements with Isabel?
5      A.    I didn't have any disagreements
6  with her. There was an incident at the Paramus
7  store location. We were in the back office and
8  it was towards the end of the day and, you know,
9  she was sitting at one desk to the right and I
10 was sitting at the desk at the left, and she
11 started talking about, you know, her personal
12 life, and then she started crying, and what I
13 mean by her personal life, about an incident that
14 happened with her late brother passing away, so
15 she got emotional. She was talking about that,
16 and I felt really bad for her, you know, and I
17 went and I gave her a box of tissues that were in
18 the office and, you know, I told her that, yes,
19 it's hard, you know, when somebody that you love
20 passes away. I said, "I've been through the same
21 thing, my father passed away, but you always have
22 to think of it as they're in a better place."
23     Q.    And do you recall what she said
24 about her personal life?
25     A.    She was going about and telling me

41

1  a story about her brother. The way that he
2  passed away was that he was stopped at a light
3  and he was carjacked and they put a gun to his
4  head and they shot her brother.
5      Q.    Did she tell you anything else
6  about her personal life at that time?
7      A.    No. That was the only reason why
8  she was upset and crying from what I saw, from
9  what she told me.
10     Q.    Do you recall when this was at the
11 Paramus store?
12     A.    I don't remember the exact date. I
13 really don't. I'm sorry.
14     Q.    That's okay.
15     A.    I don't remember.
16     Q.    Were you ever present when Isabel
17 had difficulty with any other employees?
18     A.    Hmm, I remember her coming out of
19 her office and I was at my cubicle. My cubicle
20 was towards the entrance and exit towards the
21 back in Secaucus, and like I said, her office was
22 here to the left and I would face it, and Kathy's
23 office was to the right. Lisa was to the right
24 of me, and to the right of Lisa was Amber.
25     I don't remember if Amber was there or not,

42

1 but maybe she might have been, but I remember
2 Isabel coming out enraged pointing her index
3 finger at Lisa. I think, yeah, Amber was there
4 now that I remember, and she said something to
5 the effect of.... I'm trying to remember her
6 exact words. Pretty much scolding them I guess
7 because the girls were giggling and laughing, and
8 I can't remember exactly what she said, but I
9 know towards the end of that conversation, "If
10 you guys want to talk about how much everybody
11 gets paid," she goes, "I'll tell you right now
12 how much I get paid," and she mentioned a figure.
13 It was in the 90s, 90,000 and change. I can't
14 remember exactly what it was.
15     Q.     When you say Isabel was scolding,
16 what do you mean?
17     A.     Lisa and Amber.
18     Q.     And was she raising her voice?
19     A.     Raising her voice, she was raising
20 and pointing her index finger at them. I looked
21 up because my laptop was right here facing
22 Kathy's office and Isabel's office, and when I
23 saw her come out and started pointing her finger
24 at Lisa and then at Amber, and she was waving it
25 like this, you know, back and forth from right to

43

1 left, left to right at the two of them, I, you
2 know, my eyes just opened up wide and my jaw
3 dropped. I was in shock, and I thought it was
4 inappropriate, you know, and it made me nervous
5 and uncomfortable to see that because that's not
6 an appropriate thing to do when you need to
7 reprimand an employee in my opinion for
8 something. And I didn't even see them doing
9 anything wrong. They were just laughing and
10 giggling between the two of them, so I don't....
11     Q.     Okay. When you say "they" were
12 just laughing and giggling, who do you --
13     A.     Amber and Lisa were laughing and
14 giggling.
15     Q.     Do you recall over what they were
16 laughing and giggling, about what?
17     A.     I wasn't paying attention. I was
18 focused on the laptop. I really don't remember.
19     Q.     Were you ever present when Isabel
20 had difficulty with any other employee?
21     A.     I don't remember. I mean if you
22 have something to help me jog my memory, you
23 know, then, you know, I'll talk about it, but I'm
24 thinking and I'm really -- not for those things
25 that I've mentioned, I don't remember.

44

1     Q.     Do you recall Isabel having any
2 difficulty or any other difficulty with either
3 Amber or Lisa? By the way, when I say Amber and
4 Lisa, it's Amber Dominguez and Lisa Thorpe?
5     A.     Yes.
6     Q.     Thank you. Do you recall Isabel
7 having any other difficulty with either/or both
8 of them?
9     A.     She did mention to me that she
10 wanted to have the both of them replaced.
11     Q.     Isabel mentioned that to you?
12     A.     Yes. She mentioned to me that she
13 wanted to have Amber and Lisa replaced.
14     Q.     Did she say why?
15     A.     No. She didn't tell me why.
16     Q.     Do you recall where you were when
17 Isabel said that to you?
18     A.     I think I was in her office. I was
19 in her office, and I was having issues with the
20 fax outside where my cubicle was, so I would use
21 her fax in her office because I had to fax
22 something over, but I think that's when it took
23 place. That's when it definitely took place.
24     Q.     Do you recall when that was?
25     A.     I don't remember the exact date or

45

1 time. I really don't. It was obviously in the
2 time frame that I was working for them, for
3 Ashley.
4     Q.     Do you recall any other difficulty
5 that Isabel had with Amber and/or Lisa?
6     A.     I don't. I don't remember.
7 Honestly I really don't.
8     Q.     Were you ever told by anyone that
9 Isabel had difficulty with another employee?
10     A.     No. I don't remember.
11     MR. HARZ: Okay. Let's take a two-
12 minute break. Off the record.
13     (There is a brief recess.)
14     MR. HARZ: Okay. I have no further
15 questions.
16 EXAMINATION BY MR. GRAFF:
17     Q.     I know you've answered a lot of
18 questions already. I just have some brief
19 follow-up which shouldn't take long.
20     A.     Sure.
21     MR. HARZ: I'm having difficulty
22 hearing you and I'm right here.
23     Q.     I have some brief follow-up
24 questions. I'll try not to keep you long.
25     A.     Thank you.

# EXHIBIT E

```
 1              UNITED STATES DISTRICT COURT
                DISTRICT OF NEW JERSEY
 2              Civil Action No. 13 Civ. 327 (DMC)(MF)

 3

 4   ISABEL PEREZ,

              Plaintiff,        DEPOSITION OF:
 5                              LISA THORPE
         vs.
 6

 7   FACTORY DIRECT OF SECAUCUS, LLC,
     et al.,
 8
              Defendants.
     ---------------------------X
 9

10

11

12        BEFORE RONDA L. REINSTEIN, a Certified Court

13   Reporter of the State of New Jersey, at the offices of

14   Archer & Greiner, P.C., Court Plaza South, West Wing,

15   21 Main Street, Hackensack, New Jersey 07601, on

16   Tuesday, February 18, 2014, commencing at 5:25 p.m.

17   pursuant to notice.

18

19

20             ROSENBERG & ASSOCIATES, INC.

21        Certified Court Reporters & Videographers

22   425 Eagle Rock Ave., Ste 201   250 Park Ave., 7th Fl.

23   Roseland, NJ 07068             New York, NY 10177

24    (973) 228-9100    1-800-662-6878    (212) 868-1936

25             www.rosenbergandassociates.com
```

**22**

1    Q.  Was this the first time that you had
2 heard from anyone that Isabel Perez was homosexual?
3    A.  Yes.
4    Q.  Was it the first time you heard from
5 anyone that Isabel Perez had a partner?
6    A.  Yes.
7    Q.  Ms. Perez alleges in her lawsuit, Lisa,
8 that her sexual orientation was well known among her
9 coworkers.
10       Was it your impression that her sexual
11 orientation was well known among her coworkers?
12    A.  No.
13    Q.  It was not well known?
14    A.  No.
15    Q.  What is the basis for that impression?
16    A.  I didn't know until she told me. So I
17 don't know how anybody else would know.
18    Q.  Unless she told you?
19    A.  Unless she told you.
20    Q.  Were you aware that during your
21 employment at Ashley whether Ms. Perez was married to
22 a woman?
23    A.  She told us.
24    Q.  Well, you said she said she had a
25 partner?

**23**

1    A.  Yes.
2    Q.  Did she tell you she was married to a
3 woman?
4    A.  I don't know if she said she was
5 married. She said she had a partner. I don't
6 remember the details.
7    Q.  When you say "details," what do you
8 mean?
9    A.  Whatever else she said. Again, this is
10 over a year ago, a year and some ago. At that point
11 I wasn't involved in what was going on with that. So
12 I don't remember. I don't care to remember, you
13 know.
14    Q.  I understand. I'm asking you to jog
15 your memory.
16    A.  I don't remember.
17    Q.  Let me finish. I understand that it's
18 been some time ago. What I'm asking you to do is jog
19 your memory to the extent that you can just to
20 provide us with whatever is your recollection.
21 That's all.
22       To your knowledge, did Kathy Martin know
23 that Isabel Perez was a homosexual?
24    A.  Not to my knowledge.
25    Q.  No?

**24**

1    A.  Not to my knowledge.
2    Q.  Did Kathy Martin ever mention to you
3 that Isabel Perez was a homosexual?
4    A.  Not to my knowledge.
5    Q.  Did you ever hear Kathy Martin make any
6 remark about lesbians or homosexuals?
7    A.  No, not to my knowledge.
8    Q.  Did Kathy Martin ever use the term
9 "lesbo"?
10    A.  I don't know. I don't remember.
11    Q.  Did Kathy Martin ever use the term
12 "fag"?
13    A.  I don't know. I don't remember.
14    Q.  Ms. Perez alleges in her lawsuit that
15 the fact that she was married to a woman was well
16 known among her coworkers.
17       Was it your impression that her marriage
18 to a woman was well known among her coworkers?
19    A.  I just answered. I don't remember.
20    MR. GRAFF: Objection. Asked and
21    answered.
22    MR. HARZ: Asked and answered
23    unfortunately is not a proper objection. I
24    have a right to continue.
25    Q.  You don't remember what? I'm not sure.

**25**

1    A.  The question that you asked me.
2    Q.  All right. I'm going to ask the
3 question again.
4       Ms. Perez alleges in her lawsuit that
5 the fact she was married to a woman was well known
6 among her coworkers. Was it your impression that her
7 marriage to a woman was well known among her
8 coworkers?
9    A.  I don't know.
10    Q.  Isabel Perez alleges in this lawsuit
11 that she raised concerns to Kathy Martin regarding
12 Kathy's and other co-workers' discriminatory comments
13 and conduct, including but not limited to the use of
14 racial and ethnic slurs in the workplace.
15       Did Isabel ever mention these concerns
16 to you?
17    A.  Yes.
18    Q.  Did she ever mention that she raised
19 these concerns with Kathy?
20    A.  Yes.
21    Q.  To anyone else?
22    MR. GRAFF: Objection.
23    Q.  Did she mention that she raised these
24 concerns with anyone else, Isabel?
25    A.  I don't remember.

30

1  and Isabel we would talk about it, or disagreement
2  between the two.
3      Q.    On September 19th, 2012, you and Amber
4  Dominguez attended an educational session at ADP,
5  correct?
6      A.    We attended a session at ADP, yes.  I
7  don't remember when it was.
8      Q.    I'm sorry, I didn't hear you.
9      A.    I don't remember when it was.  But if
10 you say September...
11     Q.    Sometime around September you attended
12 an educational session at ADP; isn't that correct?
13     A.    Correct.
14     Q.    Isabel Perez was also in attendance at
15 that meeting, correct?
16     A.    Yes.
17     Q.    Would you please describe Isabel's
18 conduct at that session at ADP.
19     A.    Very bossy.
20     Q.    Isabel made you feel uncomfortable at
21 that session, correct?
22     A.    Yes.
23     Q.    She made you feel withdrawn, correct?
24     A.    I wouldn't say withdrawn.  I just wasn't
25 going to argue with someone who didn't know the

31

1  purpose that we came there.  Because Kathy gave us
2  strict instructions, questions to ask ADP, what we
3  should look for.  And she was going against
4  everything that -- the questions that we would ask,
5  she was like Oh, you don't know need to know that.
6      Q.    Who said that you don't need to know the
7  answers to the questions you were asking?
8      A.    Isabel.  You don't need to know that
9  because I'm going to do something different.  You
10 don't need to do that because we're going in a
11 different direction.
12          At that point after she said that a
13 couple times I just stopped asking questions.
14     Q.    Isabel made you feel anxious at that
15 time, correct?
16     A.    Yes.
17     Q.    She was argumentative at that time,
18 correct?
19     A.    Yes.
20     Q.    Isabel interrupted Amber and you when
21 you attempted to ask questions, correct?
22     A.    Yes.
23     Q.    Amber and you told Isabel at that
24 session that you previously discussed the ADP session
25 with Kathy Martin, correct?

32

1      A.    Yes.
2      Q.    And isn't it true that Isabel Perez
3  responded by saying "Kathy Martin is not overseeing
4  ADP, I am"?
5      A.    Yes.
6      Q.    Isabel Perez recorded that ADP session,
7  correct?
8      A.    Yes.
9      Q.    When did you find out that she recorded
10 the session?
11     A.    Later on when we were in the meeting she
12 said "Oh, let me pull up what he said at ADP."  We
13 were like You recorded that without telling us, you
14 recorded us without... She's like yes.
15     Q.    Before Amber and you found out that
16 Isabel recorded the session, did you ever tell Isabel
17 that you were agreeable to her recording the session?
18     A.    No.  I didn't know she recorded it.
19     Q.    Did Amber ever tell Isabel Perez that
20 Amber was in agreement with Isabel recording the
21 session?
22     A.    Oh, I don't know what Amber did.
23          MR. GRAFF:  Objection.
24     Q.    You can answer the question.  You can
25 answer.

33

1      A.    Okay.  I don't know what Amber said to
2  her.
3          Can I just ask a question?  What does
4  that mean when he says --
5      Q.    He's stating an objection for the
6  record.  But you still have to answer the question.
7          MR. GRAFF:  My objection is not intended
8  to influence your answers at all.
9      Q.    Right.  What we do is we look at the
10 objections at a later date.
11     A.    Okay.
12     Q.    Isabel Perez requested that she, Amber
13 and you have many closed-door meetings, correct?
14     A.    Isabel said -- what did you say again?
15     Q.    Isabel Perez requested that she, Amber
16 and you have many closed-door meetings, correct?
17          MR. GRAFF:  Objection.
18     A.    I don't know what "many" means.  Many?
19 And I don't know what you mean by closed doors.
20          Most of the time Kathy wasn't there.  It
21 was just Amber, myself and Isabel.
22     Q.    Behind a closed door?
23          MR. GRAFF:  Objection.
24     A.    Yes.  I mean, the doors were always
25 closed.

34

1  Q.   At one of those meetings Isabel told
2  Amber and you that Kathy Martin was no longer in
3  charge of Ashley Human Resources Department, correct?
4  A.   I don't remember.
5  Q.   You don't remember?
6  A.   No.
7  Q.   I'm going to ask you to jog your memory
8  again. At one of those meetings didn't Isabel tell
9  you and Amber that Kathy Martin was no longer in
10  charge of the Ashley Human Resources?
11  MR. GRAFF:  Objection.
12  A.   I don't remember that.
13  Q.   Isabel told Amber and you that Amber and
14  you should only go to Isabel and not Kathy Martin
15  with regard to issues regarding human resources;
16  isn't that correct?
17  A.   I don't know if she said regarding human
18  resources or regarding our day-to-day work, because
19  she was our supervisor.
20  Q.   And Kathy Martin was not?
21  A.   She didn't say Kathy wasn't. I'm your
22  direct supervisor so you go to me. The chain of
23  command is if there was a problem she would go to
24  Kathy. Kathy would say we could go to either/or.
25  Q.   Isabel Perez said that she -- Isabel was

35

1  your direct supervisor?
2  A.   Direct supervisor.
3  Q.   And that you should go to Isabel and not
4  Kathy?
5  A.   That we should go to her.
6  Q.   To Isabel?
7  A.   Yeah.
8  Q.   Isabel also said that she and not Kathy
9  was going to be human resources manager, correct?
10  MR. GRAFF:  Objection.
11  A.   I don't remember that. Because Kathy
12  was a director, not a manager.
13  Q.   Isabel said that Eugene Chrinian does
14  not trust Kathy Martin; isn't that correct?
15  A.   She did say that, yes.
16  Q.   Did she ever tell you how she knew that?
17  A.   No.
18  Q.   Isabel also told Amber and you that
19  Eugene Chrinian wanted to fire Amber and you; isn't
20  that correct?
21  A.   Yes.
22  Q.   Isabel Perez also told you and Amber
23  that Eugene Chrinian kept files on the two of you;
24  isn't that correct?
25  A.   Yes.

36

1  Q.   Isn't it also true that in one of the
2  closed-door meetings Isabel Perez said to Amber and
3  you, quote, "I am a woman's woman, do you know what
4  that means," end quote?
5  A.   Yes.
6  Q.   Yes, she did say that?
7  A.   Yes, she did say that.
8  Q.   Isabel also said, quote, "I am married
9  to a woman," end quote; isn't that correct?
10  A.   I don't remember that.
11  Q.   Did you ever tell anyone about the
12  conversation with Isabel that we just discussed?
13  A.   No.
14  Q.   Do you know what, if anything, prompted
15  Isabel to tell you that she was a homosexual?
16  A.   No. I thought she was crazy.
17  Q.   You thought she was crazy?
18  A.   Um-hm.
19  Q.   Who?
20  A.   Isabel.
21  Q.   Why did you think she was crazy?
22  A.   You're coming into an organization two
23  weeks on the job, two weeks in giving this type of
24  information, you just don't do that type of stuff.
25  Q.   What do you mean giving this type of

37

1  information?
2  A.   Saying I'm a woman's woman. Who does
3  that if you're going to be managing somebody, that
4  make their employees feel uncomfortable.
5  Q.   Did it make you feel uncomfortable?
6  A.   No. Because I know who I am. But then
7  again I just thought the whole process, her being
8  hired and how she was hired, was just out of the
9  norm. You would never ever see that in any other
10  company that you would work at.
11  Q.   Did there come occasion when Isabel,
12  Amber and you were in the Ashley store's parking lot
13  and Isabel said "Do you see the decal on my car"?
14  A.   Yes.
15  Q.   Isn't it true that Isabel then asked you
16  "Do you know what it stands for"?
17  A.   Yes.
18  Q.   Isn't it also true that Isabel told you
19  that the decal stood for a lesbian rights
20  organization?
21  A.   Yes.
22  Q.   On October 5th, 2012, you attended a
23  meeting with respect to recruiting at which Isabel
24  Perez, Kathy Martin, Theresa Riccardi, and Amber
25  Dominguez were present, correct?

38

1    A.    I don't know if Amber was present in
2  that meeting.
3    Q.    Isabel and Theresa had a disagreement at
4  that meeting, correct?
5    A.    Yes.
6    Q.    Isabel raised her voice, correct?
7    A.    Yes.
8    Q.    Isn't it true that Isabel screamed,
9  quote, "You have to listen to me, I am the HR
10 director, I am the HR director," end quote?
11   A.    She screamed something.  I don't
12 remember what she screamed.
13   Q.    To the best of your recollection, can
14 you tell us what Isabel screamed?
15   A.    I don't remember.
16   Q.    But she did scream something?
17   A.    Yes.
18   Q.    Were you ever told by anyone that Isabel
19 had difficulty with another employee?
20   A.    No.
21   Q.    Other than what you have testified to
22 today, were you ever present when Isabel had
23 difficulty with any other employees?
24   A.    No.
25   Q.    Other than what we have discussed, did

39

1  you have any issues with Isabel?
2    A.    No.
3          MR. HARZ:  I have no further questions.
4          MR. GRAFF:  I have a few follow-up
5  questions.  Could we maybe go off the record
6  for a minute.
7          (Brief recess was taken.)
8                CROSS-EXAMINATION
9  BY MR. GRAFF:
10   Q.    Ms. Thorpe, I have just a few follow-up
11 questions.
12         First, do you understand that you're
13 still under oath and this is a continuation of your
14 deposition?
15   A.    Yes.
16   Q.    You had mentioned something to the
17 effect that Isabel had a problem with a word that
18 Ms. Martin, Kathy Martin, used, I think specifically
19 "heifer"; is that correct?
20   A.    Yes.
21   Q.    Were there any other words that
22 Ms. Martin used that Isabel said she had a problem
23 with?
24   A.    Yeah, there were other words.  I don't
25 remember what they were.  But that particular she had

40

1  a problem with.  Yeah, I don't remember.
2    Q.    Do you remember whether Ms. Martin would
3  refer to you or Amber in the workplace as a bitch?
4    A.    Yeah, she would.
5    Q.    Do you remember whether she would use a
6  racial word, the N word?
7    A.    Not to me.  But she has used that in the
8  office.
9    Q.    How do you know that she has used it in
10 the office?
11   A.    Because I heard her.
12   Q.    Can you remember any context --
13   A.    No.
14   Q.    Did you hear Ms. Martin refer to people
15 the biracial term "brownie"?
16   A.    Her kids, yes.
17   Q.    What about the word "creamy"?
18   A.    Her kids.  Because she's biracial.
19   Q.    Did Ms. Martin ever mention anything to
20 you in the workplace about a homosexual relative or
21 family member?
22   A.    I don't remember.  I don't remember.  I
23 don't want to say -- I thought I recalled her saying
24 somebody in her family was -- I think so.  But I
25 don't remember the context, how it was talked about.

41

1  I don't remember.
2    Q.    Do you remember -- not specific to who
3  she was referring to, but do you remember
4  Ms. Martin saying anything about any homosexual
5  person?
6    A.    I just remember that she -- I don't know
7  if she had a child or somebody in her family who was
8  gay.  I do remember that conversation, but I don't
9  know what else, what else came around it.
10   Q.    Do you remember if Kathy Martin said
11 anything about religion in that conversation?
12   A.    No, I don't remember.
13   Q.    Did Ms. Martin talk about religion at
14 all to you in the workplace?
15   A.    Oh, yeah, all the time.  She was a
16 minister and she prayed with us frequently.
17   Q.    When you say she prayed with you
18 frequently, can you describe what that actually --
19   A.    She would pray with Amber and I.
20   Q.    Is this something that Ms. Marty would
21 suggest that the three of you do?
22   A.    Yes.  She would say "Let's pray."
23   Q.    Did anybody else --
24   A.    It was just the three of us there.
25   Q.    Just for the transcript, I know

46

1    write that email did she explain anything about what
2    it should include and why she was asking?
3        A.    She wanted to have a trail, she said, of
4    Isabel's, her actions.  It was almost that you felt
5    obligated to write.  You've got to do it.  We've got
6    to cover ourselves.
7        Q.    Had Ms. Martin ever asked you to write
8    an email like that about any other employee or former
9    employee?
10       A.    No.
11       Q.    Did you know if Ms. Martin asked
12   anybody else to write a document or email about
13   Ms. Perez?
14       A.    I think she asked Amber, but I'm not
15   sure.
16       Q.    You had mentioned earlier -- I know we
17   already touched on this.  I just have a couple more
18   questions.
19             You mentioned earlier that Ms. Martin
20   would refer to, I believe, you and Amber by the word
21   "heifer."  Did you ever hear her refer to any other
22   employees at the company by that word?
23       A.    I mean, if somebody called in, you know,
24   from the store and she had spoken to them about
25   something and she said "Heifer, didn't I just tell

47

1    you or I spoke to you last week about it?"  Again,
2    when she said that, she didn't mean anything by it.
3    That was just her way of how she was very
4    lackadaisical, I would say, that unprofessionalism
5    going on.  But she didn't mean anything by it.
6        Q.    As you understood what the actual word
7    heifer means, what does that word mean to you?
8        A.    Coming from Kathy, like somebody you're
9    talking to in the street.  Like, I would call Amber a
10   heifer if I'm talking to her.
11       Q.    I'm not trying to ask an overly simple
12   question.  But just what does heifer mean?
13       A.    It doesn't mean anything to me.  It's
14   just another word that you use.
15       Q.    Did you agree with Isabel when she told
16   you that she thought that some of the words that
17   Ms. Martin used in the workplace to employees were
18   inappropriate in a professional workplace?
19       A.    Sometimes.  Because you know how I
20   looked at it is if somebody else came back and heard
21   her use those types of words it could not send the
22   right message.  But, again, I knew Kathy and I knew
23   she didn't mean anything by it.
24       Q.    Can I ask why you decided to end your
25   employment?

48

1        A.    Because I did not like the company, how
2    they treated their employees, starting with Eugene.
3        Q.    Are there any particular examples that
4    led you --
5        A.    They just didn't treat their employees
6    good.  They didn't care about their people.  All they
7    were worried about was numbers.
8        Q.    Anything else?
9        A.    No.
10       Q.    Is there any particular reason why you
11   referred specifically to Eugene in your last
12   response?
13       A.    Because he's the owner of the company,
14   and it starts from the top and goes down.
15       Q.    Did you ever hear Eugene say anything
16   that made you uncomfortable or upset for any reason?
17       A.    I've heard Eugene say things, you know,
18   like if a customer called in and something is wrong
19   with their delivery, they want you to refuse
20   furniture.  If the customer feels that something is
21   wrong with it, he wants you to make them, you know,
22   try to persuade them to leave that furniture there
23   regardless of what the customer is saying.
24             That was something that I didn't agree
25   because I bought furniture from there.  If I had a

49

1    scratch on it, I don't want a technician coming in
2    after I paid money for furniture coming in and
3    telling me you're going to send a technician to look
4    at it.  I want it to be perfect when I get it.
5             So it was just little stuff like that.
6    He just didn't care about his employees.
7        Q.    Can you think of any other examples like
8    that?
9             MR. HARZ:  Object.  What does this have
10   to do with the lawsuit?
11            MR. GRAFF:  I can explain it to you
12   outside of the presence of the witness.  I
13   think we'll be finished.
14            MR. HARZ:  I'll let you go a little
15   further, Ari.  But, again, I'm going to ask you
16   to stay in relation to the lawsuit.
17            MR. GRAFF:  Your comment is noted.  I
18   think we're nearly done.
19       A.    I'm sorry.
20       Q.    Can you think of any other examples or
21   instances --
22       A.    They just didn't treat their employees
23   good.
24       Q.    I'm sorry.  Just for the record, if I
25   could just finish the full question.  Thank you for

Kathy Martin

| | |
|---|---|
| From: | Lisa Thorpe [lthorpe@ashleyne.com] |
| Sent: | Wednesday, October 24, 2012 2:07 PM |
| To: | 'Kathy Martin' |

Isabel management style was not conducive to Ashley Furniture culture. She came into the organization wanting to make a change immediately without knowing the history or the culture of this company. She made me feel very uncomfortable when she said to me that her and Kathy Martin are running side by side and she never loses. I said to her that I didn't know that this was a competition but a team that suppose to be working together. Isabel was always trying to divide our team. This team was a cohesive team prior to her coming on board. When Isabel would ask me to do something and we didn't do it the way she wanted it to be done. I would say to her, let me check with Kathy. Isabel said to me you now report to me not Kathy and you don't need to check with her. Again, this made me feel uncomfortable. Isabel didn't want us to tell Kathy about anything that was going on in the department. She said she didn't need to know that's why she was there.

We attended an offsite meeting at ADP and she was very argumentative and controlling during this training. The HR team had already discussed what was needed from ADP but Isabel came in with her own agenda. I said to Isabel that this is what Kathy has approved and her reply was Kathy is not overseeing ADP she was. Isabel recorded the entire meeting without us knowing or our consent.

Isabel told Amber and I that Eugene had a file on us and we were going to be fired. We were both surprised that she said that.

On October 5, 2012 we had a meeting regarding recruiting. Isabel and Theresa had a disagreement and they both got loud. Isabel walked out the room crying saying she resigned. She came back into the meeting and again her and Theresa disagreed on a topic and Isabel yelled at Theresa "I am the HR Director" she said this over and over to her.



# EXHIBIT F

COPY

1           UNITED STATES OF DISTRICT COURT
            FOR THE DISTRICT OF NEW JERSEY
2        CIVIL ACTION NO.: 2:13-cv-00327 (DMC-MF)
   - - - - - - - - - - - - - - - - - - - - - - - -x
3
   ISABEL PEREZ,
4
          Plaintiff,
5  -vs-

6  FACTORY DIRECT OF SECAUCUS,
   LLC d/b/a ASHLEY FURNITURE
7  HOMESTORE, EUGENE CHRINIAN,
   in his official and indivi-
8  dual capacities, and KATHY
   MARTIN, in her official and
9  individual capacities,

10        Defendants/Third-
          party Plaintiffs,
11
   -vs-
12
   THE OTTINGER FIRM, P.C.,
13
          Third-party Defendant.
14 _____/ February 25, 2014
                                   Hackensack, N.J.
15

16              DEPOSITION OF:

17              AMBER DOMINGUEZ

18

19

20         ROSENBERG & ASSOCIATES, INC.

21      Certified Court Reporters & Videographers

22   425 Eagle Rock Ave., Ste 201    250 Park Ave., 7th Fl.

23   Roseland, NJ 07068               New York, NY 10177

24    (973) 228-9100    1-800-662-6878    (212) 868-1936

25          www.rosenbergandassociates.com

22

1  contact her, but nothing serious.
2      Q.      Did you ever speak to Jackie Cortez
3  about this lawsuit?
4      A.     No.
5      Q.      And you said earlier with regard to
6  Lisa Thorpe that you are friends?
7      A.     Yes.
8      Q.      Do you speak to her quite often?
9      A.     Yes.
10     Q.      Did you ever speak to Lisa Thorpe
11 about this lawsuit?
12     A.     No. We do not sit down and speak
13 about this kind of stuff outside of anything.
14     Q.      With regard to Jody Matter, how
15 often do you speak to Jody Matter?
16     A.     Just through Facebook.
17     Q.      What's the substance of your
18 communications with Jody Matter?
19     A.     Kids. Just her kids are in Cub
20 Scouts, so usually just touching base about kids.
21     Q.      Did you ever discuss this lawsuit
22 with Jody Matter?
23     A.     No.
24     Q.      How much interaction did you have
25 with Isabel Perez during your employment at

23

1  Ashley?
2      A.      Uhm, I would say a fair amount of
3  interaction with her because I was located in the
4  Secaucus facility at the time that she was
5  employed there, so mostly on a day-in-and-day-out
6  basis during her time there.
7      Q.      What portion of your workday
8  generally was involved with interacting with her?
9      A.      Honestly, mostly just in the
10 mornings upon her arrival, because after that it
11 was usually she would be in closed-door meetings
12 with Kathy or Theresa.
13     Q.      What was your general impression of
14 Isabel Perez?
15     A.      Uhm, my general impression of her
16 was that she was very stern and kind of hyper,
17 but I guess that was just the way she carried
18 herself.
19     Q.      Did Isabel Perez ever mention
20 Isabel's consulting business?
21     A.     Yes, all the time.
22     Q.      What did she say about it?
23     A.      She just had said that she had a
24 consulting business and that she had two offices,
25 and that she had actually sold her business and

24

1  came to work for Ashley Furniture.
2      Q.      Did she say anything about
3  continuing her consulting business?
4      A.      I don't recall her saying she
5  continued it, but I do recall her saying that she
6  was upset that she sold her business to come to
7  work for Ashley Furniture, but I don't recall her
8  saying that she was going to continue her
9  business.
10     Q.      Did she say these things to you
11 orally?
12     A.     Yes.
13     Q.      Were there any other witnesses at
14 the time?
15     A.      I would say yes. If I recall
16 correctly, either myself, Lisa, and Theresa would
17 be in the vicinity of the same area.
18     Q.      Were you aware during your
19 employment at Ashley that Isabel Perez was
20 homosexual?
21     A.     Yes, I was.
22     Q.      How did you become aware?
23     A.      I actually became aware of this
24 information during a sit-down that she had
25 requested for me to come into the office behind

25

1  closed doors.
2      We were having a conversation where she was
3  letting me know that neither Eugene or Kathy
4  wanted me to be part of the H.R. staff and that
5  they were looking to terminate me, and after that
6  conversation she told me that she's a woman's
7  woman and did I understand what that meant? And
8  I kind of said yes, but I didn't really
9  understand what it meant. So I kind of just
10 giggled and, you know, nodded, and like, yeah, I
11 know what it means, but I really didn't know what
12 it meant.
13     Then she asked me to bring Lisa into the
14 office for the sit-down. So I called Lisa into
15 the office, and then that's when she went into
16 more detail explaining that she was married to
17 another woman.
18     Q.      When was this? When was this sit-
19 down?
20     A.      It was the day -- I believe it was
21 the day after she was officially on-boarded.
22     Q.      The day after she was employed by
23 Ashley?
24     A.     Yes.
25     Q.      Officially employed?

26

1   A.   Yes.
2   Q.   When you say officially employed,
3   what do you mean?
4   A.   Because the day before that, and it
5   was the day before that that she was there in the
6   office, we were having a meeting in the
7   conference room but it wasn't her first official
8   day of work, it was that she was just there for
9   that short meeting to go over job duties and to
10  let us know that her and Kathy were equal.
11  Q.   What do you mean she wanted to let
12  you know that her and Kathy were equal?
13  A.   That's the part that confused me
14  all the time. That's what she told us, that her
15  and Kathy were equal; that they were both in the
16  same level in the H.R. Department.
17  Q.   By "Kathy," are you referring to
18  Kathy Martin?
19  A.   Yes.
20  Q.   Ms. Perez alleges in her lawsuit
21  that her sexual orientation was well-known among
22  her co-workers. Was it your impression that her
23  sexual orientation was well-known among her
24  co-workers?
25  A.   I honestly say no.

27

1   Q.   Why do you say that?
2   A.   Because when she told me and Lisa
3   in our conversation, she asked us not to tell
4   anybody, and I know me myself, I didn't tell
5   anybody about it. I kept it between us because
6   really it didn't matter to me what her sexual
7   orientation was. That doesn't bother me. To my
8   knowledge I don't think Lisa said anything to
9   anybody. So I would say it was just the two of
10  us that knew about it, and I know I didn't say
11  anything to anyone.
12  Q.   To your knowledge did Kathy Martin
13  know that Isabel Perez was homosexual?
14  A.   No. Kathy did not know.
15  Q.   How do you know that?
16  A.   I can say that I know that because
17  the day that Kathy found out was I believe the
18  day that Isabel got terminated, and it wasn't
19  through me or Lisa, it was through a conversation
20  that I guess Theresa Ricciardi I think her last
21  name was had with Mark Scott the night before.
22  Q.   Could you explain that further?
23  A.   To what I was told, I don't know,
24  you know, because I wasn't involved in the
25  conversation.

28

1   Q.   Told by whom?
2   A.   Told by Kathy.
3   Q.   Kathy Martin?
4   A.   Kathy Martin that Mark -- that
5   after they had terminated Isabel, Mark Scott and
6   Kathy had a conversation to where Mark Scott
7   explained to Kathy that Theresa had called him on
8   his drive home from work and was I guess talking
9   to him about situations that happened in the
10  office that she wasn't comfortable with; that I
11  guess there was a situation that happened in one
12  of the stores that I really don't know too much
13  about, and that she --
14  Q.   "She" meaning who?
15  A.   Theresa told Mark Scott that, I'm
16  sorry, that Isabel was, you know, married to a
17  woman.
18  Q.   Theresa told Mark Scott that Isabel
19  was married to a woman?
20  A.   Correct.
21  Q.   Theresa Ricciardi was not manager
22  of Ashley. Isn't that correct?
23  A.   I really don't know what her
24  position was. I don't know what she was hired
25  as.

29

1   Q.   Isn't it a fact that she was a
2   recruiter for Ashley?
3   A.   Yes, to my understanding that's
4   what she was there for, but she carried herself
5   in a totally different aspect. She wasn't doing
6   recruiting at all at the time that she was there.
7   She more or less wanted to -- you know, she was
8   involved in other things, so I don't know if she
9   was anything more than a recruiter.
10  Q.   But she wasn't a manager?
11  A.   No, she wasn't a manager.
12  Q.   Okay. Did you ever hear Kathy
13  Martin make any remark about lesbians or
14  homosexuals?
15  A.   Kathy has made remarks about
16  lesbians or homosexuals in the past, but nothing
17  degrading, because my recollection is that she
18  has two or -- I believe two family members that
19  are also lesbian.
20  Q.   Isn't it a fact that in a
21  conversation that you had with me you told me
22  that Kathy Martin did not make any remarks about
23  lesbians or homosexuals?
24  A.   Well, it's not -- I don't know.
25  Do you mean like saying a remark, saying

30

1   something degrading, like calling them names or
2   something? No. But did she mention that she had
3   somebody that's lesbian in her family, yes, so I
4   don't know if that's considered a remark.
5       Q.   Okay.  Did Kathy Martin ever use
6   the term "lesbo"?
7       A.   Not that I remember.
8       Q.   Did Kathy Martin ever use the term
9   "fag"?
10      A.   "Fag"?  Not that I remember.  No.
11      Q.   Isabel Perez alleges in her lawsuit
12  that the fact that she was married to a woman was
13  well-known among her co-workers.  Was it your
14  impression that her marriage to a woman was
15  well-known among her co-workers?
16      A.   No.
17      Q.   Isabel Perez also alleges that she
18  raised concerns to Kathy Martin regarding Kathy's
19  and other co-workers' discriminatory comments and
20  conduct including but not limited to the use of
21  racial and ethnic slurs in the workplace.  Did
22  Isabel ever mention these concerns to you?
23      A.   Yes.
24      Q.   What did she say?
25      A.   We had met -- "we" meaning myself,

31

1   Isabel, and Lisa, we met Kathy for lunch one
2   afternoon.  Kathy was in Secaucus -- I'm sorry,
3   in Edison, and we were in Secaucus.  So we met
4   her for lunch I believe in Linden at Chevy's, and
5   the conversation came up where Isabel told Kathy
6   that she shouldn't be using the word "nigga."
7       Now, Kathy turned and said that she can
8   more or less use the word "nigga" because it's
9   n-i-g-g-a and not the word "nigger," and that's
10  exactly how she said it, and she said it's not
11  n-i-g-g-e-r.  So Isabel said, you know, "I don't
12  see what the difference of either of the words
13  are.  It's more or less the same thing," and
14  Kathy went on explaining how if it ends with an
15  "a" or it ends with an "e-r" it's totally
16  different, and then Kathy also made the comment,
17  you know, that her father is black so she can use
18  the word, and her and Isabel kind of went back
19  and forth that no, you shouldn't.
20      Q.   Kathy mentioned that she was mixed
21  race?
22      A.   Yes, to us.  But to my
23  understanding she didn't tell everybody.
24      Q.   I'm not sure what you mean by that.
25      A.   She, to my understanding through

32

1   conversations with Kathy, she didn't tell Eugene
2   that she was of mixed race.
3       Q.   Okay.
4       A.   Or anybody outside of me, Lisa, and
5   Aazel at the time when Aazel was there.  It was
6   just amongst the ones that were in H.R.
7       Q.   Okay.  Isabel also alleges that she
8   raised concerns with Kathy over Kathy's
9   application of her religious beliefs to
10  relatively trivial workplace matters.  Did Isabel
11  ever mention these concerns to you?
12      A.   No.
13      Q.   Did Isabel ever complain to you
14  about Kathy?
15      A.   Yes.
16      Q.   How so?
17      A.   One evening I was the only one
18  there in the office in Secaucus.  I don't
19  remember what store Isabel had came from.  I want
20  to say Paramus, but I'm not a hundred percent
21  sure.
22      Isabel came in.  I was still there
23  finishing up a couple of things I was working on,
24  and Isabel was telling me that, you know, that
25  Kathy is very unprofessional and she doesn't --

33

1   she's not meeting the expectations of Eugene and
2   that Eugene wanted to get Kathy out of the H.R.
3   team and that Isabel was the one that was going
4   to be taking her place.
5       Q.   Isabel said these things to you?
6       A.   Yes.
7       Q.   Was anybody else present at the
8   time?
9       A.   No.  It was just me and Isabel in
10  the back office.
11      Q.   Did Isabel ever complain to you
12  about Kathy at any other time?
13      A.   Yes.
14      Q.   Explain that, please.
15      A.   It was that same night, that same
16  evening she told me that she had -- I don't know
17  if she had investigated Kathy, but she told me
18  that she had somebody look into Kathy's
19  background and that Kathy was not who everybody
20  portrayed her as and that her ex-husband was a
21  drug addict.
22      Q.   Whose ex-husband?
23      A.   Kathy's ex-husband.
24      Q.   Isabel told you that?
25      A.   Yes.

38

1  discussing on September 24, 2012 Isabel made you
2  feel confused. Correct?
3        MR. GRAFF: Objection.
4     Q.  You can answer the question.
5     A.  Yes.
6     Q.  She also made you feel
7  uncomfortable. Isn't that correct?
8        MR. GRAFF: Objection.
9     Q.  You can answer the question.
10    A.  Yes.
11    Q.  Isabel's approach during the
12  meeting was direct and bossy. Correct?
13       MR. GRAFF: Objection.
14    A.  Very.
15    Q.  Very direct and very bossy?
16    A.  Correct.
17       MR. GRAFF: Objection.
18    Q.  You felt that she had brought
19  division into the H.R. Department. Isn't that
20  correct?
21       MR. GRAFF: Objection.
22    Q.  You can answer.
23    A.  Yes, I do.
24    Q.  I now call your attention to
25  September 19th, 2012 five days before September

39

1  24th. Lisa Thorpe and you attended an
2  educational session at ADP. Isn't that correct?
3     A.  Yes.
4     Q.  Isabel Perez was also in
5  attendance. Isn't that correct?
6     A.  She arrived after us and we had no
7  idea that she was going to be attending, but,
8  yes, she did attend.
9     Q.  Isabel made you feel uncomfortable
10  at that session. Isn't that correct?
11    A.  Yes.
12       MR. GRAFF: Objection.
13    Q.  Isabel made you feel withdrawn at
14  that session. Isn't that correct?
15       MR. GRAFF: Objection.
16    A.  Yes.
17    Q.  Isabel made you feel anxious at
18  that session. Isn't that correct?
19       MR. GRAFF: Objection.
20    A.  Very.
21    Q.  Very anxious?
22    A.  Very anxious.
23    Q.  Isabel was argumentative. Correct?
24       MR. GRAFF: Objection.
25    A.  Very argumentative.

40

1     Q.  Isabel was disruptive. Isn't that
2  correct?
3     A.  That is very correct.
4     Q.  Isabel interrupted Lisa and you
5  when you attempted to ask questions of the ADP
6  instructor. Isn't that correct?
7     A.  Yes.
8     Q.  Lisa and you told Isabel that you
9  previously discussed the ADP session with Kathy
10  Martin. Isn't that correct?
11    A.  Yes.
12    Q.  Lisa and you also expressed concern
13  to Isabel that Isabel was not permitting you to
14  obtain the information you needed at the ADP
15  session. Isn't that correct?
16    A.  That's correct.
17    Q.  Isn't it also true that Isabel
18  responded by saying, "Kathy is not overseeing
19  ADP, I am"?
20       MR. GRAFF: Objection.
21    A.  Yes. And she also said that she
22  already had ADP experience so she didn't need
23  this training.
24    Q.  "She" meaning Isabel?
25    A.  Isabel, yes.

41

1     Q.  Isn't it true that Lisa and you had
2  requested the ADP session?
3     A.  Yes, we did.
4     Q.  That you had wanted to learn about
5  ADP in order to perform your daily tasks.
6  Correct?
7     A.  Yes. That's correct.
8     Q.  Isabel recorded the ADP session.
9  Correct?
10    A.  Without our knowledge, yes.
11    Q.  When did you find out that Isabel
12  recorded the session?
13    A.  I would believe about halfway into
14  the session is when we found out she was
15  recording.
16    Q.  How did you find out she was
17  recording?
18    A.  She said it. She said to the
19  instructor, "I just want you to know that I'm
20  recording," and me and Lisa were very upset about
21  it.
22    Q.  Why were you upset?
23    A.  Because there were things that were
24  mentioned in the meeting that Isabel -- that me
25  and Lisa were asking that we were told other

42

1  information about -- we were asking questions to
2  the ADP instructor things that we were told that
3  the system wouldn't allow us to do or that we
4  didn't have access to create reports or whatever.
5  Whatever blockage that we were told that we
6  didn't have to utilize the system in the manner
7  that we needed it to function for our job duties
8  day in and day out, and we were kind of upset
9  when we found out that the ADP system actually
10  was created for the tasks that we had been
11  requesting access to, and the reason why we
12  weren't able to do this is because we weren't
13  granted the access when we were set up. We were
14  set up for the access but we weren't granted the
15  access.
16      Q.      Before Lisa and you found out that
17  Isabel recorded the session, did you ever tell
18  Isabel that you were agreeable to her recording
19  the session?
20      A.      No.
21      Q.      Before Lisa and you found out that
22  Isabel recorded the session, did Lisa tell Isabel
23  that she was agreeable to Isabel recording the
24  session?
25          MR. GRAFF: Objection.

43

1      A.      No.
2      Q.      Isabel requested that she, Lisa and
3  you have many closed-door meetings. Correct?
4          MR. GRAFF: Objection.
5      Q.      You can answer the question.
6      A.      To my recollection, I didn't have
7  many closed-door meetings with Isabel. I believe
8  I would say two, two to three that I had with
9  her, and most of the closed-door meetings me and
10  Lisa weren't involved in. It was just Isabel and
11  Kathy.
12      Q.      At one of the closed-door meetings
13  Isabel told Lisa and you that Kathy Martin was no
14  longer in charge of the Ashley human resources
15  department. Isn't that correct?
16          MR. GRAFF: Objection.
17      A.      That is correct.
18      Q.      Isabel said that Kathy and she were
19  running side by side but that, quote, I never
20  lose, end quote. Isn't that correct?
21      A.      Yes, that is.
22      Q.      Isabel also told Lisa and you that
23  Lisa and you should only go to Isabel and not
24  Kathy Martin with regard to issues regarding
25  human resources. Isn't that correct?

44

1          MR. GRAFF: Objection.
2      A.      Yes, it is.
3      Q.      Isabel said that she and not Kathy
4  was going to be the H.R. manager. Correct?
5      A.      Yes.
6      Q.      Also in a closed-door meeting
7  Isabel told Lisa and you that Eugene Crinian
8  wanted to fire Lisa and you. Isn't that correct?
9      A.      Yes. Many times.
10      Q.      Isabel said that Eugene Crinian and
11  Kathy Martin wanted you out; "out" in quotes.
12  Isn't that correct?
13      A.      Yes.
14      Q.      Isabel's statements about you being
15  fired made you feel hurt. Correct?
16      A.      Very.
17      Q.      You also were confused. Correct?
18      A.      Yes.
19      Q.      Isn't it true that you said to
20  Isabel that you could not understand why your job
21  was being threatened so often?
22      A.      Yes.
23      Q.      Isabel responded that Eugene kept
24  files on Lisa and you. Isn't that correct?
25      A.      Yes, in his office.

45

1      Q.      Isn't it true that Isabel claimed
2  that she had been shown that information during
3  her interview with Eugene?
4          MR. GRAFF: Objection.
5      A.      Correct.
6      Q.      Isabel also said that Eugene was
7  planning to replace Lisa and you. Isn't that
8  correct?
9      A.      Yes.
10      Q.      Isn't it true that you felt that
11  there hadn't been any division in the H.R.
12  Department under Kathy Martin until Isabel Perez
13  became involved in the H.R. Department?
14      A.      That's correct.
15      Q.      You felt that Isabel Perez divided
16  the department. Correct?
17      A.      Yes.
18      Q.      Isabel said that Eugene Crinian did
19  not trust Kathy Martin. Isn't that correct?
20      A.      Yes.
21      Q.      Isn't it true that in one
22  closed-door meeting Isabel said -- well, strike
23  that.
24      I call your attention to an occasion where
25  you, Isabel, and Lisa were in the Ashley store

46

1  parking lot.
2      A.    In Secaucus?
3      Q.    One of the stores.  Did there come
4  a time when Isabel said to you, "Do you see the
5  decal on my car"?
6      A.    She did.  That was actually the
7  same afternoon that we were leaving the Secaucus
8  facility to meet Kathy Martin for lunch.
9      Q.    And isn't it true that Isabel asked
10 you, "Do you know what it stands for"?  Meaning
11 the decal.
12     A.    Yes.
13     Q.    And isn't it also true that Isabel
14 told you that the decal stood for a lesbian
15 rights organization?
16     A.    Yes.
17     Q.    I call your attention to October
18 5th, 2012.
19     A.    Okay.
20     Q.    Did you attend a meeting with
21 respect to recruiting which was also attended by
22 Isabel Perez, Kathy Martin, Theresa Ricciardi,
23 and Lisa Thorpe?
24     A.    Yes.  For a short period of time.
25     Q.    Isabel and Theresa had a

47

1  disagreement at that meeting.  Correct?
2      A.    They had a few disagreements in
3  that meeting.
4      Q.    What was said between Isabel and
5  Theresa?  Do you recall?
6      A.    I'm not a hundred percent sure what
7  sparked the whole disagreement.  I know it was
8  where Isabel was giving direction to Theresa and
9  Theresa started saying, you know, that you're
10 always throwing it in my face that you're the
11 manager, you're the manager, and then Isabel told
12 her, you know, that she is the manager and that
13 she's supposed to take direction from her, and
14 somehow they kind of got into a back and forth
15 arguing match and the laptop got knocked off the
16 table, and I was done with that meeting, I walked
17 out and I didn't go back in.
18     Q.    Do you recall whose laptop it was?
19     A.    It was actually Aazel's laptop that
20 she had used when she was employed there.
21     Q.    And who was using it at that time
22 at that meeting?
23     A.    At that meeting I believe --
24     Q.    It was Theresa's laptop, wasn't it?
25     A.    I don't know if it was Theresa's

48

1  laptop.  I think it was just there that we were
2  trying to get documents out of.  I don't think
3  anybody was assigned that laptop because they
4  were looking for certain documents that Aazel had
5  that we needed for H.R.
6      Q.    Isabel raised her voice at that
7  time.  Isn't that correct?
8      A.    Oh, yeah, but she wasn't the only
9  one.
10     Q.    But she raised her voice?
11     A.    Yes.
12     Q.    Theresa also raised her voice.
13 Isn't that correct?
14     A.    Yes.
15     Q.    Referring to Isabel, Theresa said
16 to you, "I can't work with her."  Isn't that
17 correct?
18     A.    Yes, that's when I went to the back
19 office and Theresa also went to the back office
20 to cool off.
21     Q.    Was anyone else present when
22 Theresa said that to you?
23     A.    Not at that very moment.  Shortly
24 after she mentioned that she couldn't work with
25 Isabel Lisa came into the office area.

49

1      Q.    Still at this October 5th, 2012
2  meeting, at one point in the meeting Isabel told
3  Kathy Martin that Isabel wanted to resign from
4  employment.  Correct?
5      A.    Yes.
6      Q.    And Kathy Martin convinced Isabel
7  not to resign.  Isn't that correct?
8          MR. GRAFF:  Objection.
9      A.    That is correct.
10     Q.    Isn't it true at one point Isabel
11 screamed, "You have to listen to me.  I am the
12 H.R. director.  I am the H.R. director"?
13     A.    Yes.
14     Q.    Were you ever present when Isabel
15 had difficulty with any other employee of Ashley?
16          MR. GRAFF:  Objection.
17     A.    No, I was not present.
18     Q.    Were you ever told by anyone that
19 Isabel had difficulty with any other employees?
20     A.    Yes.
21     Q.    By whom?
22     A.    I was told by Lisa that Isabel had
23 went to one of the other stores and had a
24 conflict with a sales manager at that store.
25     Q.    The Lisa you're referring to is

50

1  Lisa Thorpe.  Isn't that correct?
2      A.    Yes, Lisa Thorpe.
3      Q.    Was the store the Paramus store?
4      A.    I believe it was the Paramus store.
5      Q.    Do you recall the name of the
6  manager at the Paramus store?  Could it have been
7  Neil Travari (phonetic)?
8      A.    Yes, Neil.  Uh-hum.
9      Q.    Were you ever told by anyone that
10  Isabel had difficulty with any other employees?
11      A.    Not that I can remember, no.
12      Q.    By the way, Theresa Ricciardi was
13  fired by Ashley after the argument with Isabel,
14  wasn't she?
15      A.    Yes.
16      Q.    Did Eugene Crinian ever raise the
17  topic of religion with you?
18      A.    With me personally?
19      Q.    Yes.
20      A.    No.  I didn't speak very often to
21  him.
22      Q.    And you mentioned before that
23  Isabel told you that she had had someone do an
24  investigation on Kathy Martin.  Isn't that
25  correct?

51

1      A.    Yes.
2      Q.    Isabel told you that Kathy Martin
3  had been homeless.  Isn't that correct?
4      A.    Yes.
5      Q.    And Isabel alleged that Kathy was
6  hiding other personal history.  Isn't that
7  correct?
8      A.    Yes.
9      Q.    And you said, as you said before, I
10  think this was your testimony, that Isabel said
11  to you that I'm just going to tell you that
12  Kathy's husband wasn't the only person with a
13  drug problem.  Isn't that correct?
14      A.    That's correct.
15      Q.    Did Isabel say anything else to you
16  in the conversation that we've been discussing?
17      A.    Yes.
18      Q.    What else?
19      A.    She also told me that Kathy had
20  more than one baby father, so all her children
21  weren't from the same man.  I guess within
22  conversation Kathy must have said that she only
23  had one father for her children, and Isabel said
24  that wasn't true, and the part where Kathy was
25  homeless and the church had helped her I guess

52

1  get into a house with her kids and that the
2  church covered up a lot of things that Kathy had
3  done in her past, and also with the part that,
4  you know, Kathy's husband wasn't the only one
5  that had a drug problem.
6      Q.    Where did this conversation with
7  Isabel take place?
8      A.    In the Secaucus store.
9      Q.    When?
10      A.    I don't remember the exact dates.
11  I do remember it was a few days before she was
12  terminated.
13      Q.    Isabel initiated the conversation.
14  Isn't that correct?
15      A.    Yes, that's correct.
16      Q.    What did you think of the things
17  that Isabel alleged to you about Kathy?
18      A.    Uhm, I was shocked and surprised
19  because Kathy carried herself as a very, you
20  know, religious person and I didn't think that
21  she would have any reason to lie to us about if
22  she had any kind of drug problem in the past or
23  if she had more than one father of her children.
24  I really don't think that that had anything to do
25  with work, and I also don't think that she would

53

1  have any reason to lie, but it was kind of
2  shocking.
3      Q.    What did you think about Isabel
4  saying the things that she did about Kathy?
5      A.    I think that it was sneaky.  I
6  would think the word would be, because, you know,
7  you don't really -- you shouldn't have to go and
8  look up anybody's past information.  I don't
9  think that's trustworthy at all.  So I just kind
10  of -- I didn't ever say anything to her but I
11  kind of felt, well, if she did that to Kathy,
12  what would she do to anybody else?
13          MR. HARZ:  Thank you.  I have no
14  further questions.
15          MR. GRAFF:  I'll have a few
16  questions.
17          Would it be okay with everybody if we took
18  a two-minute stretch and restroom break?
19          MR. HARZ:  Two minutes.
20          MR. GRAFF:  Thank you.
21          (There is a brief recess.)
22  EXAMINATION BY MR. GRAFF:
23      Q.    Thank you, Dominguez.  I'll try to
24  be brief.
25          Do you understand that this is a

74

1  bad all around. Kathy and Isabel had first
2  gotten into a back and forth argument, and then
3  it went into Isabel and Theresa.
4      Q.    Can you think of any other
5  examples?
6      A.    There was one morning, I don't
7  remember what started -- I think I actually came
8  in and it was already something that had
9  happened, and Isabel had told Kathy that she was
10 going to quit; that she didn't want to be there.
11 It wasn't more than a couple of days of Isabel
12 being there. She, you know, Isabel was crying,
13 went into Kathy's office, of course the door got
14 closed like always, and then she came out and
15 they were fine.
16     So the problem was that they would go
17 behind closed doors a lot, Kathy and Isabel, and
18 while they were behind closed doors nobody knew
19 what was going on, and even I would tell Lisa or
20 Lisa would tell me, you know, that it was kind of
21 unfair to the rest of us that they were always
22 behind closed doors, and it was kind of
23 uncomfortable for us because we didn't know what
24 was going on.
25     Q.    Can you think of any other

75

1  examples?
2      A.    No.
3      Q.    Why did you stop working at Ashley?
4      A.    Honestly?
5      Q.    Yes. And of course in the
6  deposition, as you know, honestly is the only way
7  to respond.
8      A.    I stopped working at Ashley
9  Furniture because I felt that I was treated
10 unfairly. I felt that no matter what I did, how
11 much I did, what I said, what I would do was
12 frowned upon by Eugene.
13     I can definitely say that personally I
14 never had a sit-down with Eugene, but I was told
15 by other people he and Kathy, being Aazel, being
16 Isabel, that Eugene did not want me part of the
17 H.R. team and that he wanted me out of the
18 company. He didn't want me working there.
19     I would work long hours from home, you
20 know, doing tasks that were asked of me by my
21 manager, which was Kathy or Aazel at the time,
22 and I just felt that no matter what I did it was
23 never enough, and the two times that I did have
24 conversation with Eugene, it was him more or less
25 scolding me, and I just felt that obviously there

76

1  was something that I wasn't doing, that they
2  wouldn't see no matter what I did it was just,
3  you know, I just took myself out of the equation
4  because my thoughts are if I can't do anything
5  right, then I don't need to be here, but I knew
6  that the job that I was doing was exactly what I
7  was brought in to do, but at the time I just felt
8  like no matter what, it was never enough, it was
9  never done correctly or to his expectations.
10     Q.    Did either of those two occasions
11 when Eugene spoke to you occur after Isabel left?
12     A.    No.
13     Q.    Were they both before Isabel
14 started?
15     A.    Yes.
16     Q.    Did Kathy Martin ever talk about or
17 raise the subject of religion that you heard in
18 the workplace?
19     A.    All the time.
20     Q.    What do you mean by that? How
21 would that subject come up?
22     A.    Kathy made it very well-known from
23 day one of her being hired that she was a
24 reverend and that she spoke in tongues, which I
25 have no idea what that means, and she would ask

77

1  us to pray in a group prayer being me, herself,
2  and Lisa for different reasons on different
3  occasions. So it was very well-known about her
4  religious beliefs.
5      Q.    Apart from praying with you and
6  Lisa, as far as you know, did Ms. Martin ever
7  discuss religion or ask to pray with other people
8  at Ashley?
9      A.    Yes.
10     Q.    And who are you referring to?
11     A.    If I'm not mistaken, she spoke
12 about religion quite often with Mary Russi and I
13 believe prayed with Mary Russi as well.
14     Q.    Anyone else?
15     A.    Not that I know of, no.
16     Q.    Did Ms. Perez -- strike that.
17     Was Ms. Perez ever present at a time when
18 Kathy Martin prayed with you or anyone else at
19 Ashley?
20     MR. HARZ: Objection.
21     A.    I would say no, not as a group
22 praying session, but to my understanding Isabel
23 had mentioned to me that her and Kathy had prayed
24 together about a situation.
25     Q.    Did Isabel say what the situation

Kathy Martin

From:      Amber Dominguez {adominguez@ashleyne.com}
Sent:      Wednesday, October 24, 2012 2:28 PM
To:        kmartin@ashleyne.com
Subject:   Information Requested



Isabel came into the HR department explaining that her way of management was very different from Kathy's.

She explained during a meeting on 9/24/12, that she was overseeing HR and that Kathy was to be separated from the department, stating that "Kathy has to be able to do the job she was hired to do and not run HR". Kathy was to be levitated from the department and we were to report to directly to Isabel. This made me confused and uncomfortable. Isabel's approach was very direct and bossy. She brought division into this department telling us that HR was HR and recruiting was recruiting. I had a hard time accepting this. HR is a team and we work as a team.

On 9/19/12, we attend an offsite ADP training session. Isabel arrived recording the whole session. Isabel objected to varies questions we had by saying "oh I can teach you that, I know ADP because I've taught ADP classes". This tone was unfair and disruptive. We had requested this session prior to Isabel coming aboard looking to get information and access in ADP needed to complete our daily tasks. At break Lisa and I approached Isabel explaining our concerns about how she was not allowing us to get the information we had prior spoken over with Kathy, "Isabel's responds was Kathy is not over seeing ADP, I am". For the remainder to the session I felt uneasy knowing that Isabel was looking to take control of the department.

9/25/12 was Isabel's official date of hire. Isabel asked to speak to me in the office behind closed doors. At that time she explained to me that Kathy was no longer in charge of HR. That her and Kathy were running side by side and that according to Eugene the best person for the job would be Isabel in the position, her comment was "I never lose"| Isabel started to explain the reason she objected to questions and access during the ADP training was per Eugene's instructions to her. She explained that Eugene was looking to fire Lisa and I so, he did not want us to be granted any unnecessary access. I asked Isabel if she knew what my role was here at Ashley and her responds to me was yesbut, both Eugene and Kathy want you out. She then told me that she was not going to allow that to happen because she needed me on her team. Due to her being new and me having the knowledge I had, she needed me here. I felt very hurt and confused at this point, I commented to Isabel that I could not understand why my job was being threatened so often. Isabel explained that Eugene had a file on Lisa and myself containing notes. She was shown this information during her interview with the instructions we were to be replaced, Isabel explained that Eugene didn't trust Kathy and that Isabel was here to replace her. Being that I felt like Lisa, Kathy and I worked very well together, I could not understand what Isabel was telling me. I felt that this was the first time since May (Kathy coming aboard) that division was brought into the HR department. Isabel explained to me that she was brought into HR to fix the culture of the company. During my conversation with Isabel she mentioned to me that she was a woman's woman. Being a little confused with that comment, I asked her the meaning of it. She explained that she was involved in a same sex marriage. Isabel said that Kathy nor Eugene was aware of this. I agreed to keep this information amongst the two of us and I NEVER told Kathy about it.

During a conversation Isabel and I had upon her returning from Paramus, Isabel told me that she had done her investigation on Kathy. She said that Kathy was a born again Christian and had been homeless while pregnant with her 4th child. Claiming that the church took Kathy and her children in covering up a lot of history that Kathy was hiding. Her last remark was I'm just going to tell you Kathy's husband wasn't the only person with a drug problem. I did not ask questions Isabel's remarks. I felt that this information was ignorant and unnecessary. What was being said to me did not change the way I thought of Kathy. As I gathered my belongings, I did say to Isabel that Kathy is a very open person, that has nothing to hide or be ashamed of and that all people in life make mistakes.

As you can see Isabel came aboard causing conflict, division and animosity with in the HR department. We are not a department that works against each other. We have been a team that is known to work well with one another. During the time that Isabel was part of the HR department I said nothing to anyone about the things she said. The day Isabel was let go I then sat down with Kathy telling her what was said about her by Isabel.

Amber Dominguez| Human Resource Assistant
Ashley Furniture Homestore
p: 201.520.0634 ext# 1127| f: 866.523.0086
e: adominguez@ashleyne.com
925 Paterson Plank Rd.
Secaucus, NJ. 07094



NJ Locations: Secaucus, Fairfield, Paramus
NY Locations: Middletown, New Rochelle
Warehouse: Edison, New Jersey

OUR MISSION STATEMENT:

OUR STAFF IS COMMITTED TO EXCELLENCE IN ALL WE DO. WE PROVIDE THE BEST VALUE IN HOME FURNISHINGS BACKED BY SUPERIOR SERVICE BEFORE, DURING, AND AFTER THE SALE. BY MAINTAINING OUR CORE VALUES OF HONESTY AND INTEGRITY, WE'VE MADE ASHLEY FURNITURE HOMESTORE A GREAT PLACE TO WORK AND SHOP.

2

ASH–PER–0100

# EXHIBIT G

[Page 1]

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

------------------------------

ISABEL PEREZ,                    :   Civil Action No.:

        Plaintiff,              :   13 CIV 00327(DMC-MF)

        v.                       :

FACTORY DIRECT OF SECAUCUS,     :
LLC d/b/a ASHLEY FURNITURE
HOMESTORE, EUGENE CHRINIAN,     :
in his official and individual:
capacities, and KATHY MARTIN,
in her official and            :
individual capacities,

                                 :

        Defendants/
        Third-Party Plaintiffs, :
        v.                       :
THE OTTINGER FIRM, P.C.,        :
        Third-Party Defendant.  :
------------------------------

        TRANSCRIPT of testimony as taken by
and before MONIQUE VOUTHOURIS, a Certified Court
Reporter, RPR, CRR and Notary Public of the States
of New Jersey and New York, at the offices of
ARCHER & GREINER, P.C., 21 Main Street, Suite 353,
Hackensack, New Jersey, on Wednesday, June 18, 2014,
commencing at 11:05 a.m.

APPEARANCES:
COUNSEL FOR PLAINTIFF:
THE OTTINGER FIRM, PC
    20 West 55th Street, 6th Floor
    New York, New York  10019
    212.571.2000
BY:  ARIEL Y. GRAFF, ESQ.
    ari@ottingerlaw.com

COUNSEL FOR DEFENDANTS:
ARCHER & GREINER, P.C.
    21 Main Street
    Suite 353
    Hackensack, New Jersey  07601
    201.342.6000
BY:  STEVEN B. HARZ, ESQ.
    sharz@archerlaw.com

[Page 2]

INDEX

WITNESS                          PAGE

MARK SCOTT

    Examination by Mr. Graff          4

EXHIBITS

IDENT.        DESCRIPTION         PAGE
Scott-1    Email October 7, 2012 from
           Mark Scott to Kathy Martin,
           Bates ASH-PER-0093 to 94.      62

[Page 3]

MARK SCOTT,
    75 Walker Road, West Orange, New Jersey,
    having been first duly sworn by the Notary,
    testifies as follows:
EXAMINATION BY MR. GRAFF:
    Q.   Good morning, again, Mr. Scott.  My
name, as you heard, is Ari Graff.  I'm one of the
attorneys who is representing Isabel Perez in a
lawsuit that she filed against Ashley Furniture and
I'm going to be asking you a series of questions this
morning.
    Just to be clear, do you understand that
you have been sworn in and are testifying now under
oath?
    A.   I do.
    Q.   Have you testified under oath at a
deposition before?
    A.   No.
    Q.   Have you testified at a trial before?
    A.   No.
    Q.   Have you testified in an arbitration or
any sort of hearing under oath?
    A.   No.
    Q.   In connection with the transcript,
because the court reporter is writing down everything

[Page 4]

that's said, if you could continue to please try to
let me ask my question completely before you start
speaking and I'll make every effort not to speak over
you, because she can only write down what one person
is saying at a time.  Do you understand that?
    A.   Okay.
    Q.   Also for the transcript, if you could
continue to make your responses orally with spoken
words rather than a grunt or a nod or something that
might not be clear on the transcript.  Is that okay?
    A.   Yes.
    Q.   If you don't understand a question that
I ask, please let me know and I'll repeat or rephrase
it.  Do you understand that?
    A.   Yes.
    Q.   If I -- if you answer a question that I
ask, I'll assume that you understood it.  So please,
if you're not sure, don't guess, let me know and I'll
clarify the question.  If you want to take a break,
please let me know, we can do that whenever you would
like for as long as you like.  I would only ask if
there is a pending question and you haven't yet
answered it, that you first then answer that question
and we can take a break.  Is that okay?
    A.   Okay.

[Page 5]

[2]  (Pages 2 to 5)

1   Q.   Was it conducted by human resources'
2  employees?
3   A.   Yes.
4   Q.   Did you ever receive training on human
5  resources' policies from Ms. Bautista?
6   A.   I don't recall.
7   Q.   What about from Ms. Martin?
8   A.   I don't recall.
9   Q.   Can you recall by name or position
10  anybody who trained you on human resources' policies
11  at any time during your employment at the company?
12   A.   I don't recall.
13   Q.   As senior VP of stores, are there
14  employees who report directly to you as their
15  immediate supervisor?
16   A.   Yes.
17   Q.   And what positions do they hold?
18   A.   District manager, director of
19  merchandising, and director of visual.
20   Q.   And currently who is the director of
21  merchandising?
22   A.   Tamer Tanious.
23   Q.   How long did she hold that position?
24   A.   He.
25   Q.   He.

[Page 18]

1   A.   He has been there roughly maybe a little
2  less than myself.
3   Q.   And the first position you mentioned,
4  was that district manager?
5   A.   Um-hmm.
6   Q.   Who currently holds that position?
7   A.   Jay Travaglini.
8   Q.   How long has he held it?
9   A.   Roughly five years.
10   Q.   And, sorry, I can't read my note on the
11  third position, it was director of?
12   A.   Visual.
13   Q.   What does director of visual do?
14   A.   Goes in to make sure that the -- the
15  visual displays in the stores are up to standards.
16   Q.   Who holds that position?
17   A.   Karen McCoy.
18   Q.   How long has she held it?
19   A.   Less than a year.
20   Q.   Apart from your new hire training on HR
21  policies, was any other training that you received on
22  HR policies something that was mandatory or required
23  of your position?
24   A.   I don't understand the question.
25   Q.   Were you required as part of your job to

[Page 19]

1  take HR policy training other than as a new hire?
2   A.   No.
3   Q.   Are any employees at the company, as far
4  as you know, required to undergo HR training apart
5  from -- HR policy training apart from when they're
6  newly hired?
7      MR. HARZ:  Objection as to form.  If you
8  understand.
9   A.   No.
10   Q.   As far as you know, apart from
11  Ms. Perez, have any other employees at the company
12  alleged that they were discriminated against based on
13  sexual orientation or gender or national origin or
14  race?
15      MR. HARZ:  Objection as to form.
16   A.   Yes.
17   Q.   Did you have any role in investigating
18  or dealing with those allegations on behalf of the
19  company?
20   A.   No.
21   Q.   As far as you know, has anybody at the
22  company ever been disciplined for having
23  discriminated against or harassed or retaliated
24  against --
25      MR. HARZ:  Objection as to form.

[Page 20]

1   Q.   -- any employees?
2   A.   No.
3   Q.   When did you first meet Isabel Perez?
4   A.   During an interview.
5   Q.   Were you interviewing her for a
6  position?
7   A.   Yes.
8   Q.   What position was that?
9   A.   Director of HR.
10   Q.   And why were you looking to hire
11  somebody as director of HR at that time?
12   A.   Again, we were looking to add additional
13  support to the department.
14   Q.   And who was already in the department as
15  of that time?
16   A.   Kathy Martin.
17   Q.   Anyone else?
18   A.   There were other people in the
19  department.  I don't recall their names specifically
20  that did different roles.
21   Q.   And why was it that you were looking to
22  add additional support to the department at that
23  time?
24   A.   We were a growing company and we needed
25  to add additional people.  We had a growing

[Page 21]

[6]  (Pages 18 to 21)

1   communicate with people of all levels in terms of
2   anything that we do.  We are very, very big on being
3   able to -- an open door policy with our company, very
4   transparent.
5        Q.   Apart from what you just described, is
6   there anything else that's distinctive or
7   characterizes the culture of the company as you
8   understand it?
9        A.   No.
10       Q.   So when you refer to the culture at the
11  company, you're referring to communication skills,
12  transparency and open door?
13       A.   Correct.
14       Q.   Anything else?
15       A.   No.
16       Q.   Did you speak with anybody about your
17  interview with Ms. Perez after it was over?
18       A.   No.
19       Q.   Did you ever give anybody any feedback
20  on your --
21       A.   No.
22       Q.   -- impressions?
23            Did anyone ever ask you any questions
24  about your interview with Ms. Perez?
25       A.   No.
                              [Page 26]

1        Q.   Do you know who else Ms. Perez
2   interviewed with?
3        A.   After she interviewed with me, I believe
4   she interviewed with Eugene.
5        Q.   Do you know if that happened on the same
6   day?
7        A.   I don't know.
8        Q.   Did Eugene ever tell you anything about
9   his interview with Ms. Perez?
10       A.   After the interview?
11       Q.   Yes.
12       A.   Nothing more than that he thought that
13  she would be a good candidate.
14       Q.   Did he ask you if you agreed with his
15  view?
16       A.   No, because if I passed him along to
17  her, he knew that I thought she was going to be a
18  good -- I thought she was a good candidate as well.
19       Q.   Did he tell you that he was going to
20  move forward to hire her for the position?
21       A.   I don't know if it came from him or
22  Kathy.  I don't recall.
23       Q.   Did you at some point learn that she was
24  going to be taking on a position?
25       A.   I knew that we were going through the
                              [Page 27]

1   process of trying to bring her on board, yes.
2        Q.   When she came on board, was it
3   ultimately in the director of HR position?
4        A.   I don't recall the exact position that
5   she held as far as what it was, because then we had
6   Kathy involved as well and Kathy was her direct
7   supervisor.
8        Q.   Did Ms. Perez have any dotted line or
9   indirect supervisors?
10       A.   Meaning?
11       Q.   Did Ms. Perez report to anybody other
12  than Kathy Martin?
13       A.   No.
14       Q.   Who did Ms. Martin report to at the
15  time?
16       A.   Mr. Chrinian.
17       Q.   Did she report to anybody else?
18       A.   No.  I mean, she had a dotted line to
19  myself, but that was...
20       Q.   When you say a dotted line to yourself,
21  what are you referring to?
22       A.   Anything related to stores, you know,
23  she would get me involved with before making any kind
24  of decision, and as someone as an officer for the
25  company, if I saw something that was out of scope,
                              [Page 28]

1   obviously I would -- it's my responsibility to try to
2   rectify it.
3        Q.   Did Isabel Perez have a dotted line
4   reporting arrangement with you like that, too?
5        A.   No.
6        Q.   Did she have a dotted line reporting
7   arrangement with anyone else as far as you know?
8        A.   Not that I know of.
9        Q.   Did you have any understanding of how
10  the HR functions were going to be divided between
11  Ms. Perez and Ms. Martin?
12       A.   No.
13       Q.   So as far as you know -- strike that.
14            Do you know whether there were any
15  duties that were going to be part of Ms. Perez's
16  portfolio rather than Ms. Martin's?
17       A.   Could you repeat the question?
18       Q.   Do you know if Ms. Perez had any
19  responsibilities that were not also Ms. Martin's
20  responsibilities?
21       A.   I believe that Kathy was going to be
22  responsible for some of the -- in charge of the
23  entire department.  But I think that Isabel was going
24  to be, and again, I think, on the people side of the
25  business.
                              [Page 29]

                    [8]  (Pages 26 to 29)

1      Q.    And what do you mean -- what is your
2  source of that information?
3      A.    I know that we were looking for
4  additional support in the department, so I know that
5  Kathy's focus was on the recruiting and that other --
6  those other aspects.
7      Q.    And you indicated that Isabel Perez was
8  going to be on the people side.  What is the people
9  side?
10     A.    Just the day-to-day HR -- I don't know
11 exactly what -- the term is I believe a
12 generalist/the day-to-day operations of what an HR
13 department would be.
14     Q.    Do you know if anybody reported to
15 Ms. Perez as a supervisor during her employment?
16     A.    I don't know exactly how the reporting
17 went or who was going to report in to who, because I
18 knew all of them ultimately reported to Kathy.
19     Q.    So you don't know either way whether
20 Ms. Perez was the immediate supervisor of anybody in
21 HR?
22     A.    Again, I don't know because she wasn't
23 here that long, so I don't know exactly what the
24 set-up was as far as the structure.
25     Q.    How long was Ms. Perez at the company,

[Page 30]

1  for what our company standards are.
2      Q.    Did you ever see any written description
3  of what Ms. Perez's role or duties were going to be
4  at the company?
5      A.    No.
6      Q.    Did Mr. Chrinian ever explain to you in
7  words or in writing what he believed Ms. Perez's role
8  was going to be at the company?
9      A.    No.
10     Q.    Did Mr. Chrinian ever say anything to
11 you or communicate anything to you about why he
12 wanted Ms. Perez to work at the company?
13     A.    I don't recall any conversations
14 directly related to that.
15     Q.    Did Mr. Chrinian at any point ever say
16 or communicate anything to you about what he believed
17 Ms. Martin's role was at the company?
18     A.    I don't recall exactly what.  I just
19 know that her focus was going to be in charge of all
20 HR, but primarily recruiting.
21     Q.    Did Mr. Chrinian communicate anything to
22 you as to why that was going to be her focus?
23     A.    No, because we needed additional support
24 in the department.
25     Q.    Did he ever communicate anything to you

[Page 32]

1  if you know?
2      A.    Very, very short period of time.
3      Q.    Would that be a matter of days or weeks
4  or months, or you're not sure?
5      A.    Definitely it wasn't a month.
6      Q.    After you finished your interview with
7  Ms. Perez, when is the next time that anybody said
8  anything to you about her that you can recall?
9      A.    I don't recall when the next time was.
10     Q.    Did you receive any emails or written
11 communications about Ms. Perez ever?
12         MR. HARZ:  Objection to form.
13     A.    Not that I can recall.
14     Q.    Did you ever send any emails or written
15 communications regarding Ms. Perez to anybody at the
16 company?
17     A.    Yes.
18     Q.    And what -- was that a specific email
19 that you have in mind or was there more than one?
20     A.    One in particular was related to some
21 incidents that took place after she was on board.
22     Q.    What incidents are you referring to?
23     A.    Shortly after coming to work for us,
24 there was a big incident in one of our stores where
25 she was -- I heard the behavior was beyond acceptable

[Page 31]

1  about what differences, if any, there were going to
2  be between Ms. Martin's role and Ms. Perez's role?
3      A.    No.
4      Q.    Going back to the incident that you had
5  mentioned a few moments ago, who was it who informed
6  you about the incident?
7      A.    My store manager, Neel Jhaveri.
8      Q.    And was that in spoken communication or
9  something else?
10     A.    Spoken.
11     Q.    Was it in person?
12     A.    No.
13     Q.    He called you?
14     A.    Yes.
15     Q.    Did he call you, as far as you know, on
16 the same day as the incident occurred?
17     A.    Yes.
18     Q.    And best you recall, what did he tell
19 you in that conversation?
20     A.    The best that I recall, he was upset
21 that and didn't understand that why someone would
22 come in the store and talk to the associates in the
23 way and the manner that she did.
24     Q.    And what, if anything, did he tell you
25 about how she talked to associates?

[Page 33]

[9]   (Pages 30 to 33)

1 　　A.　Very condescending, very disrespectful
2 and not in alignment with anything that he had been
3 in contact with from anyone from the company prior.
4 　　Q.　Did he say anything else that you can
5 recall?
6 　　A.　Not specifically that I would -- that I
7 can recall specifically.
8 　　Q.　Did he indicate one way or another
9 whether Ms. Perez was -- strike that.
10 　　Did he explain why Ms. Perez was there
11 that day?
12 　　A.　Did he explain why she was there?
13 　　Q.　Yes.
14 　　A.　No.
15 　　Q.　Did you already have some understanding
16 of why it was that Ms. Perez was in his store that
17 day?
18 　　A.　She had started with the company and she
19 was doing a store visit to get to know the
20 associates.
21 　　Q.　Do you know if anyone else from the HR
22 department accompanied her for that visit?
23 　　A.　Yes.
24 　　Q.　And who else?
25 　　A.　Another associate, Theresa I believe her

[Page 34]

1 Mr. Travaglini reach out to you?
2 　　A.　Same day.
3 　　Q.　Did Mr. Travaglini tell you how it was
4 that he came to know anything about Ms. Perez's
5 visit?
6 　　A.　He had gotten feedback from associates,
7 as well as Mr. Jhaveri, regarding her behavior.
8 　　Q.　Did he tell you who the associates were?
9 　　A.　No.
10 　　Q.　When he reached out to you, was that by
11 phone or something else?
12 　　A.　Phone.
13 　　Q.　Did you take any notes --
14 　　A.　No.
15 　　Q.　-- during your discussion with
16 Mr. Jhaveri or with Mr. Travaglini?
17 　　A.　No.
18 　　Q.　Apart from the discussions with
19 Mr. Jhaveri and Mr. Travaglini, do you have any other
20 source of information about Ms. Perez's visit?
21 　　A.　Related to the behavior, no.
22 　　Q.　What about any other aspect of her
23 visit?
24 　　MR. HARZ:　You're talking about the
25 visit to the one store that one day?

[Page 36]

1 name is, her name was, yeah.
2 　　Q.　Did Mr. Jhaveri say anything to you
3 about Theresa in connection with her visit that day?
4 　　A.　Primarily the feedback was regarding
5 Ms. Perez.
6 　　Q.　Did he tell you anything in particular
7 that Ms. Perez had said or done that he had a problem
8 with?
9 　　A.　Just the manner, the tone, and the --
10 just the outright -- it was not in alignment with
11 anything that we had -- that he had been used to,
12 seen before from anyone from a leadership role.
13 　　Q.　Apart from that discussion with
14 Mr. Jhaveri, do you have any other source of
15 information about what happened at that store visit?
16 　　A.　My district manager also had also
17 reached out to me about it.
18 　　Q.　And who was the district manager at that
19 time?
20 　　A.　Jay Travaglini.
21 　　Q.　Was Jay Travaglini, as far as you know,
22 present in the store at the time of the visit?
23 　　A.　I don't believe he was.
24 　　Q.　In relation to the day of the visit and
25 that incident, at what point in time did

[Page 35]

1 　　MR. GRAFF:　Yes.
2 　　A.　Not that I can recall.
3 　　Q.　Did you ever have any communication with
4 anyone other than Mr. Travaglini or Mr. Jhaveri about
5 Ms. Perez's visit to the store that day?
6 　　A.　Prior to I spoke to Kathy.
7 　　Q.　Is that on the same day or --
8 　　A.　No. I spoke to Kathy and just kind of
9 gave her a heads-up to make sure that, you know, we
10 had -- she gave her a road map for the stores as far
11 as, you know, what to expect, the meetings and so on
12 and so forth.
13 　　Q.　So that was prior to that time when she
14 visited, Ms. Perez visited the store?
15 　　A.　Right, um-hmm.
16 　　Q.　Did you ever have any communication with
17 anyone other than what you've testified to so far
18 regarding Mr. Jhaveri, Mr. Travaglini and Ms. Martin?
19 　　A.　Regarding that visit?
20 　　Q.　Yes.
21 　　A.　Did I have any -- can you ask that
22 question, repeat the question?
23 　　Q.　Other than what you've already described
24 in the last few minutes, did you have any other
25 communication with anyone else at any point about

[Page 37]

[10]　(Pages 34 to 37)

1  Ms. Perez's visit to the store that day?
2      A.    At some point myself, Kathy and Eugene
3  talked about the behavior regarding -- just the
4  outlandish behavior that took place at that visit.
5      Q.    Was that a conversation among the three
6  of you or something else?
7      A.    It was an email that -- that ended up as
8  a summation of that visit as well as the other
9  incident that took place, incidents that took place.
10     Q.    Apart from being told about the manner
11 and tone of Ms. Perez's conduct on that store visit,
12 did you ever obtain from anybody any further details
13 about what she actually said or in what context she
14 said it?
15     A.    I just -- I received some general
16 feedback from associates regarding the behavior and
17 the tone of the conversations that took place, very
18 condescending, very disrespectful, and again, like I
19 said, not in alignment with anything that any of the
20 associates have been used to from anyone in a
21 leadership standpoint.
22     Q.    And who are the associates you're
23 referring to?
24     A.    Our sales associates in the Paramus
25 store.

[Page 38]

1      Q.    And specifically who?
2      A.    I don't -- I don't recall exactly.
3      Q.    How many different associates gave you
4  feedback of that nature?
5      A.    I don't recall the exact number.  I
6  don't recall the number.
7      Q.    Did they give you the feedback on the
8  same day as the store visit occurred?
9      A.    I think it was after a day or two
10 afterwards.
11     Q.    And whichever and however many of them
12 there were who gave you feedback, did you receive
13 that feedback in a face-to-face communication?
14     A.    Yeah.
15     Q.    Did you receive it in any other form of
16 communication?
17     A.    No.
18     Q.    Where did you have that communication
19 with associates where they gave you feedback as you
20 described?
21     A.    In the store.
22     Q.    Did you receive that feedback with a
23 group of associates simultaneously or something else?
24     A.    No, it was very sporadic, one or two
25 people that just happened to mention it in passing.

[Page 39]

1      Q.    Why were you in the store at that time?
2      A.    I do store visits to all the stores.
3      Q.    Did you take any notes in connection
4  with that feedback?
5      A.    No.
6      Q.    Did you indicate to the associates --
7  strike that.
8            How did you respond to the associate or
9  associates when they provided you with that feedback?
10     A.    I listened to what they had to say.
11     Q.    Did you say anything back to them?
12     A.    No, not that I can recall.
13     Q.    Did you at any point write anything down
14 about the feedback you received from those
15 associates?
16     A.    No.
17     Q.    Did you ever pass it along or
18 communicate it to anyone else?
19     A.    To Kathy.
20     Q.    Was that in a spoken face-to-face
21 communication?
22     A.    Spoken over the phone.
23     Q.    Was that in the same day as you received
24 the feedback or some other time?
25     A.    I don't recall the exact day I gave her

[Page 40]

1  the feedback.
2      Q.    Does Mr. Jhaveri still work at the
3  company?
4      A.    Yes.
5      Q.    What position does he hold?
6      A.    Sales manager.
7      Q.    What store?
8      A.    Paramus.
9      Q.    Is that the same position he held at the
10 time of Ms. Perez's visit?
11     A.    Yes.
12     Q.    So other than what you've already
13 testified about with Mr. Jhaveri, Mr. Travaglini,
14 Ms. Martin and associate feedback, were there any
15 other communications -- strike that. Withdrawn.
16            Did you ever speak directly with
17 Mr. Chrinian about Ms. Perez's visit to that Paramus
18 store?
19     A.    No.
20     Q.    You had referred a few moments ago to
21 another incident or incidents involving Ms. Perez.
22 What were you referring to?
23     A.    There was an incident that took place at
24 our Secaucus store shortly after the one that took
25 place in the Paramus store, where, again, her

[Page 41]

[11]  (Pages 38 to 41)

1  behavior was beyond acceptable, erratic and not in
2  alignment with anything that's -- the company would
3  accept.
4      Q.   How did you learn about Ms. Perez's
5  visit to the Secaucus store?
6      A.   That I got a call from the -- actually,
7  the recruiter that -- and I believe her name was
8  Theresa, and she gave me feedback about the incident
9  that took place between her and Isabel.
10     Q.   Was that on -- strike that.
11          Was the recruiter present at the
12  Secaucus store for that incident?
13     A.   The incident was between that person and
14  Isabel.
15     Q.   So -- strike that.
16          Was anyone other than Theresa, the
17  recruiter, and Ms. Perez involved or a participant in
18  that incident?
19     A.   Lisa Thorpe I believe was there.
20  Karen -- not Karen. Kathy was there. Those are the
21  two other people that I can recall, that I remember
22  being there.
23     Q.   And what were they doing, as far as you
24  know, in the Secaucus store at the time?
25     A.   I believe they were having a meeting,

[Page 42]

1  give you any particulars or specifics as to what
2  actual conduct by Ms. Perez she was characterizing in
3  those ways?
4      A.   Actually, at the time she basically said
5  that there was a -- they got into a -- I guess
6  Theresa and Isabel having a conversation about
7  related to training -- I'm sorry, recruiting and so
8  on, and that Isabel was raising her voice with her
9  and screaming, yelling, slamming the laptop, closing,
10  slamming the door and was talking to her in a very
11  condescending manner, and then Theresa went on to
12  talk a little bit about Paramus as a sidebar. But it
13  was consistent with what took place in Secaucus.
14     Q.   Did you ever have communication with
15  anybody else about that fight or HR meeting in
16  Secaucus?
17     A.   Up until the time when I asked Kathy
18  about it, no.
19     Q.   Did you at any point have any
20  communication with Lisa Thorpe about that incident?
21     A.   I want to say that she mentioned
22  something about it, that or something, but I don't
23  recall exactly.
24     Q.   Did you ever have any communication with
25  Ms. Perez about that incident?

[Page 44]

1  again, regarding some planning and strategy for HR.
2      Q.   Was Theresa -- strike that.
3          Do you know the last name of the Theresa
4  you were referring to?
5      A.   No. Again, I could be incorrect about
6  Theresa. I believe that's her name.
7      Q.   If I said Theresa Ricciardi, does that
8  ring a bell or sound familiar?
9      A.   I interview hundreds of people a month.
10  I don't want to assume that the name, the last name
11  is correct.
12     Q.   Was it somebody who was part of the HR
13  department?
14     A.   Yes.
15     Q.   And was that person, possibly Theresa,
16  the first person to tell you anything about the
17  Secaucus store incident?
18     A.   Yes.
19     Q.   Other than what you already testified
20  to, did she give you any other details or the context
21  about what upset her about Ms. Perez's conduct?
22     A.   Could you repeat the question?
23     Q.   You had mentioned earlier that person
24  Theresa told you that Ms. Perez's behavior was
25  unacceptable, erratic, not up to standards. Did she

[Page 43]

1      A.   No.
2      Q.   Did you ever have any communication with
3  Ms. Perez about the Paramus store visit?
4      A.   No.
5      Q.   Did you ever have any communication with
6  Ms. Perez concerning her work performance at the
7  company?
8      A.   No.
9      Q.   Did you ever have any communication with
10  Ms. Perez subsequent to your interview with her?
11     A.   Did I -- say that again?
12     Q.   Apart from interviewing Ms. Perez, did
13  you ever have any communication with her after that?
14     A.   "Hi" and "Bye" one day.
15     Q.   So the only time you communicated with
16  her was at her interview?
17     A.   At the interview and we saw each other
18  in passing, one day she was in one of the stores.
19     Q.   Do you recall what store?
20     A.   I believe it was Secaucus.
21     Q.   Do you know what she was doing in the
22  store at that time?
23     A.   I don't know. Their offices were in the
24  back of Secaucus, so I'm assuming that she was there
25  for an office visit, I'm assuming.

[Page 45]

[12]  (Pages 42 to 45)

1    Q.    Did anyone ever tell you anything about
2  Ms. Perez in connection with her being in the
3  Secaucus store on that day when you saw her in
4  passing?
5    A.    No.
6         MR. HARZ:  Objection as to form.
7    Q.    You indicated a few moments ago that at
8  some point you spoke to Kathy Martin or communicated
9  with Kathy Martin about the HR meeting at the
10  Secaucus store.  Correct?
11    A.    Correct.
12    Q.    Did you contact Ms. Martin for that
13  purpose?
14    A.    Yes.
15    Q.    How long after you had first learned
16  about the incident did you reach out to Kathy Martin?
17    A.    Which incident?
18    Q.    The Secaucus store.
19    A.    The next day.
20    Q.    So a day after you had learned about the
21  incident?
22    A.    Yes.
23    Q.    Why did you reach out to her at that
24  time?
25    A.    Because the behavior was beyond

[Page 46]

1    A.    She told me a number of things related
2  to Isabel's behavior, and, again, I wouldn't recall
3  all the specifics of them, but they were all
4  consistent with a very, very condescending,
5  unprofessional, lack of -- just not consistent with
6  anything that we have demonstrated within our
7  company.
8    Q.    Do you recall any of the specifics about
9  what she told you apart from what you've already
10  testified to?
11    A.    I don't recall any more of the specifics
12  other than just the behavior, some of the things I've
13  already mentioned.
14    Q.    Is there anything that you haven't
15  already mentioned that you can recall of what she
16  told you?
17    A.    No.
18    Q.    Did you take any notes during your call
19  with Ms. Ricciardi that night?
20    A.    No.
21    Q.    Did you take any notes during your call
22  with Kathy Martin the following day?
23    A.    No.
24    Q.    Did you say anything to Ms. Ricciardi in
25  response to the information that she gave you that

[Page 48]

1  alarming.  Again, this was the second incident for an
2  associate that had just started with our company and
3  it was obvious that there was a major problem that we
4  need to address.
5    Q.    Was there any particular reason that you
6  waited until the following day to reach out to
7  Ms. Martin?
8    A.    Well, because Theresa called me around 9
9  o'clock the night before.
10    Q.    Had Theresa ever called you at late
11  evening or nighttime hours for any reason prior to
12  that?
13    A.    No.
14    Q.    Did she call you on a work phone?
15    A.    Yes.
16    Q.    Were you at an office at that time?
17    A.    No.
18    Q.    Did she call you on -- sorry.
19         When I asked about work phone, I had in
20  mind like a phone -- did she call you on your
21  personal cell phone or company cell phone?
22    A.    Yes, company cell phone.
23    Q.    Did Theresa tell you anything else that
24  you haven't already testified about when she called
25  you that night?

[Page 47]

1  night?
2    A.    In regard to?
3    Q.    Anything.
4    A.    Only that I would be speaking to Kathy
5  because it was -- it caught me off guard that, for
6  one, she would be contacting me, and I had no idea
7  about what took place prior to her contacting me.
8    Q.    Did -- when you spoke with Kathy Martin
9  the following day, did she give you any information
10  that you didn't already have from Ms. Ricciardi about
11  what had happened at that meeting?
12    A.    The information I got from Kathy was
13  consistent with what Theresa said.
14    Q.    Did you ask Kathy any questions about
15  the incident?
16    A.    I asked Kathy why Isabel is still
17  working for the company if it's consistent with what
18  Theresa said.
19    Q.    What did Kathy say in response to that?
20    A.    Kathy said she was going to talk to
21  Isabel and that was -- the answers weren't good in
22  regard to why that she was there or why she didn't
23  address it.
24    Q.    Did you ever have any communication with
25  anyone other than Theresa and Kathy Martin about that

[Page 49]

[13]  (Pages 46 to 49)

1    HR meeting at the Secaucus store?
2       A.    Then I spoke -- emailed Kathy and Eugene
3    outlining my conversation with Kathy.
4       Q.    Earlier you had mentioned that there was
5    an email communication between you and Kathy and
6    Eugene about the Paramus store visit.  Is that the
7    same email that you're referring to now?
8       A.    It was all one-in-the-same, meaning it
9    was the detail of the incident and the reason why I
10   strongly suggested that we should terminate.
11      Q.    Is that an email that you wrote
12  yourself?
13      A.    Yes.
14      Q.    Prior to writing that email or sending
15  that email, did you have any communication with
16  Mr. Chrinian concerning Ms. Perez or her performance
17  at the company?
18      A.    Not that I can recall.
19      Q.    Did you ever speak to Mr. Chrinian in
20  person or over the phone about Ms. Perez's
21  performance at the company?
22      A.    No.
23      Q.    Did Mr. Chrinian ever send you an email
24  about Ms. Perez's performance at the company?
25      A.    No.

[Page 50]

1      Q.    Did Ms. Martin ever send you an email
2  about Ms. Perez's performance at the company?
3      A.    No.
4      Q.    Did you ever yourself send an email
5  about Ms. Perez's performance at the company other
6  than the specific email that you mentioned?
7      A.    No.
8      Q.    Have you ever, in any context, seen any
9  email that anybody else may have written about
10  Ms. Perez's performance at the company?
11      A.    No.
12      Q.    Other than the email that you wrote
13  yourself, did you ever read anything about
14  Ms. Perez's performance at the company?
15      A.    No.
16      Q.    Other than the communications that
17  you've already identified, did you ever receive
18  feedback from anybody else about Ms. Perez's
19  performance at the company?
20      A.    I may have, but I don't recall the
21  specifics of every person that talked to me regarding
22  her performance and the behavior.
23      Q.    You had indicated a moment ago that in
24  your email you strongly suggested that Ms. Perez be
25  terminated.

[Page 51]

1      A.    Um-hmm.
2      Q.    As far as you know, who had the
3  authority or could decide themselves to terminate
4  Ms. Perez?
5      A.    Either myself or Mr. Chrinian.
6      Q.    So when you say you strongly suggested
7  it, did that mean something other than you decided it
8  should happen?
9      A.    Well, it would -- it was in a
10  collaboration with Eugene, who wasn't present, and it
11  was my suggestion to him and her that we move to
12  terminate.
13      Q.    Did Mr. Chrinian ever respond to your
14  email in any way that you're aware of?
15      A.    I don't recall.
16      Q.    Who decided to terminate Isabel Perez?
17  That is, who was the final decisionmaker?
18      A.    Ultimately it was me.
19      Q.    Apart from that email, did you do
20  anything else to communicate that you had decided to
21  terminate Isabel?
22      A.    I don't understand the question.
23      Q.    Sure.  Did you tell anybody to terminate
24  Ms. Perez or do anything to effectuate her
25  termination other than sending that email?

[Page 52]

1      A.    I don't recall.
2      Q.    Do you know who actually effectuated or
3  carried out the termination?
4      A.    I believe it was Kathy and another
5  associate.
6      Q.    Do you know who the other associate was?
7      A.    I don't exactly remember who that person
8  was.
9      Q.    Was it somebody from HR?
10      A.    I don't know.
11      Q.    How is it that you know that there was
12  another associate involved in the termination?
13      A.    Because I believe there was someone else
14  involved and it would normally be protocol that there
15  would be someone else other than just one person.
16      Q.    What is the protocol that you're
17  referring to?
18      A.    That if we do a termination, we would
19  have more than one person as a witness.
20      Q.    Did anybody ever give you any
21  information about anything that happened in
22  connection with Ms. Perez subsequent to when you sent
23  that email?
24      MR. HARZ:  Objection.
25      Q.    Let me re-ask the question.

[Page 53]

[14]  (Pages 50 to 53)

1          MR. HARZ:  If you understand it, you can
2     answer.
3          A.   I don't.
4          Q.   I'll re-ask the question.
5          After sending the email that you
6     referred to where you strongly suggested that
7     Ms. Perez be terminated, did you have any
8     communication with anyone else at the company about
9     Ms. Perez prior to Ms. Perez ending her employment
10    with the company?
11         So between the time of your email and
12    Ms. Perez's termination, did you have any
13    communication with anyone at the company about
14    Ms. Perez?
15         A.   Not that I can recall.
16         Q.   As you sit here today -- strike that.
17         As best you can recall, has Mr. Chrinian
18    ever said anything to you about Ms. Perez in words or
19    in writing?
20         A.   No.  When you say that, prior to her
21    being here?  During her employment here?
22         Q.   After your interview with Ms. Perez
23    right up until today, so when you interviewed her for
24    a position until today, has Mr. Chrinian in that
25    period of time said anything to you in words or in

                                   [Page 54]

1     writing regarding Ms. Perez?
2          A.   I'm sure we've spoken to -- about
3     Ms. Perez and any associates that would be coming to
4     the company.
5          Q.   Would that be prior to her starting to
6     work at the company?
7          A.   Yeah.
8          Q.   What about during her employment at the
9     company, did you have any communication with
10    Ms. Perez -- excuse me.
11         During Ms. Perez's employment with the
12    company, did Mr. Chrinian say or write anything to
13    you about Ms. Perez?
14         A.   No, not that I can recall.
15         Q.   How about after her termination, did
16    Mr. Chrinian communicate anything to you about her
17    after she left the company?
18         A.   No.
19         Q.   So from Ms. Perez's first day of work
20    until today, did Mr. Chrinian communicate anything to
21    you about Ms. Perez?
22         A.   Again, I am sure we might have had --
23    her name may have come up like any other associate,
24    but I don't recall anything specific that we talked
25    about.

                                   [Page 55]

1          Q.   Did you at any point in time become
2     aware that Ms. Perez is a lesbian or is married to a
3     woman?
4          A.   No.
5          Q.   Did you ever -- strike that.
6          Did anyone ever tell you that she is a
7     lesbian or married to a woman prior to the last
8     moment?
9          A.   No.
10         Q.   Did you ever tell anybody that you
11    thought she may be a lesbian at any point?
12         A.   No.
13         Q.   Did you ever have any communication with
14    anyone about Ms. Perez's sexual orientation?
15         A.   No.
16         Q.   Did anyone ever tell you that Ms. Perez
17    had complained about anything in particular during
18    her employment with the company?
19         A.   No.
20         Q.   Did anyone ever tell you anything about
21    anything Ms. Perez did at the company during her
22    employment apart from in connection with the Paramus
23    and Secaucus store incidents that we've discussed?
24         A.   Nothing -- the only feedback I have
25    gotten regarding her was related to work performance

                                   [Page 56]

1     and related to the erratic behavior and such.
2          Q.   Is that what you've already testified to
3     or is there something else?
4          A.   As I said before, there was different
5     things said that I don't recall every piece of it,
6     but I'm sure that I may be missing something.
7          Q.   Do you recall at this time anything that
8     you haven't already said about that subject?
9          A.   No.
10         Q.   Did the company hire anybody to replace
11    Ms. Perez after she was terminated?
12         A.   I don't think so.  We have a new HR
13    person now, but I don't know if that one I guess
14    replaced Kathy or the person prior to that.
15         Q.   At what point in time -- strike that.
16         After Ms. Perez ended her employment,
17    did Kathy Martin continue her employment for some
18    period of time?
19         A.   Yes.
20         MR. HARZ:  Objection to form.
21         Q.   Was anybody else brought in in a
22    director or senior role in HR from the time Ms. Perez
23    left until the time Ms. Martin left?
24         A.   Not that I can recall, no.
25         Q.   Do you have any information about why

                                   [Page 57]

                         [15]   (Pages 54 to 57)

1   that store visit with Ms. Perez?
2     A.   No.
3     Q.   And you, yourself --
4     A.   When you say that, I'm sorry, if you're
5   asking me if I gave feedback to Kathy, I did.
6     Q.   Okay.  Did you ever give any feedback on
7   that visit to Ms. Perez directly?
8     A.   No.
9     Q.   Could I ask you to please read the next
10  sentence?
11    A.   "Isabella's even passed a comment that
12  even you need to be coached on how to run an HR
13  department.  I was told that Neel gave you this
14  feedback directly."
15    Q.   What was the source of your information
16  that you put down in that paragraph?  That is, did
17  Neel tell you --
18    A.   Neel, Neel told me.
19    Q.   Do you believe that Kathy Martin would
20  have benefited on being coached on how to run the HR
21  department during your employment?
22    A.   That's very subjective.  I don't know
23  that.  I'm not an HR department specialist.  But I do
24  know that if someone in leadership has a comment or
25  wants to make a statement to someone about someone in

[Page 70]

1   leadership, they should probably make it to them
2   directly.
3     Q.   If I could ask you to drop down to the
4   fourth short paragraph from the bottom on this page,
5   it starts off, "It is obvious," and I don't want to
6   present anything to you out of context.  If you want
7   to take a minute just to read through what came
8   above.
9     A.   You want me to read that paragraph, just
10  review it again?
11    Q.   Well, my questions are going to relate
12  to the "It is obvious" paragraph, but since I'm
13  skipping ahead, if you want to read to yourself that
14  stuff in the middle so you have context.
15    A.   Okay.
16    Q.   Could I ask you to read the "It is
17  obvious" paragraph for the record?
18    A.   "It is obvious that we are not going to
19  allow either of them to continue forward with the
20  company as a result of their actions in the store or
21  their collective actions on Friday that were
22  displayed toward each other."
23    Q.   And just for the record, the two people
24  that you're referring to are Ms. Perez and who was
25  the second person?

[Page 71]

1     A.   Theresa.
2     Q.   Do you know, looking again at the date
3   of this letter, Sunday, October 7, do you know on
4   what date that Theresa was terminated?
5     A.   I don't recall.  I'm sorry.  I believe
6   it was that Friday, that day.
7     Q.   So Friday the 5th?
8     A.   Correct.
9     Q.   Is that the same day that Theresa called
10  you or the same night that Theresa called you?
11    A.   Yes.
12    Q.   So was it your -- strike that.
13        How did you learn that Ms. Ricciardi had
14  been terminated on the 6th?  Was it when she called
15  you --
16        MR. HARZ:  On the 5th.
17    Q.   On the 5th.  Thank you.
18    A.   When she called me.
19    Q.   Did you direct anyone to terminate her
20  prior -- strike that.
21        Did you direct anybody to terminate her?
22    A.   No.
23    Q.   Do you know who decided to terminate
24  her?
25    A.   I wasn't there in the room, so I

[Page 72]

1   couldn't give you a specific on who exactly was the
2   person that made the decision to term.
3     Q.   Do you know who as of Friday the 5th had
4   the authority to terminate Ms. Ricciardi at the
5   company?
6     A.   That would have been Kathy.
7     Q.   Kathy Martin?
8     A.   Correct.
9     Q.   Is it -- strike that.
10        Do you have any reason to believe or any
11  information that would lead you to believe that
12  somebody other than Kathy Martin was responsible for
13  deciding to terminate Ms. Ricciardi?
14    A.   Well, as I stated earlier, I don't know
15  the exact structure of how the department was going
16  to be structured.  So, therefore, I could only refer
17  to Kathy because she was the only one that was in
18  place at the time that was in charge of the
19  department.
20    Q.   At the time that you wrote this email,
21  Scott-1, had Ms. Martin already told you that she had
22  terminated Ms. Ricciardi?
23    A.   When I wrote -- when I wrote this email
24  did she tell me?
25    Q.   I could ask it in a better way.

[Page 73]

**[19]  (Pages 70 to 73)**

1       I understand from your testimony that
2   you've learned that Ms. Ricciardi had been terminated
3   when she called you on the night of Friday the 5th.
4   Is that right?
5       A.    When Ms. Ricciardi called me on the
6   night of the 5th, she was, for lack of a better word,
7   protesting what she feels was her termination and
8   wanted to know whether or not I knew about it and had
9   I had any time to talk about it and I had no
10  knowledge whatsoever to her termination.
11      So I guess to answer your question, did
12  I know that she was termed on the 5th?  I didn't know
13  because I was told on the 5th, the night of that she
14  was termed.
15      Q.    When you called Kathy Martin the next
16  day on the 6th, did you discuss Ms. Ricciardi's
17  termination?
18      A.    Yes, absolutely.
19      Q.    And what did Ms. Martin tell you about
20  it?
21      A.    Basically that she was -- basically what
22  she told me was that both of them were acting in a
23  behavior that was unacceptable and that Ms. Ricciardi
24  was also acting in a way that was unacceptable and I
25  don't know the -- remember all the specifics to it.

[Page 74]

1       A.    We may have had an -- and again, I don't
2   recall specifically.  We may have had conversations
3   about what took place and it may have involved, you
4   know, just the on boarding process piece of it.  But,
5   again, I can't directly say that one way or the
6   other.
7       Q.    Could I ask you to please read the last
8   paragraph on this first page.
9       A.    "I'm also disappointed that this could
10  have all been avoided had we agreed to not hire the
11  person as a company employee versus a contractual
12  employee and now we have exposed our company
13  unnecessarily to the explained" -- "unnecessarily to
14  having to explain the comments and actions from the
15  past week."
16      Q.    Did you have any communications with
17  people prior to Ms. Perez being hired about whether
18  she would -- strike that.
19      What were you referring to by company
20  employee versus contractual employee?
21      A.    It was my opinion that we've had a lot
22  of HR folks and we needed to just vet out the
23  opportunity, if it was that we hire someone as a
24  contractual employee versus bringing them on to the
25  company to make sure that they are going to work out

[Page 76]

1       Q.    Did Ms. Martin suggest or recommend that
2   Ms. Perez be terminated when you spoke to her on
3   Saturday the 6th?
4       A.    She was -- again, I don't want to put
5   words in her mouth or speculate on as to what her
6   mindset was, but I knew it was something of a topic
7   that she had on her mind as well.
8       Q.    Did she say words to you suggesting or
9   encouraging or asking for permission to terminate
10  Ms. Perez?
11      A.    Well, Kathy didn't have the ultimate
12  authority to do so.  And it was, as stated, it was my
13  urging and pushing, prodding based on all the facts
14  that on the multiple incidents that led to the
15  termination.
16      Q.    Did Ms. Martin express to you directly
17  that she believed that Ms. Perez should be terminated
18  as a result of those incidents?
19      A.    I don't recall exactly what -- I just
20  know that she was struggling with the decision.
21      Q.    Did either Ms. Martin or Mr. Chrinian
22  respond by email to your email here?
23      A.    Not that I can recall.
24      Q.    Did you ever discuss this email with
25  Mr. Chrinian after it was sent?

[Page 75]

1   rather than just bringing them on and later out
2   finding out that they didn't.
3       Q.    Could you tell me what you mean by
4   contractual?
5       A.    Contractual like on a consultant basis.
6       Q.    Does the tax phrase "1099" mean anything
7   to you?
8       A.    I don't know exactly how the accounting
9   structure would work.  But rather than someone
10  working directly and employed by the company, they
11  would be a contract employee, meaning either we would
12  hire them from a company or that we would have them,
13  you know, work -- not hire them.  I'm sorry.  They
14  would work separate from working for the company
15  directly.
16      Q.    I understand, I think.
17      MR. HARZ:  Well, I'm going to ask you
18  not to editorialize on his responses, please.
19      Q.    And when you wrote that "had we agreed
20  to not hire the person as a company employee versus"
21  -- strike that.
22      Was Ms. Perez, to your understanding,
23  hired as a company employee as you used the term
24  here?
25      A.    Yes.

[Page 77]

[20]  (Pages 74 to 77)

Scott 1

Kathy Martin

From:           Mark Scott (mscott@ashleyus.com)
Sent:           Sunday, October 07, 2012 1:31 PM
To:             Kathy Martin
Cc:             Eugene Chrisian; mscott
Subject:        Paramus/Separation Discussion

Kathy, I received additional information regarding Isabella and Theresa's visit to Paramus store.

Apparently there was a degree of a "witch hunt" mentality such as a new sherrif in town type of conversations. Things related people will be written up and termed based on following the rules going forward. During the huddle Isabella is "correcting" Neel and how he is interacting with the product specialist.

Isabella's even passed a comment that even you (Kathy) needs to be coached on how to run a HR department?? I was told that Neel gave you this feedback directly.

Kathy, as I type this email I am BEYOND livid having to hear from my people about the events that took place in one of our best cultured stores with one of my best examples of management and leadership. I trusted you to handle the introduction of these two new people and I insisted that each of them spend one week with the managers LEARNING the culture and what our people do.

We are not a shipwreck organization needing major overhaul in how we treat our people, in fact we go out of our way to create the best working environment possible. As an aside in three years we have NEVER had one complaint about a manager or associate issue from store that was not handled within the boundaries of proper protocol.

I know Jay gave you feedback and I realize you did not tell them to act in this way but either way it happened and now we are dealing with associates that are very upset with what they believed is going to be the "new" direction of the company related with how we treat our people.

What I have a major issue with is that NO person can come into our company without some sort of moral compass to what we are about or what we stand for. These two people were allowed to run without any guidance and now we are dealing with results of their actions.

It is obvious that we are not going to allow either of them to continue forward with the company as a result of their actions in the store or their collective actions on Friday that were displayed towards each other.

You will follow through with the termination of Isabella tomorrow as we agreed she is not a good fit for our organization and I think you would agree that the two of you have not (nor will not) see eye to eye on how to work together. If I am hearing some of this back biting and back stabbing stuff I am sure you are hearing even more.

Please confirm first thing tomorrow that the termination has taken place. You did say to me that you had discussions with here already about her introduction period.

I am also disappointed that this could have all been avoided had we agreed to not hire the person as a company employee vs. contractual employee and now we have exposed our company unnecessarily to having to explain the comments and actions from the past week.

1

ASH-PER-0093

Lastly, going forward you and I will partner on all decisions regarding these things IR so that it never happens again.

Feel free to call me to discuss.

2

ASH-PER-0094

# EXHIBIT H

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
No. 13 Civ. 327 (DMC)(MF)

ISABEL PEREZ,                              :

        Plaintiff,                    :

     -vs-                                 :

FACTORY DIRECT OF SECAUCUS, LLC  :
d/b/a ASHLEY FURNITURE
HOMESTORE, EUGENE CHRINIAN, in   :
his official and individual
capacities, and KATHY MARTIN,    : DEPOSITION OF:
in her official and individual
capacities,                      :  ISABEL PEREZ

        Defendants/               :
        Third-Party
        Plaintiffs,               :

     -vs-                                 :

THE OTTINGER FIRM, P.C.,                   :

        Third-Party               :
        Defendant.
                                  :

------------------------------------

B E F O R E:

     SHARON B. STOPPIELLO, a Certified Court
Reporter and Notary Public of the State of New
Jersey, at the offices of ARCHER & GREINER, P.C., 21
Main Street, Hackensack, New Jersey, on THURSDAY,
JULY 11, 2013, commencing at 10:02 a.m., pursuant to
Notice.

DepoLink
Court Reporting & Litigation Support Services
Phone (973) 353-9880    Fax (973) 353-9445
www.depolinklegal.com

Page 34

1   individuals and as a unit."  And the next paragraph
2   you state, did you not, "In recent years, he's been
3   distracted by growth and when looking at the demand
4   has realized that there are areas of great
5   disrepair.  He is a big picture thinker with sharp
6   focus on objectives... I see his desire to earnestly
7   make a difference that will impact the overall
8   organizational health in a VERY powerful manner.  It
9   will be a pleasure to work for them, as individuals
10  and as a unit.  They are like minded, enterprising
11  executives with a vision.  I know I will call it
12  home with their organization."  You wrote that, as
13  well, did you not?
14      A.   Yes.
15      Q.   Ms. Perez?
16      A.   Yes.
17      Q.   You wrote that, as well?
18      A.   Yes.
19      Q.   Did you ever mention in any e-mail to
20  Ms. Cipriani that Mr. Chrinian or Ms. Martin or
21  anyone else you met with made any inappropriate
22  comments or asked any inappropriate questions?
23      A.   No.  I usually don't discussion those
24  things.
25      Q.   Please answer yes or no.  You didn't?

Page 35

1       A.   I don't usually ask those questions,
2   no.
3       Q.   So you did not, correct?
4           MR. GRAFF:  Just answer yes or no.
5       Q.   I asked you if you ever mentioned in
6   an e-mail that Mr. Chrinian, Ms. Martin or anyone
7   that you met at Ashley made any inappropriate
8   comments or asked any inappropriate questions?  You
9   did not, correct?
10      A.   No.
11      Q.   Prior to your interviews, had you
12  researched Ms. Martin and/or Mr. Chrinian to prepare
13  for your interview?
14      A.   No, just what was on their website.
15      Q.   Well, in fact, you were aware that
16  Ms. Martin was an Episcopalian minister, correct?
17      A.   No. I am.
18      Q.   Please answer my question.  I didn't
19  ask you what you are --
20      A.   No.
21      Q.   -- I asked you what she was.
22      A.   I didn't know that.
23      Q.   I ask you, please, as your counsel
24  instructed you earlier, don't step on my words.
25  Wait for me to finish my question and then answer my

Page 36

1   question.
2       I asked you if you were aware that Ms.
3   Martin was an Episcopalian minister?
4       A.   No.
5       Q.   Didn't you ask her during your
6   interview about her being an Episcopalian minister?
7       A.   No.
8       Q.   You are an Episcopalian minister; is
9   that correct?
10      A.   Yes.
11      Q.   Is that why you brought up the fact
12  with her that she was an Episcopalian minister?
13          MR. GRAFF:  Objection.
14      Q.   Answer the question.
15      A.   I did not bring anything to do with
16  her being anything.
17      Q.   Anything to do with anything?
18      A.   Religious.
19      Q.   After your interviews you were
20  offered a position with Ashley, correct?
21      A.   I'm sorry, repeat that.
22      Q.   After your interviews you were
23  offered a position with Ashley, correct?
24      A.   Yes.
25      Q.   What was that position?

Page 37

1       A.   Director of human resources.
2       Q.   Let's go through your employment
3   history with Ashley for a moment.  What positions
4   did you hold with Ashley Furniture HomeStores?
5       A.   Director of human resources.
6       Q.   Any other position?
7       A.   No.
8       Q.   What was your start date with Ashley?
9       A.   September 25th.
10      Q.   What year?
11      A.   2012.
12      Q.   What was the length of your
13  employment with Ashley Furniture HomeStores?
14      A.   Until October 8th, 2012.
15      Q.   So you were employed from
16  September 25, 2012 through October 8, 2012?  I'm
17  sorry, but the --
18      A.   Yes.
19      Q.   -- court reporter can't understand a
20  nod.
21      A.   Yes.
22      Q.   Thank you.
23      What was the location of your employment?
24          MR. GRAFF:  Objection.
25          MR. HARZ:  You're objecting to the

Page 62

1    A.    I don't recall.
2    Q.    Was the term "nigga" ever said to
3  you?
4    A.    Directed at me?
5    Q.    Yes.
6    A.    No.
7    Q.    Was the term "fag" ever directed at
8  you?
9    A.    No.
10   Q.    What are other terms that you found
11 to be retaliatory?
12   A.    "Dike."
13   Q.    "Dike" is not mentioned in your
14 complaint.
15   A.    "Lesbo."
16   Q.    Is this something new?
17   A.    No, it's interchangeable, "lesbo,
18 dike, fag," it was just used.
19   Q.    But "dike" was not mentioned in your
20 complaint, is it?
21   A.    But it's in my notes.
22   Q.    "Dike" is not mentioned in your
23 complaint, is it?
24       MR. GRAFF:  Do you want her to review
25 the complaint?

Page 63

1       MR. HARZ:  Please.
2    A.    No, the words that are used here are
3  different.
4    Q.    So "dike" is not mentioned in your
5  complaint, is it?
6    A.    No.
7    Q.    What other words were used which you
8  felt were retaliatory?
9    A.    "Ghetto," referring to the
10 administrative assistant's behavior and speech.  She
11 was called "ghetto" to her face.  "Bitch" between
12 the administrative staff.  And myself and the
13 director "Lesbo."
14   Q.    Was the term "ghetto" ever used at
15 you?
16   A.    No.
17   Q.    Was the term "bitch" ever used at
18 you?
19   A.    Yes.
20   Q.    By whom?
21   A.    Ms. Ricciardi, also Ms. Thorpe.
22   Q.    That is Theresa Ricciardi?
23   A.    Yes.
24   Q.    Was she your supervisor?
25   A.    No.

Page 64

1    Q.    What other terms do you feel were
2  retaliatory?
3    A.    That's it.
4    Q.    You mentioned "lesbo."  Was the term
5  "lesbo" ever directed at you?
6    A.    Yes.
7    Q.    By whom?
8    A.    Ms. Martin.
9    Q.    When did Ms. Martin refer to you or
10 use the term "lesbo" at you?
11   A.    Three or four times.  Twice in a
12 meeting when she was questioning my husband's
13 sexual -- I mean whether I had a husband.  Once
14 outside when we dismissed Ms. Ricciardi and she
15 noticed my human rights campaign decal, when she
16 prayed for me with her hands on my head.
17   Q.    She called you a "lesbo" when she
18 prayed for you?
19   A.    Before she prayed for me.
20   Q.    When did she call you a "lesbo"?
21   A.    She called me a lesbo right before
22 she laid her hands on me for prayer.
23   Q.    Any other terms that you feel were
24 retaliatory?
25   A.    No.

Page 65

1    Q.    Do you feel that you were retaliated
2  against in any other way?
3       MR. GRAFF:  Objection.
4    Q.    Answer the question.
5    A.    Yes.
6    Q.    How?
7    A.    I was fired.
8    Q.    Is that the only reason?
9       MR. GRAFF:  Objection.
10   Q.    Pardon me?
11   A.    No.
12   Q.    How else do you feel you were
13 retaliated against?
14   A.    When I said I was an Episcopalian
15 minister, I was asked if I was a true Christian.
16   Q.    Who asked you if you were a true
17 Christian?
18   A.    Both Mr. Chrinian and Ms. Martin.
19   Q.    Do you want to take a couple of
20 minutes?
21   A.    No.  Thank you.
22   Q.    What facts do you have to support
23 your claim that you were terminated for complaining
24 about or objecting to Ms. Martin's actions?
25   A.    Only Mr. Alfred Nunez who was in the



Page 70

MR. GRAFF: I'm not sure that she was done with her answer.

Q. Allegations concerning Ms. Martin making any statements about Mark Scott are not in your complaint; isn't that correct?

A. No, because it's --

Q. I didn't ask you why, but they're not in your complaint, correct?

A. No.

Q. Allegations about Ms. Martin making any statements about Mr. Chrinian are not in your complaint; is that correct?

A. No. No.

Q. "No," it's not correct?

A. They're not in the complaint.

Q. Thank you. Isn't it true that you were told that you were being terminated because you didn't make a good fit in Ashley?

A. Yes.

Q. Isn't it true that prior to your employment with Ashley, you attended a meeting at Automatic Data Processing, ADP, with --

A. Yes.

Q. Let me finish my question -- with Lisa Thorpe, Amber Dominquez and Ms. Martin on

Page 71

September 19th, 2012?

A. Yes.

Q. And you had some personality conflicts with Lisa Thorpe and Amber Dominquez at that meeting, correct?

A. No.

Q. You objected to some of the questions that Lisa and Amber were asking of the ADP speaker; isn't that correct?

A. Yes.

Q. And didn't you tell Ms. Martin that Lisa and Amber were standoffish?

A. Yes.

Q. And didn't you tell Ms. Martin that Lisa was being rude?

A. Yes.

Q. And you actually tape recorded this meeting, didn't you?

A. Yes.

Q. And you did not tell the others you were tape recording this meeting at that time; is that correct?

A. I told everyone that I was recording the meeting.

Q. At the end of the day you told Ms.

Page 72

Martin that you were not happy with the way things were going; isn't that correct?

A. No.

Q. What did you say to her?

A. I told her that there were issues with the way that her own staff is communicating.

Q. And you didn't use the expression "I'm not happy with the way things are going"?

A. I don't remember if that was the exact expression.

Q. You also told Ms. Martin that Ashley Furniture had a culture of "being enabled," didn't you?

A. Enabling.

Q. Enabling?

A. Yes.

Q. Thank you.

A. And that she was personally an enabler.

Q. Please just answer the questions.

A. That was the whole thing.

Q. You'll have an opportunity to editorialize if your own attorney wants to ask you questions. In the meantime, please just answer my questions.

Page 73

MR. GRAFF: Counselor, she was answering the question.

MR. HARZ: No, she wasn't. She went beyond and was editorializing. Please just answer my questions.

Q. Two days later on September 21st you had a meeting with Ms. Martin, didn't you?

A. Yes.

Q. And this meeting was at Ms. Martin's request, was it not?

A. Yes.

Q. It was a long meeting, wasn't it?

A. About four hours, five hours.

Q. During that meeting she discussed some of the concerns she had, particularly regarding your interactions with Amber and Lisa on September 19th, correct?

A. No.

Q. Ms. Martin also expressed to you that she didn't want you to move so fast because Ashley had already seen a lot of recent changes, didn't she?

A. Yes.

Q. And she also mentioned to you that she wanted to be strategic about how she could

Page 74

1  introduce you to the employees before you became
2  part of this organization; isn't that correct?
3      A.   Yes.
4      Q.   She also discussed how the two of you
5  needed to be "on the same page" was the expression
6  she used; isn't that correct?
7      A.   Yes.
8      Q.   And she said if you couldn't be on
9  the same page, she did not want you working at
10  Ashley; isn't that correct?
11      A.   No.
12      Q.   Would you be surprised to hear that
13  she's prepared to testify that she did say that to
14  you?
15      A.   Yes.
16      Q.   And you agreed to work with her,
17  correct?
18      A.   Yes.
19      Q.   In fact, the plan at the end of the
20  meeting was for you to work with Ms. Martin, and
21  that Ms. Martin would retain supervision over Lisa
22  and Amber for the time being, correct?
23      A.   No.
24      Q.   Would it surprise you to hear that
25  Lisa and Amber understood, as well, that they were

Page 75

1  to continue to report to Kathy Martin and not you?
2      A.   I would be surprised, yes.
3      Q.   And you were also reminded at this
4  meeting by Kathy Martin that you were under a 90-day
5  probationary period and you would be watched
6  closely; isn't that correct?
7      A.   No.
8      Q.   And this was to make certain that you
9  would be a good fit at Ashley, correct?
10      A.   No.
11      Q.   And you were told not to let go of
12  all your consulting contracts just yet to make
13  certain that things actually worked out; isn't that
14  correct?
15      A.   Yes.
16      Q.   There was another meeting you
17  attended on September 24th; isn't that correct?
18      A.   Yes.
19      Q.   And you asked to have this meeting to
20  meet with Theresa Ricciardi, correct?
21      A.   I did not.
22      Q.   Who asked to have the meeting?
23      A.   Ms. Martin.
24      Q.   Lisa and Amber were also at the
25  meeting, correct?

Page 76

1      A.   Yes.
2      Q.   On this same day you talked strategy,
3  recruiting and the reporting system with Ms. Martin,
4  correct?
5      A.   With everyone, not just Ms. Martin,
6  Ms. Thorpe, Ms. Ricciardi, it was recorded.
7      Q.   I'm talking about the meeting you
8  attended on September 24th.
9      A.   Yes, and it was recorded.
10      Q.   And it was agreed that Ms. Martin was
11  going to hold the H.R. functions and slowly
12  transition them to you; isn't that correct?
13      A.   No.
14      Q.   And that same day you had issues with
15  Amber and Lisa, correct?
16      A.   No.
17      Q.   Didn't the meeting turn tense between
18  you and Amber and Lisa?
19      A.   No.
20      Q.   And at one point in front of everyone
21  didn't you say that Ms. Martin was on leadership
22  team and therefore she didn't need to be bothered
23  with things such as strategy?
24      A.   Yes.
25      Q.   After that you started working on

Page 77

1  September 25th, correct?
2      A.   Yes.
3      Q.   Immediately after starting didn't you
4  inform both Amber and Lisa that you were to run H.R.
5  and that they no longer reported to Kathy Martin?
6      A.   Yes.
7      Q.   Isn't this contrary to what you had
8  agreed to with Ms. Martin previously?
9      A.   No.
10      Q.   Didn't you also inform Amber and Lisa
11  that Ashley, Mr. Chrinian and Ms. Martin were
12  looking to terminate them?
13      A.   Ms. Dominquez, yes.
14      Q.   Didn't you also inform them that
15  Eugene Chrinian and Kathy Martin had a file on them?
16      A.   Yes, I informed them that they had
17  files on everyone, but that they specifically had a
18  file on Ms. Dominquez that they were looking after,
19  specifically Ms. Dominquez, not Ms. Thorpe.
20      Q.   You told them that you were brought
21  in to fix the culture at the company; isn't that
22  correct?
23      A.   Yes.
24      Q.   And you had certain closed-door
25  meetings with Amber Dominquez; isn't that correct?



Page 82

1  They go over how to attract the customer and
2  maintain them while they're there. Also how to
3  interact with each other. If there are any loose
4  ends from the day before that needed to be hit or if
5  they had to call customers or clients, and also to
6  go over any payroll and H.R. or information that was
7  missing and may be needed for the week.
8      Q.   You asked Neel Jhaveri if you could
9  discuss H.R. matters at the huddles, correct?
10     A.   Ms. Martin did, I did not.
11     Q.   Were you there when she asked him?
12     A.   No, she e-mailed me.
13     Q.   So you didn't see or hear Ms. Martin
14 ask him if you could talk about H.R. matters at the
15 huddles, correct?
16     A.   No, but when we were at other
17 huddles, she was the one who performed the --
18     Q.   Please answer my question.
19     A.   She initially performed the
20 huddles --
21     Q.   Please --
22     A.   -- and I modeled her.
23     Q.   Please answer my question. Did you
24 actually see or see her ask --
25     A.   I saw the message that she sent to

Page 83

1  him, yes.
2      Q.   But you didn't actually see or hear
3  her ask him if you --
4      A.   I saw the message she sent him, an
5  e-mail.
6      Q.   And that's all, correct?
7      A.   Yes.
8      Q.   Thank you.
9      During the morning huddle you talked to the
10 employees about the attendance policy; isn't that
11 correct?
12     A.   Yes.
13     Q.   And you said to the employees that a
14 third violation of the attendance policy would
15 result in termination, did you not?
16     A.   I don't recall. If that was what I
17 was asked to say, then yes.
18     Q.   Well, even if it wasn't what you were
19 asked to say --
20     A.   I don't recall.
21     Q.   Would it surprise you to hear that
22 Neel Jhaveri is prepared to testify that you did say
23 to the employees --
24     A.   No, it does not surprise me.
25     Q.   Can I finish my question, please?

Page 84

1  Would it surprise you to hear that Neel Jhaveri is
2  prepared to testify that you did in a threatening
3  way say to employees, "If you're absent a third time
4  you're going to be terminated"?
5      A.   No, that would not surprise me.
6      Q.   Were there actually any attendance
7  problems at Paramus?
8      A.   I don't remember.
9      Q.   The record would show that there
10 actually weren't any attendance problems at Paramus;
11 isn't that correct?
12     A.   I don't know.
13     Q.   Did you even know when you went up
14 there if there were attendance problems?
15     A.   I did not.
16     Q.   Isn't it fair to say that you were
17 very confrontational with the employees?
18         MR. GRAFF: Objection.
19     A.   Answer the question.
20     A.   No.
21     Q.   And didn't you, in fact, cut off Mr.
22 Jhaveri as he was trying to talk to his employees?
23     A.   No.
24     Q.   In fact, didn't Mr. Jhaveri take you
25 aside and ask to talk to you about what had

Page 85

1  happened?
2      A.   No.
3      Q.   Did he, in fact, take you aside from
4  the huddle?
5      A.   No.
6      Q.   And didn't he express concern and
7  anger, actually, about how you approached his team?
8         MR. GRAFF: Objection.
9      A.   No.
10     Q.   And didn't you tell him that you
11 there to "clean up the mess"?
12     A.   Yes, I did.
13     Q.   Then the following day during an H.R.
14 meeting on October 5 you had a loud disagreement
15 with Theresa Ricciardi; isn't that correct?
16     A.   Yes.
17     Q.   You were both yelling at each other,
18 correct?
19     A.   She was yelling at me.
20     Q.   And you were yelling at her, correct?
21     A.   No.
22     Q.   You're saying you were not yelling at
23 her?
24     A.   No.
25     Q.   Would it surprise you to hear that

Page 86

1  three other people will testify that you were
2  yelling at her?
3      A.   Yes.
4      Q.   You stormed out of the meeting saying
5  that you resigned; isn't that correct?
6      A.   That I was contemplating resignation,
7  yes.
8      Q.   Ms. Martin actually asked you to come
9  back into the room asking that you do not resign.
10     A.   Yes.
11     Q.   And upon return to the room you
12  argued with Theresa Ricciardi again.
13     A.   I did argue, yes.
14     Q.   And Ms. Ricciardi was terminated that
15  day, correct?
16     A.   For insubordination, yes.
17     Q.   Which was a Friday?
18     A.   Yes.
19     Q.   And you were terminated upon coming
20  to work that Monday, October 8th, correct?
21     A.   Correct.
22     Q.   And you were told that it was because
23  you did not make a good fit for Ashley; is that
24  correct?
25     A.   Partially, yes.

Page 87

1      Q.   Please turn to the Second Cause of
2  Action in your complaint, in Perez Exhibit Number 7.
3  In your Federal Court Complaint the Second Cause of
4  Action alleges that you were discriminated against
5  in violation of the New Jersey law against
6  discrimination; is that correct?
7      A.   Yes.
8      Q.   Specifically you claim that you were
9  discriminated against because of your sexual
10  orientation, correct?
11     A.   Yes.
12     Q.   What is your sexual orientation?
13     A.   I'm a lesbian.
14     Q.   While working at Ashley, did you ever
15  discuss your sexual orientation with anyone?
16     A.   Yes.
17     Q.   Did you discuss it with Amber
18  Dominquez?
19     A.   Yes.
20     Q.   Did you discuss it with Lisa Thorpe?
21     A.   Yes.
22     Q.   Did you ever talk to Ms. Martin about
23  it?
24     A.   No.
25     Q.   Did you ever discuss it with Mr.

Page 88

1  Chrinian?
2      A.   No.
3      Q.   Did you ever discuss it with Mr.
4  Scott?
5      A.   No.
6      Q.   Do you have any evidence to show that
7  either Ms. Thorpe or Ms. Dominquez ever told Ms.
8  Martin about your sexual orientation?
9      A.   No.
10     Q.   Do you have any evidence to show that
11  Ms. Thorpe and/or Ms. Dominquez ever told Mr.
12  Chrinian about your sexual orientation?
13     A.   No.
14     Q.   What facts do you contend support
15  your claim that you were discriminated against
16  because of your sexual orientation?
17     A.   Ms. Martin on various occasions
18  questioned my relationship.  She referred to my
19  partner as "husband," and I corrected her many
20  times.  She asked me what that meant, and I said
21  that's somebody that you live with.  And she said,
22  "The only time I've ever heard that is when my dike
23  sister referred to her partner in that term.  Is
24  that what you're saying to me?"  And I know that
25  you're -- she would go back to religion.  So

Page 89

1  numerous times she questioned my sexuality, and she
2  questioned my relationship and the nature of my
3  relationship with my partner.
4      Q.   How did Ms. Martin find out about
5  your sexual orientation, do you know?
6      A.   I don't know.
7      Q.   Give me examples of other ways that
8  you feel that Ms. Martin discriminated against you
9  because of your sexual orientation?
10     A.   When she was showing me pictures of
11  her family on Facebook, she pointed to her daughter
12  and said that she was bisexual, and she also said
13  that her sister was a lesbian.  She didn't refer to
14  her as a lesbian, she referred to her as a "lesbo"
15  or a "dike" or a "rug muncher."  She said that the
16  only time that she had heard people speaking the way
17  that I do about equality and bringing diversity were
18  people who were fags and lesbos.  She asked me again
19  if I was a lesbian, to which I said, "That's really
20  not something that I want to discuss here."
21     Q.   When did she ask you if you were a
22  lesbian?
23     A.   When she was showing me pictures on
24  Facebook.  The exact date I don't remember.  It was
25  previous to my employment -- I think it was the

Page 90

1  24th, the Saturday, it was the first time that she
2  had ever even asked me that.
3      Q.   And you didn't discuss it with her,
4  correct?
5      A.   At length I said the only thing --
6      Q.   Forget about at length.  You said to
7  me before you never told her that you were a
8  lesbian.
9      A.   No.
10      Q.   So you never did tell Kathy Martin
11  that you're a lesbian?
12      A.   No.
13      Q.   Do you claim that you were subjected
14  to a hostile work environment because of your sexual
15  orientation?
16      A.   Yes.
17      Q.   And what facts do you contend support
18  this claim?
19          MR. GRAFF:  Are you asking apart from
20  things she's already testified about?
21          MR. HARZ:  Yes.  Well, actually, in
22  addition.
23      Q.   What facts do you contend support the
24  claim that you had a hostile work environment.
25          MR. HARZ:  And if it's some of the

Page 91

1  things she's said, as well, she can repeat them.
2      A.   Ms. Martin would point to people and
3  say, "She walks like a dike," or she is -- "Or look
4  at this, he has mannerisms of a fag.  I don't care
5  why people just can't act straight."  She actually
6  pointedly said to me, "You know, they could look
7  like you."
8      Q.   Anything else that you feel created a
9  hostile environment for you?
10      A.   Yes.  The continuous derogatory
11  comments calling people "fag," "lesbian."
12      Q.   Other than her comments, did she do
13  anything to create a hostile environment?
14      A.   Yes, she spoke to other employees
15  about those things and tried to create --
16      Q.   About you?
17      A.   No, about other people.
18      Q.   But not about you?
19      A.   I don't know.  They didn't tell me.
20      Q.   All I'm asking is a hostile
21  environment about you --
22      A.   No.
23      Q.   -- in terms of her creating a hostile
24  environment or anyone creating a hostile environment
25  about you which you contend involved your sexual

Page 92

1  orientation.
2      A.   No.
3      Q.   Did anyone ever make a derogatory
4  statement to you, personally, about your sexual
5  orientation?
6          MR. GRAFF:  Objection.
7      Q.   Answer the question.
8      A.   I'm not sure I understand.
9          MR. HARZ:  Read back the question,
10  please.
11      A.   No, you're going to have to say it
12  another way.  I don't understand.
13      Q.   Well, we'll read back the question
14  and then we'll go from there.
15          (The last question is read by the
16          Reporter.)
17      A.   No, to me directly, no.
18      Q.   Did anyone ever make a derogatory
19  statement to you about your gender?
20      A.   Yes.
21      Q.   Who?  Your "gender" meaning male,
22  female.
23      A.   The sales staff, Ms. Thorpe, Lisa,
24  and Ms. Dominquez, Ms. Ricciardi.
25      Q.   About your gender?

Page 93

1      A.   Yes, "bitch," that's about my gender.
2      Q.   Other than "bitch," did anyone --
3      A.   "Cunt."
4      Q.   -- make any derogatory statements?
5  And who said "bitch" to you?
6      A.   Both Ms. Thorpe -- all three, Ms.
7  Thorpe, Ms. Martin, Ms. Dominquez, not Ms.
8  Ricciardi.
9      Q.   Any other supervisors in addition to
10  Mr. Martin?
11      A.   To me directly, no.
12      Q.   And "cunt"?
13      A.   Ms. Martin.
14      Q.   To you?
15      A.   Uh-huh.
16      Q.   And any other supervisors in addition
17  to Ms. Martin?
18      A.   No.
19      Q.   Any other derogatory statements made
20  to you about your gender?
21      A.   No.
22      Q.   Did you ever complain to anyone about
23  alleged harassment?
24      A.   Yes.
25      Q.   To whom?

Page 94

```
 1        A.   Mr. Nunez.
 2        Q.   What's Mr. Nunez's position?
 3        A.   He's the sales manager -- was the
 4   sales manager. I don't know if that's his title
 5   now.
 6        Q.   Did you report to Mr. Nunez?
 7        A.   No, I was talking about his staff
 8   actually --
 9        Q.   Just answer my question yes or no.
10   Did you report to Mr. Nunez?
11        A.   No.
12        Q.   Did anyone you report to report to
13   Mr. Nunez?
14        A.   No.
15        Q.   He was the only one you complained
16   to?
17        A.   It was about his staff, yes.
18        Q.   Again, I asked you if you ever
19   complained to anyone about alleged harassment. You
20   said Mr. Nunez.
21        A.   Yes.
22        Q.   Did you ever complain to anyone else
23   about alleged harassment?
24        A.   Ms. Martin.
25        Q.   Did you ever complain to anyone else?
```

Page 95

```
 1        A.   Ms. Thorpe.
 2        Q.   Who's the supervisor?
 3        A.   You just said did I complain to
 4   anyone else.
 5        Q.   Are you going to argue with me now
 6   about my questions?
 7             MR. HARZ: Please read my question
 8   back.
 9             (The Reporter reads the following:
10             "QUESTION: Did you ever complain to
11   anyone else about alleged harassment?")
12        Q.   Did you complain to anyone else who's
13   a supervisor about alleged harassment?
14        A.   No, Ms. Martin, that's it.
15        Q.   Let's turn to your Third Cause of
16   Action in your complaint, please, in Perez
17   Exhibit 7. In your Third Cause of Action you allege
18   that you've been retaliated against in violation of
19   the New Jersey law against discrimination; is that
20   correct?
21        A.   Yes.
22        Q.   Is this claim essentially the same as
23   your retaliation claim in Section 1981 we already
24   discussed?
25             MR. GRAFF: Object, that calls for a
```

Page 96

```
 1   legal conclusion.
 2        A.   I don't know.
 3        Q.   Well, do you have any additional
 4   facts other than what we've already discussed to
 5   support your retaliation claim under the New Jersey
 6   law against discrimination?
 7             MR. GRAFF: Same objection.
 8        A.   I don't know. I'd refer to my
 9   attorney.
10        Q.   No, you can't refer to your attorney.
11   I'm asking you if you have any our facts other than
12   what we've already discussed to support your claim
13   for retaliation under --
14        A.   I wouldn't know, sir, I'm not legally
15   inclined.
16        Q.   It has nothing to do with a legal
17   issue, it has to do with facts. I'll ask my
18   question again. Other than the facts we discussed
19   with regard to your claim under Section 1981, do you
20   have any other facts to support your claim for
21   retaliation under the New Jersey law against
22   discrimination --
23        A.   I would not know --
24        Q.   -- or are they the same facts?
25        A.   -- because I don't know what the
```

Page 97

```
 1   definition encompasses. I would not be able to
 2   properly answer that question, sir. I do not know.
 3        Q.   You read your complaint, correct?
 4        A.   That is my answer, sir.
 5             MR. GRAFF: He's asking a new
 6   question.
 7        A.   I read the complaint.
 8        Q.   And you don't know?
 9        A.   I would not know. That's why I refer
10   to my counsel for that.
11        Q.   Thank you.
12   You read this complaint before you filed
13   with it with the Court?
14        A.   I did.
15        Q.   Is the complaint accurate?
16        A.   Yes.
17        Q.   Does it state all of the things you
18   believe the named defendants did that were improper?
19             MR. GRAFF: Objection.
20        A.   To the extent that my attorney feels
21   is appropriate.
22        Q.   No, no, I'm asking you the question.
23        A.   I would not know, sir, I'm not an
24   attorney.
25        Q.   Let me ask you a question. You have
```

## Page 106

1    Q.    Any other way that you're suffering
2  emotional pain and suffering?
3    A.    Yes, I had to remove my -- I don't
4  sleep.
5    Q.    You never sleep?
6    A.    No, it's impossible.
7    Q.    You said you don't sleep.
8    A.    I wake a lot. It's difficult to get
9  to sleep. I'll sleep two hours in an evening.
10     Panic attacks come and go. There's moments
11 that I feel like I'm going to be confronted with
12 something I can't handle, a bill that I can't pay,
13 hospitalization, whatever it is, a full-on panic
14 attack. I thought it was a heart attack, actually.
15 I went to the hospital.
16    Q.    But you weren't diagnosed with a
17 heart attack, were you?
18    A.    No, I was diagnosed with --
19    Q.    Thank you.
20    A.    -- a panic disorder.
21    Q.    Please, just answer my questions.
22 You weren't diagnosed with a heart attack, were you?
23    A.    No.
24    Q.    Thank you. Anxiety?
25    A.    Yes.

## Page 107

1    Q.    How does it manifest itself?
2        MR. GRAFF: Are you asking apart from
3  what she has testified to in the last few minutes?
4        MR. HARZ: Yes.
5    A.    How does it manifest? For instance,
6  while I was at Ashley Furniture and just after the
7  argument with Ms. Ricciardi, where there was back
8  and forth, cursing and derogatory names and all of
9  this, I had to leave the room. And it started with
10 shakes, it felt like I couldn't breathe, vision
11 tunneled, I sweat, my hands sweat, I can't speak.
12    Q.    All from your argument with Ms.
13 Ricciardi?
14    A.    No, not all from that. It
15 culminates.
16    Q.    What culminates?
17    A.    All of the things that are happening.
18 So, you know, you hear someone say the word
19 "nigger," call someone a "fag," and you try to
20 correct it, and then you're corrected to try to
21 help, you know, relieve --
22    Q.    But you didn't complain to any higher
23 up?
24    A.    I did, Ms. Martin.
25    Q.    You didn't complain to anyone over

## Page 108

1  Ms. Martin, did you?
2    A.    I was only required to report to Ms.
3  Martin.
4    Q.    No, please don't tell me what you
5  think the rules are. My question is --
6    A.    I don't think those are the rules.
7  Those were the rules I was given, sir.
8    Q.    Excuse me.
9    A.    And no, I did not report --
10    Q.    Excuse me.
11    A.    -- to anyone else.
12    Q.    Excuse me. I'll ask the questions,
13 you please give me the answers.
14    A.    I was answering you.
15    Q.    Please give me the answers. You
16 didn't complain to anyone who was over Ms. Martin at
17 Ashley; isn't that correct?
18    A.    I need five minutes.
19    Q.    Please answer my question, and then
20 you'll --
21    A.    I didn't even hear you. I need five
22 minutes.
23    Q.    Please answer my question. You did
24 not complain to anyone over Ms. Martin at Ashley;
25 isn't that correct?

## Page 109

1        MR. GRAFF: Just answer it yes or no.
2        THE WITNESS: I didn't even hear what
3  he's saying. I need to go to the bathroom.
4    Q.    Please answer my question.
5        MR. GRAFF: For the record, the
6  witness is acting very distraught, she's crying and
7  upset.
8        MR. HARZ: We'll give her a few
9  minutes.
10        MR. GRAFF: Thank you.
11        (At this point in the proceedings,
12     a brief recess is taken.)
13    Q.    The standing question, Ms. Perez, is:
14 Did you ever complain to a supervisor over Ms.
15 Martin at Ashley?
16    A.    No.
17    Q.    Thank you. Did you ever consult with
18 a healthcare provider about your symptoms?
19    A.    Yes.
20    Q.    A medical doctor?
21    A.    Yes.
22    Q.    Can I have the name of the medical
23 doctor?
24    A.    Sure, Dr. Luke Eyerman, and I went
25 to --